**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** <br> **Applicant,** <br> **-against-** <br> **INSTITUTIONAL SHAREHOLDER SERVICES, INC.,** <br> **Respondent.** | : | **MC. No.** |

**SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR AN ORDER TO SHOW CAUSE AND FOR AN ORDER COMPELLING COMPLIANCE WITH ADMINISTRATIVE SUBPOENA**

John V. Donnelly III, Esq.
Gregory Bockin, Esq.
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
Email: DonnellyJ@sec.gov

Counsel for Applicant/Petitioner

Dated: September 4, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iv

FACTS ........ 2

I. ISS Is A Proxy Adviser Registered With, And Regulated By, The SEC ........ 2

A. ISS Owes Fiduciary Duties To Its Clients ........ 3

B. ISS Provides Recommendation and Vote Execution Services To Clients Through ProxyExchange ........ 5

II. The SEC Examination Of ISS ........ 7

III. The SEC's Division Of Enforcement Opens An Inquiry Into ISS's Failure To Produce The Requested Information ........ 9

A. The SEC Issues A Formal Order Of Investigation ........ 10

B. The SEC's Enforcement Division Issues A Narrowly Tailored Investigative Subpoena ........ 10

IV. ISS Refuses To Comply With The Subpoena ........ 11

V. The SEC Explains Why ISS's Objections Are Meritless And Proposes A Compromise ........ 13

VI. ISS Rejects The Proposed Compromise ........ 13

ARGUMENT ........ 14

I. Legal Standard ........ 14

II. The SEC's Investigative Subpoena Satisfies The Standard For Enforcement ........ 16

A. The Subpoena Is Within The SEC'S Authority ........ 16

B. The Information Sought Is Relevant To The SEC's Examination And Investigation ........ 17

C. The SEC's Demand Is Neither Unreasonably Broad Nor Burdensome. ..........18

III. ISS's Putative Reasons For Refusing To Produce The Documents Are Meritless, And ISS Cannot Satisfy Its Heavy Burden Of Showing That The Subpoena Is Unreasonable ..........18

A. Confidentiality Concerns Do Not Relieve ISS Of Its Production Obligation ..........18

B. ISS's First Amendment Objection Is Misguided Because The SEC Is Performing Its Legitimate, Regulatory Duties ..........21

CONCLUSION ..........23

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Boy Scouts of Am. v. Dale*,
530 U.S. 640 (2000) ....................23

*Dresser Industries, Inc. v. United States*,
596 F.2d 1231 (5th Cir. 1979) ....................15

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
146 S. Ct. 1114 (2026).................... 23

*Inst. Shareholder Servs., Inc. v. Paxton*,
No. 25-cv-01160 (W.D. Tex.) ....................1, 21

*NAACP v. Button*,
371 U.S. 415 (1963) ....................23

*Perry v. Sindermann*,
408 U.S. 593 (1972) ....................22

*Pickel v. United States*,
746 F.2d 176 (3d Cir. 1984) ....................15, 16

*RNR Enterprises, Inc. v. SEC*,
122 F.3d 93 (2d Cir. 1997) ....................14

*SEC v. Barr Financial Group, Inc.*,
No. 98-1806, 1999 WL 1209520 (M.D. Fla. May 5, 1999) ....................17

*SEC v. Brigadoon Scotch Dist. Co.*,
480 F.2d 1047 (2d Cir. 1973) ....................15

*SEC v. Capital Gains Research Bureau, Inc.*,
375 U.S. 180 (1963) ....................4

*SEC v. Dresser Industries, Inc.*,
628 F.2d 1368 (D.C. Cir. 1980) ....................16, 17

*SEC v. Howatt*,
525 F.2d 226 (1st Cir. 1975) ....................15

*SEC v. J.W. Korth & Co.*,
991 F. Supp. 1468 (S.D. Fla. 1998) ....................16

*SEC v. Jerry T. O'Brien, Inc.*,
467 U.S. 735 (1984) ....................16, 19

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
648 F.2d 118 (3d Cir. 1981) ....................15

*United States v. Garden State National Bank*,
607 F.2d 61 (3d Cir. 1979) ....................16

*United States v. LaSalle Nat'l Bank*,
437 U.S. 298 (1978) ....................15

*United States v. O'Brien*,
391 U.S. 367 (1968) ....................22, 23

*United States v. Powell*,
379 U.S. 48 (1964) ....................14, 15

*United States v. Westinghouse Elec. Corp.*,
788 F.2d 164 (3d Cir. 1986) ....................14, 15

**Statutes**

5 U.S.C. § 552 ....................20

5 U.S.C. § 552(b)(4) ....................20

5 U.S.C. § 552a ....................20

15 U.S.C. § 77s(b) ....................16

15 U.S.C. § 78c(a)(37) ....................4

15 U.S.C. § 78u(a) ....................16, 17

15 U.S.C. § 78u(b) ....................16, 17

15 U.S.C. § 80b-4 .................... 4, 10

15 U.S.C. § 80b-6 ....................4, 10

15 U.S.C. § 80b-9 ....................4

**Regulations**

17 C.F.R. § 200.83 ....................................................................................................20

17 C.F.R. § 204-2 ....................................................................................................4, 10

17 C.F.R. § 249.326 ....................................................................................................6

17 C.F.R. § 274.129 ....................................................................................................6

17 C.F.R. § 275.204-2 ....................................................................................................4, 10, 17

17 C.F.R. § 275.206(4)-8 ....................................................................................................10

**Other Authorities**

*Commission Interpretation Regarding Standard of Conduct for Investment Advisers*,
84 Fed. Reg. 33,669 (July 12, 2019)....................................................................................................3

Exec. Order No. 14,366, 90 Fed. Reg. 58503 (Dec. 11, 2025) ........................................13, 21, 22

This matter arises because Institutional Shareholder Services, Inc. ("ISS") first refused to comply with routine requests from the Division of Examinations of the Securities and Exchange Commission ("SEC" or "Commission") and now continues to refuse to fully comply with an administrative subpoena issued by the SEC's Division of Enforcement. ISS's refusal to produce the required records to examinations and now enforcement staff has impeded the SEC from advancing its mission and satisfying its statutory oversight and investor protection obligations. The subpoena seeks documents highly relevant to its investigation of ISS's compliance with the federal securities laws. Accordingly, the SEC requests that the Court enter an order to show cause why an order should not issue compelling ISS to comply with the SEC's lawfully issued subpoena.

ISS provides investment advice to clients, including recommendations on how those clients should vote their shares during votes on matters presented for shareholder approval at shareholder meetings, such as board elections and shareholder proposals. ISS owes a fiduciary duty to provide advice that is in the best interest of its clients. The Commission is investigating, among other things, whether ISS is operating consistent with that duty. The request at issue calls for the production of information from ISS's database regarding its voting recommendations to its clients and the votes entered for those clients.

ISS admits that it is subject to SEC oversight and regulation and has touted the SEC's oversight as a sword against states' attempts to regulate its proxy advisory business. *See, e.g.*, *Inst. Shareholder Servs., Inc. v. Paxton*, No. 25-cv-01160 (W.D. Tex.), ECF 1 (Complaint), at ¶ 22. Since 1997, ISS has been registered with the Commission as an investment adviser under the Investment Advisers Act of 1940 ("Advisers Act"). Part of the SEC's oversight entails determining whether ISS is complying with the federal securities laws, including whether ISS is operating consistent with its fiduciary duty to act in its clients' best interests.

However, the Commission cannot assess whether ISS is acting in a particular client's best interests because ISS refuses to identify how it voted for each client. This information goes to the core of the services—the advice—ISS provides to its clients and to whether it has met its fiduciary duties to those clients. For example, client information is necessary to determine whether ISS voted in accordance with client instructions and profiles. Reviewing client data is also necessary for assessing whether ISS is adhering to its recordkeeping obligations under the federal securities laws. Nevertheless, ISS has resisted producing relevant records that ISS concedes are within its possession and responsive to the SEC's request.

The SEC's exercise of its oversight—examining the contents and client-specific application of ISS's recommendations—is a necessary part of investor protection. And as explained further below, while ISS's rationales for refusing to produce the materials have changed over time, each remains meritless. Because the SEC's subpoena requests information relevant to the SEC's investigation, the Court should enforce the subpoena and require ISS to produce the documents.

## FACTS

### I. ISS Is A Proxy Advisor Registered With, And Regulated By, The SEC

ISS is a Delaware corporation with its principal place of business in Rockville, Maryland. ISS is a wholly owned subsidiary of the German company Deutsche Börse AG. ISS is registered as an investment adviser with the Commission under the Advisers Act.

ISS provides proxy voting and other advice to institutional clients. The proxy voting process is the principal means through which shareholders of public companies vote on matters that are presented for shareholder approval. These matters include, for example, board of directors elections, shareholder or board proposals, approval of executive compensation plans, approval of

mergers or other business combinations, and any other matters requiring a shareholder vote. Public companies seeking shareholder approval of these matters must prepare and furnish proxy statements with information material to the shareholders' voting decisions on the matters as well as proxy cards that authorize a designated person to vote their shares on their behalf at the shareholder meeting.

In the U.S. securities markets, vast amounts of shares of public companies are held by large institutional investors such as pension funds, mutual funds, exchange-traded funds, hedge funds, and other institutional asset managers. To assist these institutional investors in voting proxies on myriad corporate matters involving potentially thousands of public companies, proxy advisory firms such as ISS offer research, recommendations, vote execution, recordkeeping, and reporting services. Given the importance of proxy voting to the functioning of U.S. securities markets and the economic well-being of investors in U.S. markets, the SEC, under multiple Presidential administrations, has devoted attention to executing its statutory function to regulate proxy voting, enhance transparency in proxy voting, and ensure that proxy advisors render advice that is free of undisclosed material conflicts of interests and consistent with proxy advisors' fiduciary duties.

**A. ISS Owes Fiduciary Duties To Its Clients**

In the United States, all investment advisers owe their clients fiduciary duties of care and loyalty. The investment adviser "must, at all times, serve the best interest of its client and not subordinate its client's interest to its own." *See* Declaration of Brendan P. McGlynn in Support of SEC's Application for an Order to Show Cause and An Order Compelling Compliance with An Administrative Subpoena ("McGlynn Dec."), Sept. 4, 2026, filed herewith, ¶ 7, Ex. 2, attaching true and correct copy of Commission Interpretation Regarding Standard of Conduct for Investment Advisers, 84 FR 33669, 33671 (July 12, 2019). The duty of care requires an investment adviser "to provide investment advice in the best interest of its client, based on the client's objectives." *Id.* The

duty of loyalty requires an adviser to "eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.*; *see also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186-95 (1963). Additionally, Section 206 of the Advisers Act prohibits certain deceptive or fraudulent conduct by investment advisers. 15 U.S.C § 80b-6.

SEC-registered investment advisers, such as ISS, are also subject to the books and records, examination, and other compliance-related provisions of the Advisers Act. Under Section 204(a) of the Advisers Act and Rule 204-2 thereunder, registered investment advisers are required to make and keep records relating to their advisory business. 15 U.S.C § 80b-4(a); 17 C.F.R. § 275.204-2. The Advisers Act defines the term "records" to mean "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language." 15 U.S.C §§ 80b-4(a), 78c(a)(37). Such records are "subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deems necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80b-4(a).

In addition to the examination authority set forth in Section 204(a), Section 209(a) of the Advisers Act authorizes the Commission to investigate violations of the Advisers Act or any rule thereunder, including any potential breaches of an investment adviser's fiduciary duties. 15 U.S.C. § 80b-9(a). Under Section 209(b), the Commission may issue subpoenas and "require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records which are relevant or material" to the Commission's investigation. 15 U.S.C. § 80b-9(b).

ISS has been subject to examinations by the Commission. For example, the staff of the Commission's Division of Examinations conducted examinations of ISS that began in March 2006, February 2012, July 2015, July 2022, and (as relevant to this Application), March 2026. Excluding the March 2026 examination, which is ongoing, the Commission identified deficiencies in ISS's compliance with the Advisers Act in each of these examinations.

### B. ISS Provides Recommendation And Vote Execution Services To Clients Through ProxyExchange

In the United States, ISS and one other company provide nearly all proxy advisory services to institutional investors. ISS's clients are primarily institutions, typically other investment advisers to institutional investors such as SEC-registered investment companies (*e.g.*, mutual funds), SEC-registered broker-dealers, pension funds, banks, hedge funds, and other asset management firms. *See* McGlynn Dec. ¶ 6, Ex. 1, attaching true and correct copy of ISS Form ADV Part 2 Brochure (Mar. 31, 2026), available at https://adviserinfo.sec.gov/firm/summary/111940, at 9.

ISS provides advisory services through two primary business lines: "ISS Governance Solutions" and "ISS Sustainability Solutions." *Id.* at 5-8. ISS Governance Solutions includes the provision of ISS's voting recommendations and vote execution services to clients. ISS offers Governance clients three types of recommendation voting policies: (1) the "Benchmark" policy, which ISS develops based on its own analysis and criteria and publicly discloses; (2) various thematic "Specialty" policies that ISS publicly discloses and develops based on different perspectives, for example sustainability, climate, and Catholic faith-based policies; and (3) "Custom" policies, which ISS's clients "develop in-house" reflecting their "specific approaches to proxy voting" and which are not publicly disclosed. *Id.* at 6-7. ISS has publicly stated that "[a]pproximately 90% of voted shares processed by ISS globally are tied to voting policies customized by the investor." *See* https://www.protectshareholders.com/facts, last accessed

September 2, 2026 (website established by ISS and for which ISS is responsible for editorial and content approval). ISS Governance Solutions also offers a "Vote Disclosure Service" that assists numerous clients, including registered investment companies and certain other institutional investment managers, with their obligations to disclose certain proxy vote history information publicly on SEC Form N-PX. *See* McGlynn Dec. ¶ 6, Ex. 1 at 7; *see also* 17 C.F.R. § 249.326; 17 C.F.R. § 274.129. ISS Sustainability Solutions includes a variety of advisory services that assist clients with identifying and managing their environmental, social, and governance (colloquially known as "ESG") preferences, among other matters. *See* McGlynn Dec. ¶ 6, Ex. 1 at 7-8. This Application arises from Commission requests for data concerning ISS's Governance Solutions business line only.

For ISS Governance Solutions clients, ISS offers a web-based application known as ProxyExchange that is a primary interface through which ISS provides its advisory services. According to ISS, ProxyExchange "provides clients with end-to-end management of their proxy voting process." *Id.* at 7. Through ProxyExchange, ISS communicates recommendations to clients, receives and executes client vote instructions and manages clients' vote policies, and facilitates the recordkeeping and reporting needs of ISS's clients, which include registered investment advisers subject to the same recordkeeping obligations as ISS as well as registered investment companies and other institutional clients required to publicly report certain proxy vote information on SEC Form N-PX. *See id.*

ISS also purports to disclose conflicts of interest to clients through ProxyExchange. *Id.* at 14. According to ISS's public disclosures, such conflicts of interest may arise from, among other things, an ISS affiliate's provision of consulting services to public issuers whose matters are subject to shareholder votes analyzed by the ISS Governance Solutions. *Id.* ISS also states that conflicts

may arise based on ISS's advisory relationships with corporate issuers or their affiliates or with entities that make shareholder proposals, as well as from ISS's relationship with its parent company, which is a publicly traded company in Germany. *Id.* at 15.

## II. The SEC Examination Of ISS

In March 2026, staff from the SEC's Division of Examinations in the Philadelphia Regional Office initiated an examination of ISS. *See* McGlynn Dec. ¶ 8. The SEC Division of Examinations conducts on-site examinations of various registrants. Examiners evaluate "whether firms are conducting activities in accordance with the federal securities laws and related rules, adhering to disclosures made to customers and the general public, and implementing supervisory systems or policies and procedures that are reasonably designed to ensure compliance with applicable legal requirements." *See* https://www.sec.gov/about/divisions-offices/division-examinations, last accessed Sept. 2, 2026.

The Division of Examinations routinely obtains client information during examinations to ensure that registrants are complying with the federal securities laws, including to determine whether investment advisers are acting in the best interests of specific clients. This includes reviewing recommendations to clients, sources of revenues, expenses, client agreements and disclosures, and other information relevant to assessing conflicts of interest and potential breaches of fiduciary duties. Likewise, the Division of Examinations obtains and reviews client profiles and communications to evaluate whether investment advisers are acting with care and in accordance with instructions. A proxy advisor could violate its obligations under the securities laws by, for example, providing voter recommendations that advance its own interests over those of its clients or failing to vote client shares in accordance with the client's preferences.

As it does with a host of registrants, and as it has done previously with ISS, the SEC

examination team visited ISS's facility, met with ISS personnel, and requested information and documents to conduct its examination and evaluate ISS's compliance with the federal securities laws. Among other things, the SEC examination team requested that ISS produce data relating to proxy recommendations and votes—the core of ISS's business—including information like the names of clients who received proxy recommendations and information about votes cast on their behalf, and requested that the information, which ISS maintains in its ProxyExchange system, be produced in Excel format. ISS informed the SEC examination team that ISS can query its ProxyExchange system to create reports with this information, though ISS does not maintain a central depository of such reports. *See* McGlynn Dec., ¶ 11, Ex. 5, attaching true and correct copy of Letter from Mari-Anne Pisarri, Esq to Associate Director Mark Dowdell, June 29, 2026. Initially, ISS contended it would be unduly burdensome to provide those records and, instead, offered to produce three samples. *Id*. at 1. The SEC examination team agreed to review samples of data from reports created from the ProxyExchange system for three of ISS's clients to determine the scope of the information available, with the understanding that if the information was sufficient, the SEC would require reports for more clients.

On April 27, 2026, ISS produced sample reports for three clients. After reviewing the information and discussing with ISS, during the week of May 4, 2026, the SEC examination team confirmed to ISS that the three sample reports contained the requested information for those clients and requested that ISS provide similar reports for all clients from July 1, 2024 through February 28, 2026. *See* McGlynn Dec., ¶ 10, Ex. 4, attaching true and correct copy of Letter from Associate Director Mark Dowdell to Mari-Anne Pisarri, Esq, June 24, 2026. Between May 4, 2026 and the end of June, the SEC examination team followed up with ISS and its counsel at least nine times. *Id*. ISS failed to produce the requested information notwithstanding that it is in the firm's possession,

custody, and control, claiming that it was too burdensome and that ISS was not required to "create" documents.

## III. The SEC's Division Of Enforcement Opens An Inquiry Into ISS's Failure To Produce The Requested Information

On July 6, 2026, SEC Division of Enforcement staff from the Philadelphia Regional Office notified ISS's counsel that the Division of Enforcement had opened an inquiry into ISS's failure to produce the information requested by the SEC's examination team. *See* McGlynn Dec. ¶ 12. During subsequent telephonic and written communications between ISS's counsel and the Division of Enforcement investigative staff between July 7 and July 16, ISS continued to refuse to produce the requested information, arguing at the time that providing the information would be tantamount to creating a "new record." *See* McGlynn Dec. ¶ 13.

The sample reports make clear that ISS can conveniently produce the requested data in a useable format that is acceptable to the SEC. In one letter, ISS's counsel stated that ISS had offered to create and supply an expanded sample of ProxyExchange reports but was confused about whether the SEC sought similar reports for all clients. *See* McGlynn Dec., ¶ 11, Ex. 5. As the examination team had previously informed ISS, the enforcement team confirmed that the SEC required ProxyExchange data for all clients with the same fields and formatting as the sample reports previously provided by ISS. *See* McGlynn Dec., ¶ 10, Ex. 4. However, ISS refused to produce further ProxyExchange data in electronic format, and instead sought to produce less data in hard copy, rather than Excel, and permit "onsite inspection" of the data.[1] *See, e.g.*, McGlynn Dec. ¶ 13, Ex. 6, attaching true and copy of Letter from Mari-Anne Pisarri, Esq to Kevin Levenberg, Esq., July 10, 2026, and Ex. 7, attaching true and correct copy of Letter from

[1] Producing this volume of data in hard copy, rather than electronically as it is maintained by ISS, would delay production, increase costs, and render the data effectively useless.

Mari-Anne Pisarri, Esq to Kevin Levenberg, Esq., July 15, 2026. The SEC responded that ISS' new offer was unworkable and entirely inconsistent with the nature and scale of ISS's business. *See* McGlynn Dec., Ex. 8, attaching true and correct copy of Letter from Kevin Levenberg, Esq. to Mari-Anne Pisarri, Esq., July 16, 2026.

**A. The SEC Issues A Formal Order Of Investigation**

On July 20, 2026, upon recommendation of the Division of Enforcement, the SEC issued a formal order of investigation ("Formal Order"). The Formal Order provides that, pursuant to Section 209(a) of the Advisers Act, a private investigation be made to determine whether ISS, or any persons or entities affiliated with ISS, have engaged in, or are about to engage in, acts or practices that may possibly violate Sections 204, 206(1), 206(2), and 206(4) of the Advisers Act and Rules 204-2 and 206(4)-8 thereunder.[2] *See* 15 U.S.C. §§ 80b-4, 80b-6; 17 C.F.R. §§ 275.204-2, 275.206(4)-8. Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder prohibit investment advisers from committing fraudulent acts on their investment advisory clients, including breaches of fiduciary duty, or investors in pooled investment vehicles. *See* 15 U.S.C. § 80b-6; 17 C.F.R. § 275.206(4)-8. Section 204 of the Advisers Act and Rule 204-2 thereunder, among other things, require investment advisers to maintain certain records and to produce those records and other documents to the Commission upon request. 15 U.S.C. § 80b-4; 17 C.F.R. § 275.204-2.

**B. The SEC's Enforcement Division Issues A Narrowly Tailored Investigative Subpoena**

Pursuant to the authority granted by the Formal Order, on July 21, 2026, the Commission served an investigative subpoena on ISS. *See* McGlynn Dec. ¶ 15, Ex. 9, attaching a true and

[2] Because formal orders of investigation are typically non-public, we do not attach the Formal Order here; however, a copy has been provided to counsel for ISS and can be filed with the Court under seal, if requested.

correct copy of the subpoena. The subpoena directed ISS to produce three categories of documents relevant to the Division of Enforcement's investigation: (1) documents sufficient to identify ISS's clients during a four-year period; (2) vote authorization registration agreements and any modifications, renewals, or terminations of those agreements[3]; and (3) an electronic export of ProxyExchange recommendation and voting data for a four-year period, including the data fields included in the three sample reports previously produced. ISS was required to produce the documents by August 4, 2026. At ISS's request, the SEC agreed to an extension to August 11, 2026, and represented that it was amenable to affording ISS additional time to produce documents on a rolling basis. *See* McGlynn Dec., ¶ 16; Ex. 10, attaching a true and correct copy of Letter from Kevin Levenberg to Paul Bazil, Esq., Aug. 4, 2026.

## IV. ISS Refuses To Comply With The Subpoena

Prior to the due date, ISS substituted counsel from Hogan Lovells Cadwalader US LLC for its prior counsel to respond to the subpoena. ISS agreed to produce documents in response to Requests 1 and 2 of the subpoena, which called for documents sufficient to identify ISS's clients during a four-year period and vote authorization registration agreements and any modifications, renewals, or terminations of those agreements. However, ISS declined to produce the documents in Request 3 in the form of the samples already provided by ISS. Instead, ISS proposed "anonymizing" the records before production, which counsel conveyed ISS could readily

---

[3] Vote authorization registration agreements set forth clients' instructions as to when and how ISS will execute proxy votes on clients' behalf. ISS offers two vote execution options to clients, "Implied Consent" and "Mandatory Signoff." If a client elects "Implied Consent" in a vote authorization registration agreement, ISS agrees to execute votes in accordance with ISS's recommendations to the client—without further action by the client—with the client retaining the ability to override the recommendation, in which case the vote authorization registration agreements instruct the client to "utilize the ProxyExchange platform to communicate your override." If a client elects "Mandatory Signoff," ISS states in vote authorization registration agreements that it will not process any proxy votes on behalf of the client "without first receiving your specific instruction via ProxyExchange." In addition to the foregoing, vote authorization registration agreements set forth client instructions and preferences for ISS's vote executions under various specific circumstances.

achieve. SEC counsel expressed concern that the proposed approach would prevent the SEC from being able to properly evaluate the data but agreed to consider the proposal and confer further with ISS counsel. ISS subsequently proposed sending the SEC the same three samples that ISS had previously provided, but in the anonymized format ISS was proposing. But ISS later advised the SEC that ISS could not and would not produce the samples it had suggested. ISS explained that, given the detail of ProxyExchange data and the breadth of ISS's confidentiality concerns, ISS required the assistance of a third-party expert "data cruncher" to review the data, identify all fields that may tend to identify any aspect of a direct ISS client or a "downstream" client of ISS's client, and devise a methodology to reformulate ProxyExchange data to conceal all client identifiers. *See* McGlynn Dec. ¶ 17-18. ISS proposed retaining this expert to completely "anonymize" the data, but ISS provided no timeframe for completing that task or indication of what the output of the expert's analysis might be. SEC counsel expressed serious reservations with ISS's proposal and requested that ISS provide further information regarding its rationale for seeking to anonymize ProxyExchange data.

In response to this request, on August 24, 2026, ISS sent a letter setting forth "principal categories" of objections to the production of ProxyExchange data. *See* McGlynn Dec. ¶ 19, Ex. 11, attaching true and correct copy of Letter from Douglas A. Fellman, Esq. to Kevin E. Levenberg, Esq., Aug. 24, 2026, at 1. The first objection, ISS explained, related to the "high level of sensitivity associated with the requested information," including ISS's "voting recommendations under ISS'[s] and clients' custom policies" and "data on how ISS'[s] clients have voted their shares." *Id.* ISS stated that its clients "share their confidential voting strategies, priorities, and voting decisions with ISS with an expectation of confidentiality, just as American voters cast their ballots in the privacy of voting booths. . . ." *Id.* at 2. ISS further claimed that its

clients may suffer competitive harm from "disclosure of the data at issue." *Id.* ISS's second objection was "based on the First Amendment rights of ISS and its clients." *Id.* ISS cited the President's December 11, 2025 Executive Order 14366 concerning proxy advisors[4] and expressed "concern[s] that the Subpoena, and Request 3 in particular, poses an unlawful effort to subject ISS to retaliatory actions for having engaged in protected speech." *Id.* at 3. Finally, ISS argued disclosure of ProxyExchange data might burden ISS's and its clients' freedom of association because clients could "choose not to associate with ISS" if their voting data were disclosed to the Commission. *Id.* at 4. Instead, ISS reiterated its proposal to retain an expert to completely "anonymize" the data, but ISS again provided no timeframe for completing that task. *Id*.

## V. The SEC Explains Why ISS's Objections Are Meritless And Proposes A Compromise

On September 1, 2026, the SEC responded to ISS's objections and proposed a compromise. *See* McGlynn Dec. ¶ 20 and Ex. 13, attaching true and correct copy of Letter from Kevin E. Levenberg, Esq. to Douglas A. Fellman, Esq., Sept. 1, 2026, at 1-2. SEC counsel explained certain of the Commission's purposes for seeking this data and why ISS's objections were unfounded, including its First Amendment arguments. *Id*. at 1-4.

## VI. ISS Rejects The Proposed Compromise

On September 3, 2026, ISS responded to the SEC and rejected the SEC's proposed

[4] Executive Order 14366 states that ISS and another foreign-owned proxy advisor "control more than 90 percent of the proxy advisor market, [and] advise their clients about how to vote the enormous numbers of shares their clients hold and manage on behalf of millions of Americans in mutual funds and exchange traded funds." *See* McGlynn Dec., ¶ 19, Ex. 12, attaching a true and correct copy of Exec. Order No. 14366, 90 Fed. Reg. 58503 (Dec. 11, 2025). The Executive Order also states that "these proxy advisors wield enormous influence over corporate governance matters, including shareholder proposals, board composition, and executive compensation, as well as the capital markets and the value of American's investments more generally . . . ." *Id.* The Executive Order further provides that the practices of these proxy advisors "raise significant concerns about conflicts of interest and the quality of their recommendations," and therefore, the United States must "increase oversight of and take action to restore public confidence in the proxy advisor industry, including by promoting accountability, transparency, and competition." *Id.*

compromise. *See* McGlynn Dec. ¶ 23, Ex. 15, attaching true and correct copy of Letter from Douglas A. Fellman, Esq. to Kevin E. Levenberg, Esq., Sept. 3, 2026.

* * * * *

More than four months have elapsed since the Exams team's original request, and ISS still has not produced the requested information. During this period, the SEC staff has continuously engaged with ISS in an effort to obtain the data while addressing the ever-evolving "concerns" that ISS has raised then abandoned. ISS has wasted enough time and resources. The SEC makes this Application to compel ISS to produce the requested documents.

## ARGUMENT

The Court should require ISS to produce the requested information. ISS is a registered investment adviser, regulated by the SEC. As a registrant, ISS is subject to SEC oversight and examination to ensure its compliance with applicable laws and regulations. Here, the requested materials are relevant to answer a host of questions about ISS's compliance with the law. For example, does ISS's advice satisfy its fiduciary duties to its clients? Is ISS properly disclosing conflicts of interest to clients? Is ISS correctly and faithfully executing its clients' instructions in voting? Is ISS maintaining appropriate and complete books and records? Without the requested information, including information about who the client is, the SEC—ISS's regulator—cannot do its job of assessing whether ISS is complying with its fiduciary duty to such client.

### I. Legal Standard

The court's role in determining the enforceability of an investigative subpoena is limited. *See United States v. Powell*, 379 U.S. 48, 57-58 (1964) (articulating factors to consider in enforcing IRS summons); *RNR Enterprises, Inc. v. SEC*, 122 F.3d 93, 96 (2d Cir. 1997) (stating that the courts' role in an administrative subpoena enforcement proceeding is "extremely limited") (internal citation omitted). "Courts will enforce a subpoena if: (1) the subpoena is

within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp*., 788 F.2d 164, 166 (3d Cir. 1986) (citing *Powell*, 379 U.S. at 58). If a subpoena is issued for an improper purpose, however, courts will decline to enforce it. *Westinghouse*, 788 F.2d at 166-67; *SEC v. Wheeling-Pittsburgh Steel Corp*., 648 F.2d 118, 124 (3d Cir. 1981) (*en banc*).

The Supreme Court has "recognized the importance of judicial deference to administrative agencies in conducting investigations, and has admonished all federal courts that frequent judicial interference is inappropriate." *Wheeling-Pittsburgh*, 648 F.2d at 124 (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316-17 (1978)). This limited role furthers the important governmental interest in expeditious investigation of possible unlawful activity. Courts have correctly reasoned that the SEC "must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the Commission's regulatory authority." *SEC v. Brigadoon Scotch Dist. Co*., 480 F.2d 1047, 1052-53 (2d Cir. 1973) (quoted in *SEC v. Howatt*, 525 F.2d 226, 230 (1st Cir. 1975)). The Third Circuit has recognized the soundness of the policy of non-interference: "[j]udicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would prove unmanageable and would certainly throw great amounts of sand into the gears of the administrative process." *Wheeling-Pittsburgh*, 648 F.2d at 127 n.12 (quoting *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1235 n.1 (5th Cir. 1979)).

As the party opposing enforcement, ISS bears the burden of showing that the administrative subpoena should not be enforced. *Pickel v. United States*, 746 F.2d 176, 184-85

(3d Cir. 1984) (discussing standard in context of IRS matter). That burden is "'almost insurmountable.'" *Pickel*, 746 F.2d 176, 184-85 (3d Cir. 1984) (quoting *United States v. Garden State National Bank*, 607 F.2d 61, 69 (3d Cir. 1979)).

**II. The SEC's Investigative Subpoena Satisfies The Standard For Enforcement**

The SEC's subpoena more than meets the standard for enforcement by the Court. The subpoena requests three categories of documents for a period of less than four years.

**A. The Subpoena Is Within The SEC's Authority**

The SEC has broad authority to examine registrants and to investigate possible violations of the federal securities laws. The SEC's examination authority is "central to the SEC's execution of its congressionally-mandated regulatory duties." *SEC v. J.W. Korth & Co.*, 991 F. Supp. 1468, 1472 n.5 (S.D. Fla. 1998) (citing, *e.g.*, H.R. Rep. No. 229, 94th Cong., 1st Sess. 119-20 (1975)). The SEC conducts examinations to "determine whether the entity being examined is: conducting its activities in accordance with the federal securities laws and the rules adopted under these laws . . . ; adhering to the disclosures it has made to its clients, customers, the general public, and/or the Commission; and implementing supervisory systems and/or compliance policies and procedures that are reasonably designed to ensure that the entity's operations are in compliance with applicable legal requirements." *See* McGlynn Dec. ¶ 8, Ex. 3, attaching true and correct copy of SEC's Information for Entities Subject to Examination or Inspection by the Securities and Exchange Commission, at 1. Likewise, "Congress has vested the SEC with broad authority to conduct investigations into possible violations of the federal securities laws and to demand production of evidence relevant to such investigations." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 741 (1984) (citing, *e.g.*, 15 U.S.C. § 77s(b), 78u(a), and 78u(b)). For example, the SEC's "investigative authority includes the power to administer oaths and affirmations, subpoena

witnesses, take evidence, and require production of any books, papers, correspondence, memoranda, or other records which the SEC deems relevant or material." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1376 (D.C. Cir. 1980) (citing 15 U.S.C. § 78u(a)-(b)).

Request 3 seeks electronic records ISS maintains pertaining to services ISS provides to its clients. ISS is regulated by the SEC and the inquiry falls squarely within both the SEC's examination and investigative authority.

**B. The Information Sought Is Relevant To the SEC's Examination And Investigation**

The information sought by Request 3 is reasonably relevant to a host of issues germane to both the examination of ISS and the current Enforcement investigation. For example, the ProxyExchange data will show, among other things:

- The advice provided by ISS to its clients and the bases for that advice;
- Whether ISS complied with the voting instructions of its clients;
- Whether ISS properly disclosed potential conflicts to its clients; and
- Whether ISS had maintained accurate books and records.

Registrants like ISS keep and maintain a host of records, and the SEC is entitled to inspect the records to ensure compliance. *See, e.g.*, 17 C.F.R. § 275.204-2(c). *See also SEC v. Barr Financial Group, Inc.*, No. 98-1806, 1999 WL 1209520 (M.D. Fla. May 5, 1999) (granting summary judgment to SEC where an SEC-registered investment adviser had declined to produce certain records, including the release of client information, in response to an SEC examination). These records are relevant to the SEC's examination of whether ISS is complying with the federal securities laws, including its fiduciary duties.

Likewise, the records also fall well within the scope of the SEC's investigation, which relates to potential violations of Sections 204, 206(1), 206(2), and 206(4) of the Advisers Act and

Rules 204-2 and 206(4)-8. Section 204 of the Advisers Act and Rule 204-2 thereunder, among other things, require investment advisers to maintain certain required records and to produce those required records and other documents to the Commission upon request. Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder prohibit investment advisers from committing fraudulent acts on their clients, including breaches of fiduciary duty, or investors in pooled investment vehicles.

### C. The SEC's Demand Is Neither Unreasonably Broad Nor Burdensome

The SEC's demand is neither unreasonably broad nor burdensome. Request 3 is clear and limited to a reasonable period of four years. While ISS at one time contended that it would be unduly burdensome to produce these documents, it has subsequently abandoned that argument. Indeed, ISS's proposal to fully "anonymize" the data via an outside expert would be far more burdensome than complying with the SEC's request to produce the records from the firm's database.

## III. ISS's Putative Reasons For Refusing To Produce The Documents Are Meritless, And ISS Cannot Satisfy Its Heavy Burden Of Showing That The Subpoena Is Unreasonable

For four months, ISS has refused to produce these responsive and plainly relevant business records. ISS contends that it should not be required to produce the records in response to Request 3 because: (1) ISS and its clients view this data as confidential and proprietary; and (2) the First Amendment bars the SEC's inquiry. McGlynn Dec. ¶ 19, Ex. 12. ISS is wrong.

### A. Confidentiality Concerns Do Not Relieve ISS Of Its Production Obligation

ISS first argues that the SEC cannot obtain the requested information because ISS and its clients consider the information confidential and proprietary. *Id*. As an initial matter, that statement of clients' expectations is not accurate. Numerous ISS clients pay ISS to facilitate

required SEC Form N-PX regulatory filings that publicly disclose certain proxy votes, demonstrating one of many differences between proxy votes made by registered investment advisers and the electoral votes of American citizens at the ballot box (a misguided analogy proffered by ISS). Of course, neither ISS nor its clients have any confidentiality interest in materials they have already publicly disclosed. While that voting information is public, Form N-PX does not enable the SEC to evaluate other relevant information, such as whether any of ISS's conflicts of interest impacted its recommendation to clients, whether ISS voted shares correctly and with reasonable care, or whether ISS is complying with its record keeping requirements.

More fundamentally, concerns regarding confidentiality and proprietary information do not permit regulated entities to shield such information from their regulator. *See, e.g.*, *Jerry T. O'Brien, Inc.*, 467 U.S. at 743. "It is established that, when a person communicates information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records thereof to law enforcement authorities." *Id.* In both examinations of registrants and investigations, the SEC constantly deals with large volumes of confidential, sensitive, and client-specific data to effect the SEC's critical investor protection mission. The type of sensitive data regularly obtained by the SEC includes, for example: personal and business financial and tax records; securities positions and trading history from individuals, advisers, and other institutions; material nonpublic information about public issuers; identifying personal information; personal and business communications; and details about familial, business, and personal relationships. Were it otherwise, every regulated entity, including brokerage companies and investment advisers, could decline to provide its records to the SEC and shield themselves from examination of potential violations.

ISS is well-aware of its obligation to provide documents, even sensitive ones, to its

regulator. ISS's privacy notice states that ISS may obtain a wide array of personally identifying information about its clients in connection with ISS's provision of products and services, including financial information such as investments, transaction history, and account information, and that this information may be disclosed to "our regulators (e.g., the United States Securities and Exchange Commission)." *See* McGlynn Dec. ¶ 21, Ex. 14, attaching true and correct copy of ISS Privacy Notice, accessed on Aug. 28, 2026.

Moreover, Congress, and the Commission by rulemaking, have addressed the confidentiality concerns raised by ISS through multiple federal statutes and rules governing the disclosure of information obtained by the Commission, including, for example the Privacy Act of 1974 [5 U.S.C. § 552a], the Freedom of Information Act [5 U.S.C. § 552] ("FOIA"), and 17 C.F.R. § 200.83. For example, Exemption 4 to the Freedom of Information Act protects "commercial or financial information obtained from a person [that] is privileged or confidential." 5 U.S.C. § 552(b)(4). ISS invoked such protections in its August 24, 2026 letter, requesting that the Commission accord confidential treatment to any documents ISS produces. *See* McGlynn Dec. ¶ 19, Ex. 11. ISS cannot argue that those same protections are insufficient to permit production of documents it would prefer not to produce.

During discussions regarding the subpoena, ISS at one time proposed producing anonymized data—but that "solution" cannot substitute for compliance. An anonymized production is materially different information that cannot serve the oversight purposes described above. Reconciling voting recommendations against the client-specific vote authorization registration agreements sought in Request 2, or testing whether recommendations were differentiated among similarly situated clients, is only possible if the voting data can be tied to a specific, identified client. Stripping client identity from the data does not merely inconvenience

the SEC's investigation, it thwarts the investigation's ability to determine whether there were violations of the federal securities laws.

Furthermore, ISS's position is undermined by the position it has taken in its own litigation against the State of Texas. *Inst. Shareholder Servs., Inc. v. Paxton*, No. 25-cv-01160 (W.D. Tex.). There, ISS represented to a federal court that ISS is subject to "a comprehensive regulatory regime under the Advisers Act," which requires "maintaining and regularly testing a comprehensive compliance program, including . . . policies and procedures designed to eliminate or manage and disclose to clients conflicts of interest," as well as "maintaining a comprehensive set of books and records and . . . . submit[ting] to the SEC's periodic examination." *Id.*, ECF 1, Compl. ¶ 22. ISS cannot use the existence of SEC oversight and examination as a sword in state cases, then seek to evade that oversight here when the oversight goes to the core of its business.

**B. ISS's First Amendment Objection Is Misguided Because The SEC Is Performing Its Legitimate, Regulatory Duties**

In its August 24 letter to the SEC, ISS contends that the First Amendment shields it from being examined by its regulator to determine whether it has complied with its obligations as a registered entity. *See* McGlynn Dec. ¶ 19, Ex. 11. ISS is mistaken. Whether or not ISS and the Administration disagree about policy matters does not excuse ISS—a registered investment adviser—from performing its duties, nor does it prevent the SEC—ISS's regulator—from performing its function and examining and investigating ISS's compliance. Accordingly, ISS's retaliation argument fails.

Executive Order 14366 expresses concerns that proxy advisors, including ISS, are using "their substantial power to advance and prioritize radical politically-motivated agendas." *See* McGlynn Dec., ¶ 19, Ex. 12. The Executive Order directs the Chairman of the Securities and Exchange Commission to take certain actions to "analyze," "assess," "examine," and "consider"

various practices of and rules relating to proxy advisors and, if necessary, "enforce the Federal securities laws' anti-fraud provisions[.]" *Id*. That is the fundamental role of a regulator, and ISS's political views do not shield it from examination and analysis as to whether it is complying with its fiduciary duty to its clients or other obligations under the securities laws. It is wholly appropriate for the SEC to look into whether ISS's investment advice to clients on proxy voting is driven by a particular political or policy aim to the detriment of its clients' interests. If it is, then ISS is breaching its fiduciary duties and violating the law. In other words, ISS can hardly point to the Executive Order's concerns about whether ISS's recommendations subordinate clients' interests to ISS's political preferences (and are therefore unlawful), to fend off the SEC's investigation into whether ISS's recommendations are in fact unlawful.

In addition, ISS's contentions do not come close to raising a retaliation claim. Putting aside whether ISS's proxy advice to its clients qualifies as protected speech for purposes of the retaliation doctrine—ISS has not identified any case recognizing a First Amendment retaliation defense in similar circumstances—it is not enough for ISS just to show that its voting advice led to the SEC's inquiry. Instead, ISS must show that it would be improper for the SEC to investigate it in light of that speech. The retaliation doctrine exists to prevent the government from harassing people in unrelated ways because of what they have said. *See, e.g., Perry v. Sindermann*, 408 U.S. 593, 598 (1972) (non-tenured professor might have retaliation claim for retaliatory refusal to renew a contract because of his speech). It does not protect potential wrongdoers from investigation just because their speech itself rightly brought them under suspicion. *See, e.g., United States v. O'Brien*, 391 U.S. 367 (1968) (upholding statute criminalizing the destruction of draft cards even though burning a draft card has an obvious

speech component).[5]

**CONCLUSION**

For all the foregoing reasons, the Court should enter an order to show cause why an order should not issue requiring ISS to comply with the SEC's lawfully issued subpoena, and compel ISS's compliance with the administrative subpoena.

Respectfully submitted,

By s/ John V. Donnelly III
John V. Donnelly III, Esq.
Gregory Bockin, Esq.
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
Email: DonnellyJ@sec.gov

Counsel for Applicant

Dated: September 4, 2026

[5] ISS also claims that responding to Request 3 "would impermissibly burden the freedom of association rights of ISS and its clients." *See* McGlynn Dec. ¶ 19, Ex. 11. Analogizing to a case about whether a pro-life women's center has standing to challenge a subpoena requiring it to disclose its donors, ISS argues that its clients may "choose not to associate with ISS" if ISS discloses its voting recommendations to them. *Id*. (citing *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 146 S. Ct. 1114 (2026)). But ISS is not a crisis pregnancy center, nor is it the NAACP during the Civil Rights Era, *see NAACP v. Button*, 371 U.S. 415 (1963), nor the Boy Scouts fighting for its view of traditional morality, *see Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000). It is a registered investment adviser, paid to provide voting and other advice to clients who are shareholders in public companies in a highly regulated environment. The right to freedom of association cannot possibly preclude the Commission from investigating whether an investment adviser put its own politics ahead of its fiduciary duties.