# EXHIBIT 2

Federal Register / Vol. 84, No. 134 / Friday, July 12, 2019 / Rules and Regulations 33669

162944.pdf ("Parsons Feedback Form"); David Schreiner, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899390-162946.pdf ("Schreiner Feedback Form"); Ron Seits, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899580-162956.pdf ("Seits Feedback Form"); Mark Shaffer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899570-162954.pdf ("Shaffer Feedback Form"); Malia Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899562-162953.pdf ("Starmer1 Feedback Form"); Jason Starmer, 6/18/2018, https://www.sec.gov/comments/s7-08-18/s70818-3899436-162949.pdf ("Starmer2 Feedback Form").

[FR Doc. 2019–12376 Filed 7–11–19; 8:45 am]

**BILLING CODE 8011–01–C**

---

**SECURITIES AND EXCHANGE COMMISSION**

**17 CFR Part 276**

**[Release No. IA–5248; File No. S7–07–18]**

**RIN 3235–AM36**

## Commission Interpretation Regarding Standard of Conduct for Investment Advisers

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the ''SEC'' or the ''Commission'') is publishing an interpretation of the standard of conduct for investment advisers under the Investment Advisers Act of 1940 (the ''Advisers Act'' or the ''Act'').

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** Olawalé Oriola, Senior Counsel; Matthew Cook, Senior Counsel; or Jennifer Songer, Branch Chief, at (202) 551–6787 or *IArules@sec.gov,* Investment Adviser Regulation Office, Division of Investment Management, Securities and Exchange Commission, 100 F Street NE, Washington, DC 20549–8549.

**SUPPLEMENTARY INFORMATION:** The Commission is publishing an interpretation of the standard of conduct for investment advisers under the Advisers Act [15 U.S.C. 80b].[1]

### Table of Contents

I. Introduction
   A. Overview of Comments
II. Investment Advisers' Fiduciary Duty
   A. Application of Duty Determined by Scope of Relationship
   B. Duty of Care
   1. Duty To Provide Advice That Is in the Best Interest of the Client
   2. Duty To Seek Best Execution
   3. Duty To Provide Advice and Monitoring Over the Course of the Relationship
   C. Duty of Loyalty
III. Economic Considerations
   A. Background
   B. Potential Economic Effects

### I. Introduction

Under federal law, an investment adviser is a fiduciary.[2] The fiduciary duty an investment adviser owes to its client under the Advisers Act, which comprises a duty of care and a duty of loyalty, is important to the Commission's investor protection efforts. Also important to the Commission's investor protection efforts is the standard of conduct that a broker-dealer owes to a retail customer when it makes a recommendation of any securities transaction or investment strategy involving securities.[3] Both investment advisers and broker-dealers play an important role in our capital markets and our economy more broadly. Investment advisers and broker-dealers have different types of relationships with investors, offer different services, and have different compensation models. This variety is important because it presents investors with choices regarding the types of relationships they can have, the services they can receive, and how they can pay for those services.

On April 18, 2018, the Commission proposed rules and forms intended to enhance the required standard of conduct for broker-dealers[4] and provide retail investors with clear and succinct information regarding the key aspects of their brokerage and advisory relationships.[5] In connection with the publication of these proposals, the Commission published for comment a separate proposed interpretation regarding the standard of conduct for investment advisers under the Advisers Act (''Proposed Interpretation'').[6] We stated in the Proposed Interpretation, and we continue to believe, that it is appropriate and beneficial to address in one release and reaffirm—and in some cases clarify—certain aspects of the fiduciary duty that an investment adviser owes to its clients under section 206 of the Advisers Act.[7] After

---

[1] 15 U.S.C. 80b. Unless otherwise noted, when we refer to the Advisers Act, or any paragraph of the Advisers Act, we are referring to 15 U.S.C. 80b of the United States Code, at which the Advisers Act is codified, and when we refer to rules under the Advisers Act, or any paragraph of these rules, we are referring to title 17, part 275 of the Code of Federal Regulations [17 CFR 275], in which these rules are published.

[2] *SEC* v. *Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963) (''SEC v. Capital Gains''); *see also infra* footnotes 34–44 and accompanying text; Investment Adviser Codes of Ethics, Investment Advisers Act Release No. 2256 (July 2, 2004); Compliance Programs of Investment Companies and Investment Advisers, Investment Advisers Act Release No. 2204 (Dec. 17, 2003); Electronic Filing by Investment Advisers; Proposed Amendments to Form ADV, Investment Advisers Act Release No. 1862 (Apr. 5, 2000). Investment advisers also have antifraud liability with respect to prospective clients under section 206 of the Advisers Act.

[3] *See* Regulation Best Interest, Exchange Act Release No. 34–86031 (June 5, 2019) (''Reg. BI Adoption''). This final interpretation regarding the standard of conduct for investment advisers under the Advisers Act (''Final Interpretation'') interprets section 206 of the Advisers Act, which is applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act. This Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles. Separately, in various circumstances, case law, statutes (such as the Employee Retirement Income Security Act of 1974 (''ERISA'')), and state law impose obligations on investment advisers. In some cases, these standards may differ from the standard enforced by the Commission.

[4] Regulation Best Interest, Exchange Act Release No. 83062 (Apr. 18, 2018) (''Reg. BI Proposal'').

[5] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 4888 (Apr. 18, 2018) (''Relationship Summary Proposal'').

[6] Proposed Commission Interpretation Regarding Standard of Conduct for Investment Advisers; Request for Comment on Enhancing Investment Adviser Regulation, Investment Advisers Act Release No. 4889 (Apr. 18, 2018).

[7] Further, the Commission recognizes that many advisers provide impersonal investment advice. *See, e.g.,* Advisers Act rule 203A–3 (defining ''impersonal investment advice'' in the context of defining ''investment adviser representative'' as ''investment advisory services provided by means of written material or oral statements that do not purport to meet the objectives or needs of specific individuals or accounts''). This Final Interpretation

Continued

considering the comments received, we are publishing this Final Interpretation with some clarifications to address comments.[8]

*A. Overview of Comments*

We received over 150 comment letters on our Proposed Interpretation from individuals, investment advisers, trade or professional organizations, law firms, consumer advocacy groups, and bar associations.[9] Although many commenters generally agreed that the Proposed Interpretation was useful,[10] some noted the challenges inherent in a Commission interpretation covering the broad scope of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act.[11] Some of these commenters suggested modifications to or withdrawal of the Proposed Interpretation.[12] Although most commenters agreed that an investment adviser's fiduciary duty comprises a duty of care and a duty of loyalty, as described in the Proposed Interpretation, they had differing views on aspects of the fiduciary duty and in some cases sought clarification on its application.[13]

Some commenters requested that we adopt rule text instead.[14] The relationship between an investment adviser and its client has long been based on fiduciary principles not generally set forth in specific statute or rule text. We believe that this principles-based approach should continue as it expresses broadly the standard to which investment advisers are held while allowing them flexibility to meet that standard in the context of their specific services. In our view, adopting rule text is not necessary to achieve our goal in this Final Interpretation of reaffirming and in some cases clarifying certain aspects of the fiduciary duty.

## II. Investment Advisers' Fiduciary Duty

The Advisers Act establishes a federal fiduciary duty for investment advisers.[15] This fiduciary duty is based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act.[16] The investment adviser's fiduciary duty is broad and applies to the entire adviser-client relationship.[17] The fiduciary duty to which advisers are subject is not specifically defined in the Advisers Act or in Commission rules, but reflects a Congressional recognition ''of the delicate fiduciary nature of an investment advisory relationship'' as well as a Congressional intent to ''eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.'' [18] An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the nature of the relationship between an investment adviser and a client and the desire ''so far as is presently practicable

---

does not address the extent to which the Advisers Act applies to different types of impersonal investment advice.

[8] In the Proposed Interpretation, the Commission also requested comment on: Licensing and continuing education requirements for personnel of SEC-registered investment advisers; delivery of account statements to clients with investment advisory accounts; and financial responsibility requirements for SEC-registered investment advisers, including fidelity bonds. We are continuing to evaluate the comments received in response.

[9] Comment letters submitted in File No. S7–09–18 are available on the Commission's website at *https://www.sec.gov/comments/s7-09-18/s70918.htm.* We also considered those comments submitted in File No. S7–08–18 (Comments on Relationship Summary Proposal) and File No. S7–07–18 (Comments on Reg. BI Proposal). Those comments are available on the Commission's website at *https://www.sec.gov/comments/s7-08-18/s70818.htm* and *https://www.sec.gov/comments/s7-07-18/s70718.htm.*

[10] *See, e.g.,* Comment Letter of North American Securities Administrators Association (Aug. 23, 2018) (''NASAA Letter'') (stating that the Proposed Interpretation is a ''useful resource''); Comment Letter of Invesco (Aug. 7, 2018) (''Invesco Letter'') (agreeing that ''there are benefits to having a clear statement regarding the fiduciary duty that applies to an investment adviser'').

[11] *See, e.g.,* Comment Letter of Pickard Djinis and Pisarri LLP (Aug. 7, 2018) (''Pickard Letter'') (noting the Commission's ''efforts to synthesize case law, legislative history, academic literature, prior Commission releases and other sources to produce a comprehensive explanation of the fiduciary standard of conduct''); Comment Letter of Dechert LLP (Aug. 7, 2018) (''Dechert Letter'') (''It is crucial that any universal interpretation of an adviser's fiduciary duty be based on sound and time-tested principles. Given the difficulty of defining and encompassing all of an adviser's responsibilities to its clients, while also accommodating the diversity of advisory arrangements, interpretive issues will arise in the future.''); Comment Letter of the Hedge Funds Subcommittee of the Federal Regulation of Securities Committee of the Business Law Section of the American Bar Association (Aug. 24, 2018) (''ABA Letter'') (''We note at the outset that it is difficult to capture the nature of an investment adviser's fiduciary duty in a broad statement that has universal applicability.'').

[12] *See, e.g.,* Comment Letter of L.A. Schnase (Jul. 30, 2018) (urging the Commission not to issue the Proposed Interpretation in final form, or at least not without substantial rewriting or reshaping); Comment Letter of Money Management Institute (Aug. 7, 2018) (''MMI Letter'') (urging the Commission to ''revise the interpretation so that it reflects the common law principles in which an investment adviser's fiduciary duty is grounded''); Dechert Letter (recommending that we withdraw the Proposed Interpretation and instead rely on existing authority and sources of law, as well as existing Commission practices for providing interpretive guidance, in order to define the source and scope of an investment adviser's fiduciary duty).

[13] *See, e.g.,* Comment Letter of Cambridge Investment Research Inc. (Aug. 7, 2018) (''Cambridge Letter'') (stating that ''greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals''); Comment Letter of Institutional Limited Partners Association (Aug. 6, 2018) (''ILPA Letter 1'') (''Interpretation will provide more certainty regarding the fiduciary duties owed by private fund advisers to their clients.''); Comment Letter of New York City Bar Association (Jun. 26, 2018) (''NY City Bar Letter'') (stating that the uniform interpretation of an investment adviser's fiduciary duty is necessary).

[14] Some commenters suggested that we codify the Proposed Interpretation. *See, e.g.,* Comment Letter of Roy Tanga (Apr. 25, 2018); Comment Letter of Financial Engines (Aug. 6, 2018) (''Financial Engines Letter''); ILPA Letter 1; Comment Letter of AARP (Aug. 7, 2018) (''AARP Letter''); Comment Letter of Gordon Donohue (Aug. 6, 2018); Comment Letter of Financial Planning Coalition (Aug. 7, 2018) (''FPC Letter'').

[15] *Transamerica Mortgage Advisors, Inc.* v. *Lewis,* 444 U.S. 11, 17 (1979) (''*Transamerica Mortgage* v. *Lewis*'') (''§ 206 establishes federal fiduciary standards to govern the conduct of investment advisers.'') (quotation marks omitted); *Santa Fe Industries, Inc.* v. *Green,* 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC* v. *Capital Gains,* stating that the Supreme Court's reference to fraud in the ''equitable'' sense of the term was ''premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers''); *SEC* v. *Capital Gains, supra* footnote 2; Amendments to Form ADV, Investment Advisers Act Release No. 3060 (July 28, 2010) (''Investment Advisers Act Release 3060'') (''Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own,'' citing Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003) (''Investment Advisers Act Release 2106'')).

[16] *See SEC* v. *Capital Gains, supra* footnote 2 (discussing the history of the Advisers Act, and how equitable principles influenced the common law of fraud and changed the suits brought against a fiduciary, ''which Congress recognized the investment adviser to be'').

[17] The Commission has previously recognized the broad scope of section 206 of the Advisers Act in a variety of contexts. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15; Timbervest, LLC, et al., Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ('' [O]nce an investment advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the advisory relationship.''); *see also SEC* v. *Lauer,* 2008 WL 4372896, at 24 (S.D. Fla. Sept. 24, 2008) (''Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.' ''); Thomas P. Lemke & Gerald T. Lins, Regulation of Investment Advisers (2013 ed.), at § 2:30 (''[T]he SEC has . . . applied [sections 206(1) and 206(2)] where fraud arose from an investment advisory relationship, even though the wrongdoing did not specifically involve securities.'').

[18] *See SEC* v. *Capital Gains, supra* footnote 2; *see also* In the Matter of Arleen W. Hughes, Exchange Act Release No. 4048 (Feb. 18, 1948) (''Arleen Hughes'') (Commission Opinion) (discussing the relationship of trust and confidence between the client and a dual registrant and stating that the registrant was a fiduciary and subject to liability under the antifraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934).

to eliminate the abuses'' that led to the enactment of the Advisers Act.[19] It is made enforceable by the antifraud provisions of the Advisers Act.[20]

An investment adviser's fiduciary duty under the Advisers Act comprises a duty of care and a duty of loyalty.[21] This fiduciary duty requires an adviser ''to adopt the principal's goals, objectives, or ends.'' [22] This means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words, the investment adviser cannot place its own interests ahead of the interests of its client. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in the ''best interest'' of its client at all times.[23] In our view, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty. As discussed in more detail below, in our view, the duty of care requires an investment adviser to provide investment advice in the best interest of its client, based on the client's objectives. Under its duty of loyalty, an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which is not disinterested such that a client can provide informed consent to the conflict.[24] We believe this is another part of an investment adviser's obligation to act in the best interest of its client.

*A. Application of Duty Determined by Scope of Relationship*

An adviser's fiduciary duty is imposed under the Advisers Act in recognition of the nature of the relationship between an adviser and its client—a relationship of trust and confidence.[25] The adviser's fiduciary duty is principles-based and applies to the entire relationship between the adviser and its client. The fiduciary duty follows the contours of the relationship between the adviser and its client, and the adviser and its client may shape that relationship by agreement, provided that there is full and fair disclosure and informed consent.[26] With regard to the scope of the adviser-client relationship, we recognize that investment advisers provide a wide range of services, from a single financial plan for which a client may pay a one-time fee, to ongoing portfolio management for which a client may pay a periodic fee based on the value of assets in the portfolio. Investment advisers also serve a large variety of clients, from retail clients with limited assets and investment knowledge and experience to institutional clients with very large portfolios and substantial knowledge, experience, and analytical resources.[27] In our experience, the principles-based fiduciary duty imposed by the Advisers Act has provided sufficient flexibility to serve as an effective standard of conduct for investment advisers, regardless of the services they provide or the types of clients they serve.

Although all investment advisers owe each of their clients a fiduciary duty under the Advisers Act, that fiduciary duty must be viewed in the context of the agreed-upon scope of the relationship between the adviser and the client. In particular, the specific obligations that flow from the adviser's fiduciary duty depend upon what functions the adviser, as agent, has agreed to assume for the client, its principal. For example, the obligations

---

[19] *See SEC* v. *Capital Gains, supra* footnote 2 (noting that the ''declaration of policy'' in the original bill, which became the Advisers Act, declared that ''the national public interest and the interest of investors are adversely affected . . . when the business of investment advisers is so conducted as to defraud or mislead investors, or to enable such advisers to relieve themselves of their fiduciary obligations to their clients. It is hereby declared that the policy and purposes of this title, in accordance with which the provisions of this title shall be interpreted, *are to mitigate and, so far as is presently practicable to eliminate* the abuses enumerated in this section'') (citing S. 3580, 76th Cong., 3d Sess., § 202 and Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28) (emphasis added).

[20] *Id.; Transamerica Mortgage* v. *Lewis, supra* footnote 15 (''[T]he Act's legislative history leaves no doubt that Congress intended to impose enforceable fiduciary obligations.''). Some commenters questioned the standard to which the Advisers Act holds investment advisers. *See, e.g.,* Comment Letter of Stark & Stark, PC (undated) (''The duty of care at common law and under the Advisers Act only requires that advisers not be negligent in performing their duties.'') (internal citation omitted); Comment Letter of Institutional Limited Partners Association (Nov. 21, 2018) (''ILPA Letter 2'') (''The Advisers Act standard is a lower simple 'negligence' standard.''). Claims arising under Advisers Act section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence. *Robare Group, Ltd., et al.* v. *SEC,* 922 F.3d 468, 472 (D.C. Cir. 2019) (''*Robare* v. *SEC*''); *SEC* v. *Steadman,* 967 F.2d 636, 643, n.5 (D.C. Cir. 1992) (citing *SEC* v. *Capital Gains, supra* footnote 2) (''[A] violation of § 206(2) of the Investment Advisers Act may rest on a finding of simple negligence.''); *SEC* v. *DiBella,* 587 F.3d 553, 567 (2d Cir. 2009) (''the government need not show intent to make out a section 206(2) violation''); *SEC* v. *Gruss,* 859 F. Supp. 2d 653, 669 (S.D.N.Y. 2012) (''Claims arising under Section 206(2) are not scienter-based and can be adequately pled with only a showing of negligence.''). However, claims arising under Advisers Act section 206(1) require scienter. *See, e.g., Robare* v. *SEC; SEC* v. *Moran,* 922 F. Supp. 867, 896 (S.D.N.Y. 1996); *Carroll* v. *Bear, Stearns & Co.,* 416 F. Supp. 998, 1001 (S.D.N.Y. 1976).

[21] *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15. These duties were generally recognized by commenters. *See, e.g.,* Comment Letter of Consumer Federation of America (Aug. 7, 2018) (''CFA Letter''); Comment Letter of the Investment Adviser Association (Aug. 6, 2018) (''IAA Letter''); Comment Letter of Investments & Wealth Institute (Aug. 6, 2018); Comment Letter of Raymond James (Aug. 7, 2018); FPC Comment Letter. *But see* Dechert Letter (questioning the sufficiency of support for a duty of care).

[22] Arthur B. Laby, *The Fiduciary Obligations as the Adoption of Ends,* 56 Buffalo Law Review 99 (2008); *see also* Restatement (Third) of Agency, § 2.02 Scope of Actual Authority (2006) (describing a fiduciary's authority in terms of the fiduciary's reasonable understanding of the principal's manifestations and objectives).

[23] Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that ''under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own,'' citing Investment Advisers Act Release 2106, *supra* footnote 15). *See SEC* v. *Tambone,* 550 F.3d 106, 146 (1st Cir. 2008) (''*SEC* v. *Tambone*'') (''Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . .''); *SEC* v. *Moran,* 944 F. Supp. 286, 297 (S.D.N.Y 1996) (''*SEC* v. *Moran*'') (''Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.''). Although most commenters agreed that an adviser has an obligation to act in its client's best interest, some questioned whether the Proposed Interpretation appropriately considered the best interest obligation as part of the duty of care, or whether it instead should be considered part of the duty of loyalty. *See, e.g.,* MMI Letter; Comment Letter of Investment Company Institute (Aug. 7, 2018) (''ICI Letter'').

[24] *See infra* footnotes 67–70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

[25] *See, e.g.,* Hearings on S. 3580 before Subcommittee of the Senate Committee on Banking and Currency, 76th Cong., 3d Sess. (leading investment advisers emphasized their relationship of ''trust and confidence'' with their clients); *SEC* v. *Capital Gains, supra* footnote 2 (citing same).

[26] Several commenters asked that we clarify that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies through contract. *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter.

[27] This Final Interpretation also applies to automated advisers, which are often colloquially referred to as ''robo-advisers.'' Automated advisers, like all SEC-registered investment advisers, are subject to all of the requirements of the Advisers Act, including the requirement that they provide advice consistent with the fiduciary duty they owe to their clients. *See* Division of Investment Management, Robo Advisers, IM Guidance Update No. 2017–02 (Feb. 2017), *available at https://www.sec.gov/investment/im-guidance-2017-02.pdf* (describing Commission staff's guidance as to three distinct areas under the Advisers Act that automated advisers should consider, due to the nature of their business model, in seeking to comply with their obligations under the Advisers Act).

of an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client (*e.g.,* monitoring and periodically adjusting a portfolio of equity and fixed income investments with limited restrictions on allocation) will be significantly different from the obligations of an adviser to a registered investment company or private fund where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity (*e.g.,* a mandate to manage a fixed income portfolio subject to specified parameters, including concentration limits and credit quality and maturity ranges).[28]

While the application of the investment adviser's fiduciary duty will vary with the scope of the relationship, the relationship in all cases remains that of a fiduciary to the client. In other words, an adviser's federal fiduciary duty may not be waived, though it will apply in a manner that reflects the agreed-upon scope of the relationship.[29] A contract provision purporting to waive the adviser's federal fiduciary duty generally, such as (i) a statement that the adviser will not act as a fiduciary, (ii) a blanket waiver of all conflicts of interest, or (iii) a waiver of any specific obligation under the Advisers Act, would be inconsistent with the Advisers Act,[30] regardless of the sophistication of the client.[31]

[28] *See, e.g., infra* text following footnote 35.

[29] Because an adviser's federal fiduciary obligations are enforceable through section 206 of the Advisers Act, we would view a waiver of enforcement of section 206 as implicating section 215(a) of the Advisers Act, which provides that ''any condition, stipulation or provision binding any person to waive compliance with any provision of this title . . . shall be void.'' *See also* Restatement (Third) of Agency, § 8.06 Principal's Consent (2006) (''[T]he law applicable to relationships of agency as defined in § 1.01 imposes mandatory limits on the circumstances under which an agent may be empowered to take disloyal action. These limits serve protective and cautionary purposes. Thus, an agreement that contains general or broad language purporting to release an agent in advance from the agent's general fiduciary obligation to the principal is not likely to be enforceable. This is because a broadly sweeping release of an agent's fiduciary duty may not reflect an adequately informed judgment on the part of the principal; if effective, the release would expose the principal to the risk that the agent will exploit the agent's position in ways not foreseeable by the principal at the time the principal agreed to the release. In contrast, when a principal consents to specific transactions or to specified types of conduct by the agent, the principal has a focused opportunity to assess risks that are more readily identifiable.'').

[30] *See* sections 206 and 215(a). Commenters generally agreed that a client cannot waive an investment adviser's fiduciary duty through agreement. *See* Dechert Letter; Comment Letter of Ropes & Gray LLP (Aug. 7, 2018) (''Ropes & Gray Letter''), at n.20; *see also supra* footnote 29. In the Proposed Interpretation, we stated that ''the investment adviser cannot disclose or negotiate away, and the investor cannot waive, the federal fiduciary duty.'' One commenter disputed this broad statement, believing that it called into question ''the ability of an investment adviser and client to define the scope of the adviser's services and duties.'' ABA Letter; *see also* Financial Engines Letter. We have modified this statement to clarify that a general waiver of the fiduciary duty would violate that duty and to provide examples of such a general waiver.

[31] Some commenters mentioned a 2007 No-Action Letter in which staff indicated that whether a clause in an advisory agreement that purports to limit an adviser's liability under that agreement (a so-called ''hedge clause'') would violate sections 206(1) and 206(2) of the Advisers Act depends on all of the surrounding facts and circumstances. Heitman Capital Management, LLC, SEC Staff No-Action Letter (Feb. 12, 2007) (''Heitman Letter''). A few commenters indicated that the Heitman Letter expanded the ability of investment advisers to private funds, and potentially other sophisticated clients, to disclaim their fiduciary duties under state law in an advisory agreement. *See, e.g.,* ILPA Letter 1; ILPA Letter 2. The commenters' descriptions of the Heitman Letter suggest that it may have been applied incorrectly. The Heitman Letter does not address the scope or substance of an adviser's federal fiduciary duty; rather, it addresses the extent to which hedge clauses may be misleading in violation of the Advisers Act's antifraud provisions. Another commenter agreed with this reading of the Heitman Letter. *See* Comment Letter of American Investment Council (Feb. 25, 2019). In response to these comments, we express below the Commission's views about an adviser's obligations under sections 206(1) and 206(2) of the Advisers Act with respect to the use of hedge clauses. Accordingly, because we are expressing our views in this Final Interpretation, the Heitman Letter is withdrawn.

This Final Interpretation makes clear that an adviser's federal fiduciary duty may not be waived, though its application may be shaped by agreement. This Final Interpretation does not take a position on the scope or substance of any fiduciary duty that applies to an adviser under applicable state law. *See supra* footnote 3. The question of whether a hedge clause violates the Advisers Act's antifraud provisions depends on all of the surrounding facts and circumstances, including the particular circumstances of the client (*e.g.,* sophistication). In our view, however, there are few (if any) circumstances in which a hedge clause in an agreement with a retail client would be consistent with those antifraud provisions, where the hedge clause purports to relieve the adviser from liability for conduct as to which the client has a non-waivable cause of action against the adviser provided by state or federal law. Such a hedge clause generally is likely to mislead those retail clients into not exercising their legal rights, in violation of the antifraud provisions, even where the agreement otherwise specifies that the client may continue to retain its non-waivable rights. Whether a hedge clause in an agreement with an institutional client would violate the Advisers Act's antifraud provisions will be determined based on the particular facts and circumstances. To the extent that a hedge clause creates a conflict of interest between an adviser and its client, the adviser must address the conflict as required by its duty of loyalty.

### *B. Duty of Care*

As fiduciaries, investment advisers owe their clients a duty of care.[32] The Commission has discussed the duty of care and its components in a number of contexts.[33] The duty of care includes, among other things: (i) The duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship.

#### 1. Duty To Provide Advice That Is in the Best Interest of the Client

The duty of care includes a duty to provide investment advice that is in the best interest of the client, including a duty to provide advice that is suitable for the client.[34] In order to provide such

[32] *See* Investment Advisers Act Release 2106, *supra* footnote 15 (stating that under the Advisers Act, ''an adviser is a fiduciary that owes each of its clients duties of care and loyalty with respect to all services undertaken on the client's behalf, including proxy voting,'' which is the subject of the release, and citing *SEC* v. *Capital Gains supra* footnote 2, to support this point). This Final Interpretation does not address the specifics of how an investment adviser might satisfy its fiduciary duty when voting proxies. *See also* Restatement (Third) of Agency, § 8.08 (discussing the duty of care that an agent owes its principal as a matter of common law); Tamar Frankel & Arthur B. Laby, The Regulation of Money Managers (updated 2017) (''Advice can be divided into three stages. The first determines the needs of the particular client. The second determines the portfolio strategy that would lead to meeting the client's needs. The third relates to the choice of securities that the portfolio would contain. The duty of care relates to each of the stages and depends on the depth or extent of the advisers' obligation towards their clients.'').

[33] *See, e.g.,* Suitability of Investment Advice Provided by Investment Advisers; Custodial Account Statements for Certain Advisory Clients, Investment Advisers Act Release No. 1406 (Mar. 16, 1994) (''Investment Advisers Act Release 1406'') (stating that advisers have a duty of care and discussing advisers' suitability obligations); Interpretive Release Concerning the Scope of Section 28(e) of the Securities Exchange Act of 1934 and Related Matters, Exchange Act Release No. 23170 (Apr. 28, 1986) (''Exchange Act Release 23170'') (''an adviser, as a fiduciary, owes its clients a duty of obtaining the best execution on securities transactions''). We highlight certain contexts, but not all, in which the Commission has addressed the duty of care. *See, e.g.,* Investment Advisers Act Release 2106, *supra* footnote 15.

[34] In 1994, the Commission proposed a rule that would have made express the fiduciary obligation of investment advisers to make only suitable recommendations to a client. Investment Advisers Act Release 1406, *supra* footnote 33. Although never adopted, the rule was designed, among other things, to reflect the Commission's interpretation of an adviser's *existing* suitability obligation under the Advisers Act. In addition, we do not cite Investment Advisers Act Release 1406 as the source of authority for the view we express here, which at least one comment letter suggested, but cite it merely to show that the Commission has long held this view. *See* Comment Letter of the Managed Funds Association and the Alternative Investment

advice, an adviser must have a reasonable understanding of the client's objectives. The basis for such a reasonable understanding generally would include, for retail clients, an understanding of the investment profile, or for institutional clients, an understanding of the investment mandate.[35] The duty to provide advice that is in the best interest of the client based on a reasonable understanding of the client's objectives is a critical component of the duty of care.

Reasonable Inquiry Into Client's Objectives

How an adviser develops a reasonable understanding will vary based on the specific facts and circumstances, including the nature of the client, the scope of the adviser-client relationship, and the nature and complexity of the anticipated investment advice.

In order to develop a reasonable understanding of a retail client's objectives, an adviser should, at a minimum, make a reasonable inquiry into the client's financial situation, level of financial sophistication, investment experience, and financial goals (which we refer to collectively as the retail client's ''investment profile''). For example, an adviser undertaking to formulate a comprehensive financial plan for a retail client would generally need to obtain a range of personal and financial information about the client such as current income, investments, assets and debts, marital status, tax status, insurance policies, and financial goals.[36]

In addition, it will generally be necessary for an adviser to a retail client to update the client's investment profile in order to maintain a reasonable understanding of the client's objectives and adjust the advice to reflect any changed circumstances.[37] The frequency with which the adviser must update the client's investment profile in order to consider changes to any advice the adviser provides would itself turn on the facts and circumstances, including whether the adviser is aware of events that have occurred that could render inaccurate or incomplete the investment profile on which the adviser currently bases its advice. For instance, in the case of a financial plan where the investment adviser also provides advice on an ongoing basis, a change in the relevant tax law or knowledge that the client has retired or experienced a change in marital status could trigger an obligation to make a new inquiry.

By contrast, in providing investment advice to institutional clients, the nature and extent of the reasonable inquiry into the client's objectives generally is shaped by the specific investment mandates from those clients. For example, an investment adviser engaged to advise on an institutional client's investment grade bond portfolio would need to gain a reasonable understanding of the client's objectives within that bond portfolio, but not the client's objectives within its entire investment portfolio. Similarly, an investment adviser whose client is a registered investment company or a private fund would need to have a reasonable understanding of the fund's investment guidelines and objectives. For advisers acting on specific investment mandates for institutional clients, particularly funds, we believe that the obligation to update the client's objectives would not be applicable except as may be set forth in the advisory agreement.

Reasonable Belief That Advice Is in the Best Interest of the Client

An investment adviser must have a reasonable belief that the advice it provides is in the best interest of the client based on the client's objectives. The formation of a reasonable belief would involve considering, for example, whether investments are recommended only to those clients who can and are willing to tolerate the risks of those investments and for whom the potential benefits may justify the risks.[38] Whether the advice is in a client's best interest must be evaluated in the context of the portfolio that the adviser manages for the client and the client's objectives.

For example, when an adviser is advising a retail client with a conservative investment objective, investing in certain derivatives may be in the client's best interest when they are used to hedge interest rate risk or other risks in the client's portfolio, whereas investing in certain directionally speculative derivatives on their own may not. For that same client, investing in a particular security on margin may not be in the client's best interest, even if investing in that same security without the use of margin may be in the client's best interest. However, for example, when advising a financially sophisticated client, such as a fund or other sophisticated client that has an appropriate risk tolerance, it may be in the best interest of the client to invest in such derivatives or in securities on margin, or to invest in other complex instruments or other products that may have limited liquidity.

Similarly, when an adviser is assessing whether high risk products—such as penny stocks or other thinly-traded securities—are in a retail client's best interest, the adviser should generally apply heightened scrutiny to whether such investments fall within the retail client's risk tolerance and objectives. As another example,

---

Management Association (Aug. 7, 2018) (indicating that the Commission's failure to adopt the proposed suitability rule means ''investment advisers are not subject to an express 'suitability' standard under existing regulation''). We believe that this obligation to make only suitable recommendations to a client is part of an adviser's fiduciary duty to act in the best interest of its client. Accordingly, an adviser must provide investment advice that is suitable for its client in providing advice that is in the best interest of its client. *See SEC* v. *Tambone, supra* footnote 23 (''Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund. . . .''); SEC v. Moran, *supra* footnote 23 (''Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.'').

[35] Several commenters stated that the duty to make a reasonable inquiry into a client's investment profile may not apply in the institutional client context. *See, e.g.,* Comment Letter of BlackRock, Inc. (Aug. 7, 2018); Comment Letter of Teachers Insurance and Annuity Association of America (Aug. 7, 2018); Comment Letter of Allianz Global Investors U.S. LLC (Aug. 7, 2018) (''Allianz Letter''); Comment Letter of John Hancock Life Insurance Company (U.S.A.) (Aug. 3, 2018). Accordingly, we are describing the duty as a duty to have a reasonable understanding of the client's objectives. While not every client will have an investment profile, every client will have objectives. For example, an institutional client's objectives may be ascertained through its investment mandate.

[36] Investment Advisers Act Release 1406, *supra* footnote 33. After making a reasonable inquiry into the client's investment profile, it generally would be reasonable for an adviser to rely on information provided by the client (or the client's agent) regarding the client's financial circumstances, and an adviser should not be held to have given advice not in its client's best interest if it is later shown that the client had misled the adviser concerning the information on which the advice was based.

[37] Such updating would not be needed with one-time investment advice. In the Proposed Interpretation, we stated that an adviser ''must'' update a client's investment profile in order to adjust the advice to reflect any changed circumstances. We believe that any obligation to update a client's investment profile, like the nature and extent of the reasonable inquiry into a retail client's objectives, turns on what is reasonable under the circumstances. Accordingly, we have revised the wording of this statement in this Final Interpretation.

[38] Item 8 of Part 2A of Form ADV requires an investment adviser to describe its methods of analysis and investment strategies and disclose that investing in securities involves risk of loss which clients should be prepared to bear. This item also requires that an adviser explain the material risks involved for each significant investment strategy or method of analysis it uses and particular type of security it recommends, with more detail if those risks are significant or unusual. Accordingly, investment advisers are required to identify and explain certain risks involved in their investment strategies and the types of securities they recommend. An investment adviser needs to consider those same risks in determining the clients to which the adviser recommends those investments.

complex products such as inverse or leveraged exchange-traded products that are designed primarily as short-term trading tools for sophisticated investors may not be in the best interest of a retail client absent an identified, short-term, client-specific trading objective and, to the extent that such products are in the best interest of a retail client initially, they would require daily monitoring by the adviser.[39]

A reasonable belief that investment advice is in the best interest of a client also requires that an adviser conduct a reasonable investigation into the investment sufficient not to base its advice on materially inaccurate or incomplete information.[40] We have taken enforcement action where an investment adviser did not independently or reasonably investigate securities before recommending them to clients.[41]

The cost (including fees and compensation) associated with investment advice would generally be one of many important factors—such as an investment product's or strategy's investment objectives, characteristics (including any special or unusual features), liquidity, risks and potential benefits, volatility, likely performance in a variety of market and economic conditions, time horizon, and cost of exit—to consider when determining whether a security or investment strategy involving a security or securities is in the best interest of the client. When considering similar investment products or strategies, the fiduciary duty does not necessarily require an adviser to recommend the lowest cost investment product or strategy.

Moreover, an adviser would not satisfy its fiduciary duty to provide advice that is in the client's best interest by simply advising its client to invest in the lowest cost (to the client) or least remunerative (to the investment adviser) investment product or strategy without any further analysis of other factors in the context of the portfolio that the adviser manages for the client and the client's objective. Rather, the adviser could recommend a higher-cost investment or strategy if the adviser reasonably concludes that there are other factors about the investment or strategy that outweigh cost and make the investment or strategy in the best interest of the client, in light of that client's objectives. For example, it might be consistent with an adviser's fiduciary duty to advise a client with a high risk tolerance and significant investment experience to invest in a private equity fund with relatively higher fees and significantly less liquidity as compared with a fund that invests in publicly-traded companies if the private equity fund was in the client's best interest because it provided exposure to an asset class that was appropriate in the context of the client's overall portfolio.

An adviser's fiduciary duty applies to all investment advice the investment adviser provides to clients, including advice about investment strategy, engaging a sub-adviser, and account type.[42] Advice about account type includes advice about whether to open or invest through a certain type of account (*e.g.,* a commission-based brokerage account or a fee-based advisory account) and advice about whether to roll over assets from one account (*e.g.,* a retirement account) into a new or existing account that the adviser or an affiliate of the adviser manages.[43] In providing advice about account type, an adviser should consider all types of accounts offered by the adviser and acknowledge to a client when the account types the adviser offers are not in the client's best interest.[44]

2. Duty To Seek Best Execution

An investment adviser's duty of care includes a duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades (typically in the case of discretionary accounts).[45] In meeting this obligation, an adviser must seek to obtain the execution of transactions for each of its clients such that the client's total cost or proceeds in each transaction are the most favorable under the circumstances. An adviser fulfills this duty by seeking to obtain the execution of securities transactions on behalf of a client with

[39] *See* Exchange-Traded Funds, Securities Act Release No. 10515 (June 28, 2018); SEC staff and FINRA, Investor Alert, Leveraged and Inverse ETFs: Specialized Products with Extra Risks for Buy-and-Hold Investors (Aug. 1, 2009); SEC Office of Investor Education and Advocacy, Investor Bulletin: Exchange-Traded Funds (ETFs) (Aug. 2012); *see also* FINRA Regulatory Notice 09–31, Non-Traditional ETFs—FINRA Reminds Firms of Sales Practice Obligations Relating to Leveraged and Inverse Exchange-Traded Funds (June 2009).

[40] *See, e.g.,* Concept Release on the U.S. Proxy System, Investment Advisers Act Release No. 3052 (July 14, 2010) (indicating that a fiduciary ''has a duty of care requiring it to make a reasonable investigation to determine that it is not basing its recommendations on materially inaccurate or incomplete information'').

[41] *See, e.g.,* In the Matter of Larry C. Grossman, Investment Advisers Act Release No. 4543 (Sept. 30, 2016) (Commission Opinion) (''*In re* Grossman'') (in connection with imposing liability on a principal of a registered investment adviser for recommending offshore private investment funds to clients), *stayed in part,* Investment Advisers Act No. 4563 (Nov. 1, 2016), *response to remand,* Investment Advisers Act Release No. 4871 (Mar. 29, 2018) (reinstating the Sept. 30, 2016 opinion and order, except with respect to the disgorgement and prejudgment interest in light of the Supreme Court's decision in *Kokesh* v. *SEC,* 137 S. Ct. 1635 (2017)).

[42] In addition, with respect to prospective clients, investment advisers have antifraud liability under section 206 of the Advisers Act, which, among other things, applies to transactions, practices, or courses of business which operate as a fraud or deceit upon prospective clients, including those regarding investment strategy, engaging a sub-adviser, and account type. We believe that, in order to avoid liability under this antifraud provision, an investment adviser should have sufficient information about the prospective client and its objectives to form a reasonable basis for advice before providing any advice about these matters. At the point in time at which the prospective client becomes a client of the investment adviser (*e.g.,* at account opening), the fiduciary duty applies. Accordingly, while advice to prospective clients about these matters must comply with the antifraud provisions under section 206 of the Advisers Act, the adviser must also satisfy its fiduciary duty with respect to any such advice (*e.g.,* regarding account type) when a prospective client becomes a client.

[43] We consider advice about ''rollovers'' to include advice about account type, in addition to any advice regarding the investments or investment strategy with respect to the assets to be rolled over, as the advice necessarily includes the advice about the account type into which assets are to be rolled over. As noted below, as a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest. *See infra* text accompanying footnote 52.

[44] Accordingly, in providing advice to a client or customer about account type, a financial professional who is dually licensed (*i.e.,* an associated person of a broker-dealer and a supervised person of an investment adviser (regardless of whether the professional works for a dual registrant, affiliated firms, or unaffiliated firms)) should consider all types of accounts offered (*i.e.,* both brokerage accounts and advisory accounts) when determining whether the advice is in the client's best interest. A financial professional who is only a supervised person of an investment adviser (regardless of whether that advisory firm is a dual registrant or affiliated with a broker-dealer) may only recommend an advisory account the adviser offers when the account is in the client's best interest. If a financial professional who is only a supervised person of an investment adviser chooses to advise a client to consider a non-advisory account (or to speak with other personnel at a dual registrant or affiliate about a non-advisory account), that advice should be in the best interest of the client. This same framework applies in the case of a prospective client, but any advice or recommendation given to a prospective client would be subject to the antifraud provisions of the federal securities laws. *See supra* footnote 42 and Reg. BI Adoption, *supra* footnote 3.

[45] *See* Commission Guidance Regarding Client Commission Practices Under Section 28(e) of the Securities Exchange Act of 1934, Exchange Act Release No. 54165 (July 18, 2006) (stating that investment advisers have ''best execution obligations''); Investment Advisers Act Release 3060, *supra* footnote 15 (discussing an adviser's best execution obligations in the context of directed brokerage arrangements and disclosure of soft dollar practices); *see also* Advisers Act rule 206(3)–2(c) (referring to adviser's duty of best execution of client transactions).

the goal of maximizing value for the client under the particular circumstances occurring at the time of the transaction. Maximizing value encompasses more than just minimizing cost. When seeking best execution, an adviser should consider ''the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness'' to the adviser.[46] In other words, the ''determinative factor'' is not the lowest possible commission cost, ''but whether the transaction represents the best qualitative execution.'' [47] Further, an investment adviser should ''periodically and systematically'' evaluate the execution it is receiving for clients.[48]

3. Duty To Provide Advice and Monitoring Over the Course of the Relationship

An investment adviser's duty of care also encompasses the duty to provide advice and monitoring at a frequency that is in the best interest of the client, taking into account the scope of the agreed relationship.[49] For example, when the adviser has an ongoing relationship with a client and is compensated with a periodic asset-based fee, the adviser's duty to provide advice and monitoring will be relatively extensive as is consistent with the nature of the relationship.[50] Conversely, absent an express agreement regarding the adviser's monitoring obligation, when the adviser and the client have a relationship of limited duration, such as for the provision of a one-time financial plan for a one-time fee, the adviser is unlikely to have a duty to monitor. In other words, in the absence of any agreed limitation or expansion, the scope of the duty to monitor will be indicated by the duration and nature of the agreed advisory arrangement.[51] As a general matter, an adviser's duty to monitor extends to all personalized advice it provides to the client, including, for example, in an ongoing relationship, an evaluation of whether a client's account or program type (for example, a wrap account) continues to be in the client's best interest.[52]

*C. Duty of Loyalty*

The duty of loyalty requires that an adviser not subordinate its clients' interests to its own.[53] In other words, an investment adviser must not place its own interest ahead of its client's interests.[54] To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship.[55] Material facts relating to the advisory relationship include the capacity in which the firm is acting with respect to the advice provided. This will be particularly relevant for firms or individuals that are dually registered as broker-dealers and investment advisers and who serve the same client in both an advisory and a brokerage capacity. Thus, such firms and individuals generally should provide full and fair disclosure about the circumstances in which they intend to act in their

[46] Exchange Act Release 23170, *supra* footnote 33.

[47] *Id.*

[48] *Id.* The Advisers Act does not prohibit advisers from using an affiliated broker to execute client trades. However, the adviser's use of such an affiliate involves a conflict of interest that must be fully and fairly disclosed and the client must provide informed consent to the conflict. *See also* Interpretation of Section 206(3) of the Investment Advisers Act of 1940, Investment Advisers Act Release No. 1732 (Jul. 17, 1998) (discussing application of section 206(3) of the Advisers Act to certain principal and agency transactions). Two commenters requested that we prescribe specific obligations related to best execution. Comment Letter of the Healthy Markets Association (Aug. 7, 2018); Comment Letter of ICE Data Services (Aug. 7, 2018). However, prescribing specific requirements of how an adviser might satisfy its best execution obligations is outside of the scope of this Final Interpretation.

[49] *Cf. SEC* v. *Capital Gains, supra* footnote 2 (describing advisers' ''basic function'' as ''furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments'' (quoting Investment Trusts and Investment Companies, Report of the Securities and Exchange Commission, Pursuant to Section 30 of the Public Utility Holding Company Act of 1935, on Investment Counsel, Investment Management, Investment Supervisory, and Investment Advisory Services, H.R. Doc. No. 477, 76th Cong. 2d Sess., 1, at 28)). *Cf.* Barbara Black, *Brokers and Advisers—What's in a Name?,* 32 Fordham Journal of Corporate and Financial Law XI (2005) (''[W]here the investment adviser's duties include management of the account, [the adviser] is under an obligation to monitor the performance of the account and to make appropriate changes in the portfolio.''); Arthur B. Laby, *Fiduciary Obligations of Broker-Dealers and Investment Advisers,* 55 Villanova Law Review 701 (2010) (''Laby Villanova Article'') (stating that the scope of an adviser's activity can be altered by contract and that an adviser's fiduciary duty would be commensurate with the scope of the relationship) (internal citations omitted).

[50] However, an adviser and client may scope the frequency of the adviser's monitoring (*e.g.,* agreement to monitor quarterly or monthly and as appropriate in between based on market events), provided that there is full and fair disclosure and informed consent. We consider the frequency of monitoring, as well as any other material facts relating to the agreed frequency, such as whether there will also be interim monitoring when there are market events relevant to the client's portfolio, to be a material fact relating to the advisory relationship about which an adviser must make full and fair disclosure and obtain informed consent as required by its fiduciary duty.

[51] *See also* Laby Villanova Article, *supra* footnote 49, at 728 (2010) (''If an adviser has agreed to provide continuous supervisory services, the scope of the adviser's fiduciary duty entails a continuous, ongoing duty to supervise the client's account, regardless of whether any trading occurs. This feature of the adviser's duty, even in a non-discretionary account, contrasts sharply with the duty of a broker administering a non-discretionary account, where no duty to monitor is required.'') (internal citations omitted).

[52] Investment advisers also may consider whether written policies and procedures relating to monitoring would be appropriate under Advisers Act rule 206(4)–7, which requires any investment adviser registered or required to be registered under the Advisers Act to adopt and implement written policies and procedures reasonably designed to prevent violation of the Advisers Act and the rules thereunder by the adviser and its supervised persons.

[53] Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that ''[u]nder the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own,'' citing Investment Advisers Act Release 2106, *supra* footnote 15). The duty of loyalty applies not just to advice regarding potential investments, but to all advice the investment adviser provides to an existing client, including advice about investment strategy, engaging a sub-adviser, and account type. *See supra* text accompanying footnotes 42–43.

[54] For example, an adviser cannot favor its own interests over those of a client, whether by favoring its own accounts or by favoring certain client accounts that pay higher fee rates to the adviser over other client accounts. The Commission has brought numerous enforcement actions against advisers that allocated trades to their own accounts and allocated less favorable or unprofitable trades to their clients' accounts. *See, e.g., SEC* v. *Strategic Capital Management, LLC and Michael J. Breton,* Litigation Release No. 23867 (June 23, 2017) (partial settlement) (adviser placed trades through a master brokerage account and then allocated profitable trades to adviser's account while placing unprofitable trades into the client accounts in violation of fiduciary duty and contrary to disclosures). In the Proposed Interpretation, we stated that the duty of loyalty requires an adviser to ''put its client's interest first.'' One commenter suggested that the requirement of an adviser to put its client's interest ''first'' is very different from a requirement not to ''subordinate'' or ''subrogate'' clients' interests, and is inconsistent with how the duty of loyalty had been applied in the past. *See* Comment Letter of the Asset Management Group of the Securities Industry and Financial Markets Association (Aug. 7, 2018) (''SIFMA AMG Letter''). Accordingly, we have revised the description of the duty of loyalty in this Final Interpretation to be more consistent with how we have previously described the duty. *See* Investment Advisers Act Release 3060, *supra* footnote 15 (''Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own.'') (citing Investment Advisers Act Release 2106, *supra* footnote 15). In practice, referring to putting a client's interest first is a plain English formulation commonly used by investment advisers to explain their duty of loyalty in a way that may be more understandable to retail clients.

[55] *See SEC* v. *Capital Gains, supra* footnote 2 (''Failure to disclose material facts must be deemed fraud or deceit within its intended meaning.''); Investment Advisers Act Release 3060, *supra* footnote 15 (''as a fiduciary, an adviser has an ongoing obligation to inform its clients of any material information that could affect the advisory relationship''); *see also* General Instruction 3 to Part 2 of Form ADV (''Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship.'').

brokerage capacity and the circumstances in which they intend to act in their advisory capacity. This disclosure may be accomplished through a variety of means, including, among others, written disclosure at the beginning of a relationship that clearly sets forth when the dual registrant would act in an advisory capacity and how it would provide notification of any changes in capacity.[56] Similarly, a dual registrant acting in its advisory capacity should disclose any circumstances under which its advice will be limited to a menu of certain products offered through its affiliated broker-dealer or affiliated investment adviser.

In addition, an adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.[57] We believe that while full and fair disclosure of all material facts relating to the advisory relationship or of conflicts of interest and a client's informed consent prevent the presence of those material facts or conflicts themselves from violating the adviser's fiduciary duty, such disclosure and consent do not themselves satisfy the adviser's duty to act in the client's best interest.[58] To illustrate what constitutes full and fair disclosure, we are providing the following guidance on (i) the appropriate level of specificity, including the appropriateness of stating that an adviser ''may'' have a conflict, and (ii) considerations for disclosure regarding conflicts related to the allocation of investment opportunities among eligible clients.

In order for disclosure to be full and fair, it should be sufficiently specific so that a client is able to understand the material fact or conflict of interest and make an informed decision whether to provide consent.[59] For example, it would be inadequate to disclose that the adviser has ''other clients'' without describing how the adviser will manage conflicts between clients if and when they arise, or to disclose that the adviser has ''conflicts'' without further description.

Similarly, disclosure that an adviser ''may'' have a particular conflict, without more, is not adequate when the conflict actually exists.[60] For example, we would consider the use of ''may'' inappropriate when the conflict exists with respect to some (but not all) types or classes of clients, advice, or transactions without additional disclosure specifying the types or classes of clients, advice, or transactions with respect to which the conflict exists. In addition, the use of ''may'' would be inappropriate if it simply precedes a list of all possible or potential conflicts regardless of likelihood and obfuscates

[56] *See also* Reg. BI Adoption, *supra* footnote 3, at 99.

[57] In the Proposed Interpretation, we stated that an adviser must seek to avoid conflicts of interest with its clients. Proposed Interpretation, *supra* footnote 6. Some commenters requested clarity on what it means to ''seek to avoid'' conflicts of interest. *See, e.g.,* Comment Letter of Schulte Roth & Zabel LLP (Aug. 8, 2018); ABA Letter (stating that this wording could be read to require an adviser to first seek to avoid a conflict, before addressing a conflict through disclosure, rather than being able to provide full and fair disclosure of a conflict, and only seek avoidance if the conflict cannot be addressed through disclosure). The Commission first used this phrasing when adopting amendments to the Form ADV Part 2 instructions. *See* Investment Advisers Act Release 3060, *supra* footnote 15 and General Instruction 3 to Part 2 of Form ADV (''As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship.''). The release adopting this instruction clarifies the Commission's intent that it capture the fiduciary duty described in *SEC* v. *Capital Gains and Arleen Hughes. See* Investment Advisers Act Release 3060, *supra* footnote 15, at n.4 and accompanying text (citing *SEC* v. *Capital Gains, supra* footnote 2, and Arleen Hughes, *supra* footnote 18, as the basis of this language). Both of these cases emphasized that the adviser, as a fiduciary, should seek to avoid conflicts, but at a minimum must make full and fair disclosure of the conflict and obtain the client's informed consent. *See SEC* v. *Capital Gains, supra* footnote 2 (''The Advisers Act thus reflects . . . a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.''); Arleen Hughes, *supra* footnote 18 (''Since loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal'' but if a fiduciary ''chooses to assume a role in which she is motivated by conflicting interests, . . . she may do so if, but only if, she obtains her client's consent after disclosure . . .''). We believe the Commission's reference to ''seek to avoid'' conflicts in the Form ADV Part 2 instructions is consistent with the Final Interpretation's statement that an adviser ''must eliminate or at least expose all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested'' as well as the substantively identical statements in *SEC* v. *Capital Gains, supra* footnote 2, and Arleen Hughes, *supra* footnote 18. While an adviser may satisfy its duty of loyalty by making full and fair disclosure of conflicts of interest and obtaining the client's informed consent, an adviser is prohibited from overreaching or taking unfair advantage of a client's trust.

[58] As noted above, an investment adviser's obligation to act in the best interest of its client is an overarching principle that encompasses both the duty of care and the duty of loyalty. *See SEC* v. *Tambone, supra* footnote 23 (stating that Advisers Act section 206 ''imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . and *includes* an obligation to provide 'full and fair disclosure of all material facts' '') (emphasis added) (citing *SEC* v. *Capital Gains, supra* footnote 2). We describe above in this Final Interpretation how the application of an investment adviser's fiduciary duty to its client will vary with the scope of the advisory relationship. *See supra* section II.A.

[59] Arleen Hughes, *supra* footnote 18, at 4 and 8 (stating, ''[s]ince loyalty to his trust is the first duty which a fiduciary owes to his principal, it is the general rule that a fiduciary must not put himself into a position where his own interests may come in conflict with those of his principal. To prevent any conflict and the possible subordination of this duty to act solely for the benefit of his principal, a fiduciary at common law is forbidden to deal as an adverse party with his principal. An exception is made, however, where the principal gives his informed consent to such dealings,'' and adding that, ''[r]egistrant has an affirmative obligation to disclose all material facts to her clients in a manner which is clear enough so that a client is fully apprised of the facts and is in a position to give his informed consent.''); *see also Hughes* v. *Securities and Exchange Commission,* 174 F.2d 969 (1949) (affirming the SEC decision in Arleen Hughes); General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation ''requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them''); Investment Advisers Act Release 3060, *supra* footnote 15; Restatement (Third) of Agency § 8.06 (''Conduct by an agent that would otherwise constitute a breach of duty as stated in §§ 8.01, 8.02, 8.03, 8.04, and 8.05 [referencing the fiduciary duty] does not constitute a breach of duty if the principal consents to the conduct, provided that (a) in obtaining the principal's consent, the agent (i) acts in good faith, (ii) discloses all material facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them, and (iii) otherwise deals fairly with the principal; and (b) the principal's consent concerns either a specific act or transaction, or acts or transactions of a specified type that could reasonably be expected to occur in the ordinary course of the agency relationship.''). *See infra* footnotes 67–70 and accompanying text for a more detailed discussion of informed consent and how it is generally considered on an objective basis and may be inferred.

[60] We have brought enforcement actions in such cases. *See, e.g.,* In the Matter of The Robare Group, Ltd., et al., Investment Advisers Act Release No. 4566 (Nov. 7, 2016) (Commission Opinion) (finding, among other things, that adviser's disclosure that it *may* receive a certain type of compensation was inadequate because it did not reveal that the adviser actually had an arrangement pursuant to which it received fees that presented a potential conflict of interest); *aff'd in part and rev'd in part on other grounds Robare* v. *SEC, supra* footnote 20; *In re Grossman, supra* footnote 41 (indicating that ''the use of the prospective 'may' in [the relevant Form ADV disclosures] is misleading because it suggested the mere possibility that [the broker] would make a referral and/or be paid 'referral fees' at a later point, when in fact a commission-sharing arrangement was already in place and generating income''). *Cf. Dolphin & Bradbury, Inc.* v. *SEC,* 512 F.3d 634, 640 (D.C. Cir. 2008) (''The Commission noted the critical distinction between disclosing the risk that a future event *might* occur and disclosing actual knowledge the event *will* occur.'') (emphasis in original). For Form ADV Part 2 purposes, advisers are instructed that when they have a conflict or engage in a practice with respect to some (but not all) types or classes of clients, advice, or transactions, to indicate as such rather than disclosing that they ''may'' have the conflict or engage in the practice. General Instruction 2 to Part 2 of Form ADV.

actual conflicts to the point that a client cannot provide informed consent. On the other hand, the word ''may'' could be appropriately used to disclose to a client a potential conflict that does not currently exist but might reasonably present itself in the future.[61]

Whether the disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the material fact or conflict. Full and fair disclosure for an institutional client (including the specificity, level of detail, and explanation of terminology) can differ, in some cases significantly, from full and fair disclosure for a retail client because institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications.[62] Nevertheless, regardless of the nature of the client, the disclosure must be clear and detailed enough for the client to make an informed decision to consent to the conflict of interest or reject it.

When allocating investment opportunities among eligible clients, an adviser may face conflicts of interest either between its own interests and those of a client or among different clients.[63] If so, the adviser must eliminate or at least expose through full and fair disclosure the conflicts associated with its allocation policies, including how the adviser will allocate investment opportunities, such that a client can provide informed consent.[64] When allocating investment opportunities, an adviser is permitted to consider the nature and objectives of the client and the scope of the relationship.[65] An adviser need not have *pro rata* allocation policies, or any particular method of allocation, but, as with other conflicts and material facts, the adviser's allocation practices must not prevent it from providing advice that is in the best interest of its clients.[66]

While most commenters agreed that informed consent is a component of the fiduciary duty, a few commenters objected to what they saw as subjectivity in the use of the term ''informed'' to describe a client's consent to a disclosed conflict.[67] The fact that disclosure must be full and fair such that a client can provide informed consent does not require advisers to make an affirmative determination that a particular client understood the disclosure and that the client's consent to the conflict of interest was informed. Rather, disclosure should be designed to put a client in a position to be able to understand and provide informed consent to the conflict of interest. A client's informed consent can be either explicit or, depending on the facts and circumstances, implicit.[68] We believe, however, that it would not be consistent with an adviser's fiduciary duty to infer or accept client consent where the adviser was aware, or reasonably should have been aware, that the client did not understand the nature and import of the conflict.[69] In some cases, conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or the nature, magnitude, and potential effect of the conflict sufficient for a client to consent to or reject it.[70] In other cases, disclosure may not be specific enough for a client to understand whether and how the conflict could affect the advice it receives. For retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable. In all of these cases where an investment adviser cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent, the adviser should either *eliminate* the conflict or adequately *mitigate* (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible.

Full and fair disclosure of all material facts relating to the advisory relationship, and all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested, can help clients and prospective clients in evaluating and selecting investment advisers. Accordingly, we require advisers to deliver to their clients a ''brochure,'' under Part 2A of Form ADV, which sets

---

[61] We have added this example of a circumstance where ''may'' could be appropriately used in response to the request of some commenters. *See, e.g.,* Pickard Letter; ICI Letter; Ropes & Gray Letter; IAA Letter.

[62] *Arleen Hughes, supra* footnote 18 (the ''method and extent of disclosure depends upon the particular client involved,'' and an unsophisticated client may require ''a more extensive explanation than the informed investor'').

[63] *See* Restatement (Third) of Agency, § 8.01 General Fiduciary Principle (2006) (''Unless the principal consents, the general fiduciary principle, as elaborated by the more specific duties of loyalty stated in §§ 8.02 to 8.05, also requires that an agent refrain from using the agent's position or the principal's property to benefit the agent or a third party.'').

[64] The Commission has brought numerous enforcement actions alleging that advisers unfairly allocated client trades to preferred clients without making full and fair disclosure. *See* Staff of the U.S. Securities and Exchange Commission, *Study on Investment Advisers and Broker-Dealers As Required by Section 913 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (Jan. 2011), *available at https://www.sec.gov/news/studies/2011/913studyfinal.pdf,* at 23–24 (citing enforcement actions). This Final Interpretation sets forth the Commission's views regarding what constitutes full and fair disclosure. *See, e.g., supra* text accompanying footnote 59; *see also* Barry Barbash and Jai Massari, *The Investment Advisers Act of 1940; Regulation by Accretion,* 39 Rutgers Law Journal 627 (2008) (stating that under section 206 of the Advisers Act and traditional notions of fiduciary and agency law, an adviser must not give preferential treatment to some clients or systematically exclude eligible clients from participating in specific opportunities without providing the clients with appropriate disclosure regarding the treatment).

[65] An adviser and a client may even agree that certain investment opportunities or categories of investment opportunities will not be allocated or offered to a client.

[66] In the Proposed Interpretation, we stated that ''in allocating investment opportunities among eligible clients, an adviser must treat all clients fairly.'' Some commenters interpreted this statement to mean that it would be impermissible for an adviser to allocate a particular investment to one eligible client instead of a second eligible client, even when the second client had received full and fair disclosure and provided informed consent to such an investment being allocated to the first client. *See, e.g.,* Ropes & Gray Letter; SIFMA AMG Letter. We have removed that sentence from this Final Interpretation and replaced it with this discussion that clarifies our views regarding allocation of investment opportunities.

[67] *See, e.g.,* Comment Letter of LPL Financial LLC (Aug. 7, 2018); Ropes & Gray Letter.

[68] We do not interpret an adviser's fiduciary duty to require that full and fair disclosure or informed consent be achieved in a written advisory contract or otherwise in writing. For example, an adviser could provide a client full and fair disclosure of all material facts relating to the advisory relationship as well as full and fair disclosure of all conflicts of interest which might incline the adviser, consciously or unconsciously, to render advice that was not disinterested, through a combination of Form ADV and other disclosure and the client could implicitly consent by entering into or continuing the investment advisory relationship with the adviser.

[69] *See* Arleen Hughes, *supra* footnote 18 (''Registrant cannot satisfy this duty by executing an agreement with her clients which the record shows some clients do not understand and which, in any event, does not contain the essential facts which she must communicate.''). In the Proposed Interpretation, we stated that inferring or accepting client consent to a conflict would not be consistent with the fiduciary duty where ''the material facts concerning the conflict could not be fully and fairly disclosed.'' Some commenters expressed agreement with this statement. *See, e.g.,* CFA Letter (agreeing that ''advisers should be precluded from inferring or accepting client consent to a conflict'' where the material facts concerning the conflict could not be fully and fairly disclosed). Other commenters expressed doubt that such disclosure could be impossible. *See, e.g.,* Allianz Letter (''[W]e have not encountered a situation in which we could not fully and fairly disclose the material facts, including the nature, extent, magnitude and potential effects of the conflict.''). In response to commenters, we have replaced the general statement about an inability to fully and fairly disclose material facts about the conflict with more specific examples of how advisers can make such full and fair disclosure. *See supra* text accompanying footnotes 59–66.

[70] As discussed above, institutional clients generally have a greater capacity and more resources than retail clients to analyze and understand complex conflicts and their ramifications. *See supra* text accompanying footnote 62.

out minimum disclosure requirements, including disclosure of certain conflicts.[71] Investment advisers are required to deliver the brochure to a prospective client at or before entering into a contract so that the prospective client can use the information contained in the brochure to decide whether or not to enter into the advisory relationship.[72] In a concurrent release, we are requiring all investment advisers to deliver to retail investors, at or before the time the adviser enters into an investment advisory agreement, a relationship summary, which would include, among other things, a plain English summary of certain of the firm's conflicts of interest, and would encourage retail investors to inquire about those conflicts.[73]

## III. Economic Considerations

As noted above, this Final Interpretation is intended to reaffirm, and in some cases clarify, certain aspects of an investment adviser's fiduciary duty under the Advisers Act. The Final Interpretation does not itself create any new legal obligations for advisers. Nonetheless, the Commission recognizes that to the extent an adviser's practices are not consistent with the Final Interpretation provided above, the Final Interpretation could have potential economic effects. We discuss these potential effects below.

### *A. Background*

The Commission's interpretation of the standard of conduct for investment advisers under the Advisers Act set forth in this Final Interpretation would affect investment advisers and their associated persons as well as the clients of those investment advisers, and the market for financial advice more broadly.[74] As of December 31, 2018, there were 13,299 investment advisers registered with the Commission with over $84 trillion in assets under management as well as 17,268 investment advisers registered with states with approximately $334 billion in assets under management and 3,911 investment advisers who submit Form ADV as exempt reporting advisers.[75] As of December 31, 2018, there are approximately 41 million client accounts advised by SEC-registered investment advisers.[76]

These investment advisers currently incur ongoing costs related to their compliance with their legal and regulatory obligations, including costs related to understanding the standard of conduct. We believe, based on the Commission's experience, that the interpretations set forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act.[77] However, we recognize that as the scope of the adviser-client relationship varies and in many cases can be broad, there may be certain current circumstances where investment advisers interpret their fiduciary duty to require something less, and other current circumstances where they interpret their fiduciary duty to require something more, than this Final Interpretation. We lack data to identify which investment advisers currently understand their fiduciary duty to require something different from the standard of conduct articulated in this Final Interpretation. Based on our experience over decades of interacting with the investment management industry as its primary regulator, however, we generally believe that it is not a significant portion of the market.

One commenter suggested that the Proposed Interpretation's discussion of how an adviser fulfills its fiduciary duty appeared to be based in the context of having as a client an individual investor, and not a fund.[78] This commenter indicated its concerns about the ability of a fund manager to infer consent from a client that is a fund, and that issues regarding inferring consent from funds could significantly increase compliance costs for venture capital funds.[79] Our discussion above in this Final Interpretation includes clarifications to address comments, and expressly acknowledges that while all investment advisers owe each of their clients a fiduciary duty, the specific application of the investment adviser's fiduciary duty must be viewed in the context of the agreed-upon scope of the adviser-client relationship.[80] This Final Interpretation, as compared to the Proposed Interpretation, includes significantly more examples of the application of the fiduciary duty to institutional clients, and clarifies the Commission's interpretation of what constitutes full and fair disclosure and informed consent, acknowledging a number of comments on this topic.[81] We believe that these clarifications will help address some of this commenter's concerns with respect to increased compliance costs for venture capital funds, in part by clarifying how the fiduciary duty can apply to institutional clients. We continue to believe, based on our experience with investment advisers to different types of clients, that advisers understand their fiduciary

[71] Investment Advisers Act Release 3060, *supra* footnote 15; General Instruction 3 to Part 2 of Form ADV (''Under federal and state law, you are a fiduciary and must make full disclosure to your clients of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your clients that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them.''). *See also Robare* v. *SEC, supra* footnote 20 (''[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.'').

[72] Investment Advisers Act rule 204–3. *See* Investment Advisers Act Release 3060, *supra* footnote 15 (adopting amendments to Form ADV and stating that, ''A client may use this disclosure to select his or her own adviser and evaluate the adviser's business practices and conflicts on an ongoing basis. As a result, the disclosure clients and prospective clients receive is critical to their ability to make an informed decision about whether to engage an adviser and, having engaged the adviser, to manage that relationship.''). To the extent that the information required for inclusion in the brochure does not satisfy an adviser's disclosure obligation, the adviser ''may have to disclose to clients information not specifically required by Part 2 of Form ADV or in more detail than the brochure items might otherwise require'' and this disclosure may be made ''in [the] brochure or by some other means.'' General Instruction 3 to Part 2 of Form ADV.

[73] Form CRS Relationship Summary; Amendments to Form ADV; Required Disclosures in Retail Communications and Restrictions on the use of Certain Names or Titles, Investment Advisers Act Release No. 5247 (June 5, 2019) (''Relationship Summary Adoption'').

[74] *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A (discussing the market for financial advice generally).

[75] Data on investment advisers is based on staff analysis of Form ADV, particularly Item 5.F.(2)(c) of Part 1A for Regulatory Assets under Management. Because this Final Interpretation interprets an adviser's fiduciary duty under section 206 of the Advisers Act, this interpretation would be applicable to both SEC- and state-registered investment advisers, as well as other investment advisers that are exempt from registration or subject to a prohibition on registration under the Advisers Act.

[76] Item 5.F.(2)(f) of Part 1A of Form ADV.

[77] *See supra* section II.B.i. For example, some commenters asked that we clarify from the Proposed Interpretation that an adviser and its client can tailor the scope of the relationship to which the fiduciary duty applies, through contract. *See, e.g.,* MMI Letter; Financial Engines Letter; ABA Letter. *See supra* footnotes 67–69 and accompanying text, including clarifications addressing these commenters' concerns. More generally, some commenters requested clarifications from the Proposed Interpretation, and we are issuing this Final Interpretation to address those issues raised by commenters, as discussed in more detail above.

[78] *See* Comment Letter of National Venture Capital Association (Aug. 7, 2018) (''NVCA Letter'').

[79] *Id.*

[80] *See supra* section II.A.

[81] In particular, this Final Interpretation expressly notes our belief that a client generally may provide its informed consent implicitly ''by entering into or continuing the investment advisory relationship with the adviser'' after disclosure of a conflict of interest. *See supra* footnote 68.

duty to be generally consistent with the standards of this Final Interpretation.

*B. Potential Economic Effects*

Based on our experience as the long-standing regulator of the investment adviser industry, the Commission's interpretation of the fiduciary duty under section 206 of the Advisers Act described in this Final Interpretation generally reaffirms the current practices of investment advisers. Therefore, we expect there to be no significant economic effects from this Final Interpretation. However, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, we acknowledge that affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Further, to the extent certain investment advisers currently understand the practices necessary to comply with their fiduciary duty to be different from those discussed in this Final Interpretation, there could be some economic effects, which we discuss below.

Clients of Investment Advisers

The typical relationship between an investment adviser and a client is a principal-agent relationship, where the principal (the client) hires an agent (the investment adviser) to perform some service (investment advisory services) on the principal's behalf.[82] Because investors and investment advisers are likely to have different preferences and goals, the investment adviser relationship is subject to agency problems, including those resulting from conflicts: That is, investment advisers may take actions that increase their well-being at the expense of investors, thereby imposing agency costs on investors.[83] A fiduciary duty, such as the duty investment advisers owe their clients, can mitigate these agency problems and reduce agency costs by deterring investment advisers from taking actions that expose them to legal liability.[84]

To the extent this Final Interpretation causes a change in behavior of those investment advisers, if any, who currently interpret their fiduciary duty to require something different from this Final Interpretation, we expect a potential reduction in agency problems and, consequently, a reduction of agency costs to the client.[85] For example, an adviser that, as part of its duty of loyalty, fully and fairly discloses[86] a conflict of interest and receives informed consent from its client with respect to the conflict may reduce agency costs by increasing the client's awareness of the conflict and improving the client's ability to monitor the adviser with respect to this conflict. Alternatively, the client may choose to not consent given the information the adviser discloses about a conflict of interest if the perceived risk associated with the conflict is too significant, and instead try to renegotiate the contract with the adviser or look for an alternative adviser or other financial professional. In addition, the obligation to fully and fairly disclose a current conflict may cause the adviser to take other actions, for example eliminating or adequately mitigating (*i.e.,* modifying practices to reduce) that conflict rather than taking the risk that the client will not provide informed consent or will look for an alternative adviser or other financial professional. The extent to which agency costs would be reduced by such a disclosure is difficult to assess given that we are unable to ascertain the total number of investment advisers that currently interpret their fiduciary duty to require something different from the Commission's interpretation,[87] and consequently we are not able to estimate the agency costs such advisers currently impose on investors. In addition, we believe that there may be potential benefits for clients of those investment advisers, if any, to the extent this Final Interpretation is effective at strengthening investment advisers' understanding of their obligations to their clients. Further, to the extent that this Final Interpretation enhances the understanding of any investment advisers of their duty of care, it may potentially raise the quality of investment advice and also lead to increased compliance with the duty to monitor, for example whether advice about an account or program type remains in the client's best interest, thereby increasing the likelihood that the advice fits with a client's objectives.

In addition, to the extent that this Final Interpretation causes some investment advisers to properly identify circumstances in which conflicts may be of a nature and extent that it would be difficult to provide disclosure to clients that adequately conveys the material facts or nature, magnitude, and potential effect of the conflict sufficient for clients to consent to it or reject it, or in which the disclosure may not be specific enough for clients to understand whether and how the conflict could affect the advice they receive, this Final Interpretation may lead those investment advisers to take additional steps to improve their disclosures or to determine whether adequately mitigating (*i.e.,* modifying practices to reduce) the conflict may be appropriate such that full and fair disclosure and informed consent are possible. This Final Interpretation may also cause some investment advisers to conclude in some circumstances that they cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent. We would expect that these advisers would either eliminate the conflict or adequately mitigate (*i.e.,* modify practices to reduce) the conflict such that full and fair disclosure and informed consent would be possible. Thus, to the extent this Final Interpretation would cause investment advisers to better understand their obligations and therefore to modify their business practices in ways that (i) reduce the likelihood that conflicts and other agency costs will cause an adviser to place its interests ahead of the interests of the client or (ii) help those advisers to provide full and fair disclosure, it would be expected to ameliorate the agency conflict between investment advisers and their clients. In

[82] *See, e.g.,* James A. Brickley, Clifford W. Smith, Jr. & Jerold L. Zimmerman, *Managerial Economics and Organizational Architecture* (2004), at 265 (''An agency relationship consists of an agreement under which one party, the principal, engages another party, the agent, to perform some service on the principal's behalf.''); *see also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* 3 Journal of Financial Economics 305–360 (1976) (''Jensen and Meckling'').

[83] *See, e.g.,* Jensen and Meckling, *supra* footnote 82.

[84] *See, e.g.,* Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty,* 36 Journal of Law & Economics 425–46 (1993).

[85] To the extent that this Final Interpretation clarifies the fiduciary duty for investment advisers, one commenter suggested it may then clarify what clients expect of their investment advisers. *See* Cambridge Letter (stating that ''greater clarity on all aspects of an investment adviser's fiduciary duty will improve the ability to craft such policies and procedures, as well as support the elimination of confusion for retail clients and investment professionals'').

[86] As discussed above, whether such a disclosure is full and fair will depend upon, among other things, the nature of the client, the scope of the services, and the conflict. *See supra* section II.C.

[87] One commenter did not agree that the discussion of fiduciary obligations in the Proposed Interpretation applied to advisers to funds as well as advisers to retail investors. *See* NVCA Letter. As discussed above, this Final Interpretation has clarified the discussion to address this commenter's concerns and acknowledges that the application of the fiduciary duty of an adviser to a retail client would be different from the specific application of the fiduciary duty of an adviser to a registered investment company or private fund.

turn, this may improve the quality of advice that the clients receive and therefore produce higher overall returns for clients and increase the efficiency of portfolio allocation. However, as discussed above, we would generally expect these effects to be minimal because we believe that the interpretations we are setting forth in this Final Interpretation are generally consistent with investment advisers' current understanding of their fiduciary duty under the Advisers Act. Finally, this Final Interpretation would also benefit clients of investment advisers to the extent it assists the Commission in its oversight of investment advisers' compliance with their regulatory obligations.

Investment Advisers and the Market for Investment Advice

In general, we expect this Final Interpretation to affirm investment advisers' understanding of the fiduciary duty they owe their clients under the Advisers Act, reduce uncertainty for advisers, and facilitate their compliance. Further, by addressing in one release certain aspects of the fiduciary duty that an investment adviser owes to its clients under the Advisers Act, this Final Interpretation could reduce investment advisers' costs associated with comprehensively assessing their compliance obligations. We acknowledge that, as with other circumstances in which the Commission speaks to the legal obligations of regulated entities, affected firms, including those whose practices are consistent with the Commission's interpretation, incur costs to evaluate the Commission's interpretation and assess its applicability to them. Moreover, as discussed above, there may be certain investment advisers who currently understand their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation. Those investment advisers would experience an increase in their compliance costs as they change their systems, processes, disclosures, and behavior, and train their supervised persons, to align with this Final Interpretation. However, this increase in costs would be mitigated by potential benefits in efficiency for investment advisers that are able to understand aspects of their fiduciary duty by reference to a single Commission release that reaffirms—and in some cases clarifies—certain aspects of the fiduciary duty.[88] In addition, and as discussed above, in the case of an investment adviser that believed it owed its clients a lower standard of conduct, there will be client benefits from the ensuing adaptation of a higher standard of conduct and related change in policies and procedures.

Moreover, to the extent any investment advisers that understood their fiduciary duty to require something different from the fiduciary duty described in this Final Interpretation change their behavior to align with this Final Interpretation, there could also be some economic effects on the market for investment advice. For example, any improved compliance may not only reduce agency costs in current investment advisory relationships and increase the value of those relationships to current clients, it may also increase trust in the market for investment advice among all investors, which may result in more investors seeking advice from investment advisers. This may, in turn, benefit investors by improving the efficiency of their portfolio allocation. To the extent it is costly or difficult, at least in the short term, to expand the supply of investment advisory services to meet an increase in demand, any such new demand for investment advisory services could put some upward price pressure on fees. At the same time, however, if any such new demand increases the overall profitability of investment advisory services, then we expect it would encourage entry by new investment advisers—or hiring of new representatives by current investment advisers—such that competition would increase over time. Indeed, the recent growth in the investment adviser segment of the market, both in terms of number of firms and number of representatives,[89] may suggest that the costs of expanding the supply of investment advisory services are currently relatively low.

Additionally, we acknowledge that to the extent certain investment advisers recognize, as a result of this Final Interpretation, that their fiduciary duty is stricter than the fiduciary duty as they currently interpret it, it could potentially affect competition. Specifically, this Final Interpretation of certain aspects of the standard of conduct for investment advisers may result in additional compliance costs for investment advisers seeking to meet their fiduciary duty. This increase in compliance costs, in turn, may discourage competition for client segments that generate lower revenues, such as clients with relatively low levels of financial assets, which could reduce the supply of investment advisory services and raise fees for these client segments. However, the investment advisers who already are complying with the understanding of their fiduciary duty reflected in this Final Interpretation, and who may therefore currently have a comparative cost disadvantage, could find it more profitable to compete for the clients of those investment advisers who would face higher compliance costs as a result of this Final Interpretation, which would mitigate negative effects on the supply of investment advisory services. Further, as noted above, there has been a recent growth trend in the supply of investment advisory services, which is likely to mitigate any potential negative supply effects from this Final Interpretation.[90]

One commenter discussed that, in its view, any statement in the Proposed Interpretation that certain circumstances may require the elimination of material conflicts, rather than full and fair disclosure or the mitigation of such conflicts, could lead to an effect on the market and costs to advisers, if such a requirement would cause advisers who had not shared that interpretation to change their business models or product offerings or the ways in which they interact with clients.[91] We disagree that this Final Interpretation includes a requirement to eliminate conflicts of interest. As discussed in more detail above, elimination of a conflict is one method of addressing that conflict; when appropriate advisers may also address the conflict by providing full and fair disclosure such that a client can provide informed consent to the

[88] As noted above, *supra* footnote 3, this Final Interpretation is intended to highlight the principles relevant to an adviser's fiduciary duty. It is not, however, intended to be the exclusive resource for understanding these principles.

[89] *See* Relationship Summary Proposal, *supra* footnote 5, at section IV.A.1.d.

[90] Beyond having an effect on competition in the market for investment adviser services, it is possible that this Final Interpretation could affect competition between investment advisers and other providers of financial advice, such as broker-dealers, banks, and insurance companies. This may be the case if certain investors base their choice between an investment adviser and another provider of financial advice, at least in part, on their perception of the standards of conduct each owes to their customers. To the extent that this Final Interpretation increases investors' trust in investment advisers' overall compliance with their standard of conduct, certain of these investors may become more willing to hire an investment adviser rather than one of their non-investment adviser competitors. As a result, investment advisers as a group may become more competitive compared to that of other types of providers of financial advice. On the other hand, if this Final Interpretation raises costs for investment advisers, they could become less competitive with other financial advice providers.

[91] *See* Dechert Letter.

conflict.[92] Further, we believe that any potential costs or market effects resulting from investment advisers addressing conflicts of interest may be decreased by the flexibility advisers have to meet their federal fiduciary duty in the context of the specific scope of services that they provide to their clients, as discussed in this Final Interpretation.

The commenter also drew particular attention to the question of whether the Commission's discussion of the fiduciary duty in the Proposed Interpretation applied to advisers to institutional clients as well as those to retail clients. The same commenter indicated that failing to accommodate the application of the concepts in the Proposed Interpretation to sophisticated clients could risk changing the marketplace or limiting investment opportunities for sophisticated clients, increasing compliance burdens for advisers to sophisticated clients, or chilling innovation. As explained above, this Final Interpretation, as compared to the Proposed Interpretation, discusses in more detail the ability of investment advisers and different types of clients to shape the scope of the relationship to which the fiduciary duty applies.[93] In particular, this Final Interpretation acknowledges that while advisers owe each of their clients a fiduciary duty, the specific obligations of, for example, an adviser providing comprehensive, discretionary advice in an ongoing relationship with a retail client will be significantly different from the obligations of an adviser to an institutional client, such as a registered investment company or private fund, where the contract defines the scope of the adviser's services and limitations on its authority with substantial specificity.[94]

Finally, to the extent this Final Interpretation causes some investment advisers to reassess their compliance with their duty of loyalty, it could lead to a reduction in the expected profitability of advice relating to particular investments for which compliance costs would increase following the reassessment.[95] As a result, the number of investment advisers willing to advise a client to make these investments may be reduced. A decline in the supply of investment adviser advice regarding these types of investments could affect efficiency for investors; it could reduce the efficiency of portfolio allocation for those investors who might otherwise benefit from investment adviser advice regarding these types of investments and are no longer able to receive such advice. At the same time, if providing full and fair disclosure and appropriate monitoring for highly complex products (*e.g.,* those with a complex payout structure, such as those that include variable or contingent payments or payments to multiple parties) results in these products becoming less profitable for investment advisers, investment advisers may be discouraged from supplying advice regarding such products. However, investors may benefit from (1) no longer receiving inadequate disclosure or monitoring for such products, (2) potentially receiving advice regarding other, less complex or expensive products that may be more efficient for the investor, and (3) only receiving recommendations for highly complex or high cost products for which an investment adviser can provide full and fair disclosure regarding its conflicts and appropriate monitoring.

**List of Subjects in 17 CFR Part 276**

Securities.

**Amendments to the Code of Federal Regulations**

For the reasons set out above, the Commission is amending Title 17, chapter II of the Code of Federal Regulations as set forth below:

## PART 276—INTERPRETATIVE RELEASES RELATING TO THE INVESTMENT ADVISERS ACT OF 1940 AND GENERAL RULES AND REGULATIONS THEREUNDER

■ 1. Part 276 is amended by adding Release No. IA–5428 and the release date of June 5, 2019, to the end of the list of interpretive releases to read as follows''

| Subject | Release No. | Date | FR vol. and page |
|---|---|---|---|
| * * * | * | * | * * * |
| Commission Interpretation Regarding Standard of Conduct for Investment Advisers. | IA–5248 | June 5, 2019 ................ | [Insert FR Volume Number] FR [Insert FR Page Number]. |

By the Commission.

Dated: June 5, 2019.

**Vanessa A. Countryman,**

*Acting Secretary.*

[FR Doc. 2019–12208 Filed 7–11–19; 8:45 am]

BILLING CODE 8011–01–P

## SECURITIES AND EXCHANGE COMMISSION

## 17 CFR Part 276

**[Release No. IA–5249]**

## Commission Interpretation Regarding the Solely Incidental Prong of the Broker-Dealer Exclusion From the Definition of Investment Adviser

**AGENCY:** Securities and Exchange Commission.

**ACTION:** Interpretation.

**SUMMARY:** The Securities and Exchange Commission (the ''SEC'' or the ''Commission'') is publishing an interpretation of a section of the Investment Advisers Act of 1940 (the ''Advisers Act'' or the ''Act''), which excludes from the definition of ''investment adviser'' any broker or dealer that provides advisory services when such services are ''solely incidental'' to the conduct of the broker or dealer's business and when such incidental advisory services are provided for no special compensation.

**DATES:** Effective July 12, 2019.

**FOR FURTHER INFORMATION CONTACT:** James McGinnis, Senior Counsel, Investment Adviser Regulation Office, at (202) 551–6787 or *IArules@sec.gov;* and Benjamin Kalish, Attorney-Advisor, or

[92] *See supra* section II.C.

[93] *See supra* footnotes 78–81 and accompanying text.

[94] *See supra* section II.A.

[95] For example, such products could include highly complex, high cost products with risk and return characteristics that are hard for retail investors to fully understand, or where the investment adviser and its representatives receive complicated payments from affiliates that create conflicts of interest that are difficult for retail investors to fully understand.