**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Applicant,<br><br>v.<br><br>INSTITUTIONAL SHAREHOLDER SERVICES, INC.,<br><br>Respondent; | ) | Misc. Case No. 2:26-mc-00078 |

**RESPONDENT'S MEMORANDUM IN OPPOSITION TO THE SECURITIES AND EXCHANGE COMMISSION'S APPLICATION FOR AN ORDER COMPELLING COMPLIANCE WITH THE ADMINISTRATIVE SUBPOENA**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

BACKGROUND ........ 4

A. ISS' Proxy Advisory Services ........ 4

B. The President's Executive Order ........ 6

C. The SEC's Examination ........ 7

D. The SEC's Subpoena ........ 8

ARGUMENT ........ 10

I. The SEC Has Not Met Its Heightened Burden For Compelled Disclosure Of Client-Identifying Voting Information Under The First Amendment ........ 11

A. Producing Client-Identified Voting Data Burdens the First Amendment Rights of ISS and ISS' Clients ........ 11

1. ISS and Its Clients Are Engaged in Protected First Amendment Speech and Association ........ 11

2. Requiring Disclosure of Client-Identified Information Would Burden The First Amendment Rights of ISS And Its Clients ........ 14

B. The SEC Fails to Justify Intruding on The First Amendment Rights of ISS and ISS' Clients ........ 17

II. The SEC's Request Has A Retaliatory Purpose ........ 19

III. The Government Cannot Articulate Any Legitimate Investigative Need For The Disputed Client-Identifying Voting Data ........ 24

IV. At Minimum, The Court Should Impose Adequate Safeguards On Any Production ........ 25

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Amato v. Wilentz*,
952 F.2d 742 (3d Cir. 1991)....................11

*Americans for Prosperity v. Bonta*,
594 U.S. 595 (2021).................... *passim*

*Arista Recs., LLC v. Doe 3*,
604 F.3d 110 (2d Cir. 2010)....................14

*Bair v. Shippensburg Univ.*,
280 F. Supp. 2d 357 (M.D. Pa. 2003)....................15

*Boyle v. Cnty. of Allegheny Penn.*,
139 F.3d 386 (3d Cir. 1998)....................20

*Buckley v. Am. Constitutional Law Found., Inc.*,
525 U.S. 182 (1999)....................13

*Buckley v. Valeo*,
525 U.S. 182 (1999)....................15

*EEOC v. C&P Tel. Co.*,
813 F. Supp. 874 (D.D.C. 1993)....................25

*EEOC v. Univ. of Penn.*,
850 F.2d 969 (3d Cir. 1988)....................10

*Endocrine Soc'y v. FTC*,
832 F. Supp. 3d 1 (D.D.C. 2026)....................22

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026)....................1, 2, 16

*Fraternal Order of Police Pennsylvania Lodge v. Twp. of Springfield*,
668 F. Supp. 3d 375 (E.D. Pa. 2023)....................16

*Greenberg v. Hagerty*,
491 F. Supp. 3d 12 (E.D. Pa. 2020)....................14

*Houston Comm'ty Coll. Sys. v. Wilson*,
595 U.S. 468 (2022)....................20

**TABLE OF AUTHORITIES—Continued**

Page(s)

*In re Subpoena Duces Tecum*,
228 F.3d 341 (4th Cir. 2000) ....................22

*ISS v. Kobach*,
No. 2:26-cv-02254-HLT-RES, 2026 WL 1815236 (D. Kan. June 24, 2026) ....................6, 11, 12, 21

*ISS v. Paxton*,
No. 1:25-cv-01153-ADA, Aug. 29, 2025 Text Order (W.D. Tex. 2025) ....................7, 21

*ISS v. Rokita*,
No. 1:26-cv-00717, 2026 WL 1847882 (S.D. Ind. June 26, 2026) .................... *passim*

*John Doe v. Reed*,
561 U.S. 186 (2010)....................13

*Mazo v. New Jersey Secretary of State*,
54 F.4th 124 (3d Cir. 2022) ....................13

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
429 U.S. 274 (1977)....................20

*NAACP v. Alabama ex rel. Patterson*,
357 U.S. 449 (1958)....................12, 13, 15, 16

*Nat'l Rifle Ass'n v. Vullo*,
602 U.S. 175 (2024)....................16, 20, 21, 22

*NLRB v. Vista Del Sol Health Servs., Inc.*,
40 F. Supp. 3d 1238 (C.D. Cal. 2014) ....................24

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
475 U.S. 1 (1986)....................13

*Pickel v. United States*,
746 F.2d 176 (3d Cir. 1984)....................24

*Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*,
653 F.3d 290 (3d Cir. 2011)....................14

*Salvation Army v. Dep't of Cmty. Affs. of N.J.*,
919 F.2d 183 (3d Cir. 1990)....................13

**TABLE OF AUTHORITIES—Continued**

Page(s)

*SEC v. Barr Fin. Group, Inc.*,
No. 98-1806, 1999 WL 1209520 (M.D. Fla. May 5, 1999)....................................................24

*SEC v. Wheeling-Pittsburgh Steel Co.*,
No. 80-1375, 1980 WL 8157 (3d Cir. Aug. 27, 1980), *modified on reh'g*, 648 F.2d 118 (3d Cir. 1981) (en banc)............................................................23

*See v. City of Seattle*,
387 U.S. 541 (1967)..........................................................................................19

*St. German of Alaska E. Orthodox Catholic Church v. U.S.*,
840 F.2d 1087 (2d Cir. 1988)..........................................................................16, 17

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*,
309 F.3d 144 (3d Cir. 2002)..........................................................................13

*United States v. Fensterwald*,
553 F.2d 231 (D.C. Cir. 1977)........................................................................23

*United States v. Harrington*,
388 F.2d 520 (2d Cir. 1968)..........................................................................24

*United States v. Hunton & Williams*,
952 F. Supp. 843 (D.D.C. 1997)......................................................................25

*United States v. McCarthy*,
514 F.2d 368 (3d Cir. 1975)..........................................................................23

*United States v. Powell*,
379 U.S. 48 (1964)..........................................................................11, 20, 24

*United States v. Rockwell Intern.*,
897 F.2d 1255 (3d Cir. 1990)..........................................................................11

*Virginia v. Am. Booksellers*,
484 U.S. 383 (1988)..........................................................................................11

*Wearly v. FTC*,
616 F.2d 662 (3d Cir. 1980)..........................................................................19, 25

*Zapach v. Dismuke*,
134 F. Supp. 2d 682 (E.D. Pa. 2001)..............................................................12

**TABLE OF AUTHORITIES—Continued**

Page(s)

**STATUTE:**

15 U.S.C. § 80b-6 .....8

**REGULATIONS:**

17 C.F.R. § 240.24c-1(b) .....15

17 C.F.R. § 275.204-2(c)(1).....8

17 C.F.R. § 275.206(4)-8.....8

*Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies*, 68 Fed. Reg. 6,564 (Feb. 7, 2003).....17

*Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers*, 87 Fed. Reg. 78,770 (Dec. 22, 2022) .....17

Exec. Order 14,366, Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors, 90 Fed. Reg. 58,503 (Dec. 11, 2025) ..... *passim*

**OTHER AUTHORITIES:**

*Fact Sheet: President Donald J. Trump Protects American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors* (Dec. 11, 2025) ("*Fact Sheet*"), https://tinyurl.com/mubtkbae (last visited September 18, 2026).....3, 6, 21

Benjamin Zycher, *As firms back away from ESG, Congress must reform proxy voting*, The Hill (Oct. 29, 2025), https://tinyurl.com/ena4p96t (last visited September 15, 2026) .....21

## INTRODUCTION

As an investment adviser regulated under the Investment Advisers Act of 1940, Institutional Shareholder Services Inc. ("ISS") takes its Securities and Exchange Commission ("SEC") compliance obligations seriously. But precisely because it is a regulated investment adviser, ISS has a duty to protect its clients' most sensitive commercial information. ISS therefore opposes just one of the requests in the SEC's subpoena, and even then only in part, so that its clients' crucial First Amendment and privacy interests can be protected from unwarranted government overreach.

Every year, shareholders are asked to weigh in on governance and policy issues affecting public companies. Many of them touch on some of the thorniest political, economic, and social problems confronting society. Because ISS operates a platform that facilitates investor voting, ISS effectively serves as a repository for those votes on behalf of its over 1,400 clients—which include churches' and universities' endowments, states' and unions' pension funds, and major companies, including asset managers and other investors who manage billions, if not trillions of dollars. The SEC's subpoena demands that ISS provide the SEC with *millions of lines of data* documenting the views of these ISS clients on a range of controversial issues.

Just a few months ago, the Supreme Court held that similar "compelled disclosure[s]" as part of government investigations "can constitute an effective restraint" on First Amendment freedoms, *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 185 (2026) (cleaned up)—which is why courts must apply "exacting scrutiny" before authorizing them, *Americans for Prosperity v. Bonta*, 594 U.S. 595, 608 (2021) ("*AFP*").

The SEC's demand for client voting data cannot survive exacting scrutiny. The agency has articulated *no* legitimate investigative purpose for insisting that ISS turn over data allowing

the SEC to determine how every single ISS client voted on every single shareholder issue for every single vote contained in ISS' records for nearly four years. To ISS' knowledge, the SEC has *never* issued a comparable request for comprehensive client voting data.

ISS has repeatedly offered a compromise approach that *would* satisfy the agency's ostensible investigative needs: ISS would produce anonymized data revealing the voting directions ISS received from its clients, ISS' recommendation on each shareholder vote, and whether the client ultimately followed ISS' recommendation. The SEC rejected such a compromise, even as it identified no valid government interest in knowing the name of the client who voted for, or against, a given proposal.

The SEC's application largely ignores the narrow dispute between the parties, instead addressing the strawman argument of whether the subpoena *in general* is enforceable. But as ISS has told the SEC repeatedly—and reaffirms today—ISS already has complied or is in the process of complying with all of the subpoena's other requests. The *only* live dispute is the SEC's demand that ISS produce data that would match clients' names to their votes. The SEC even acknowledges (at 11) that ISS has told the agency it will comply except for this client-identifiable voting data. Yet the SEC dedicates a solitary paragraph—and really, just one sentence (at 20)—to trying to articulate a valid investigatory need for the only data in dispute.

There is, however, a clear explanation for the SEC's insistence on pursuing this data. As the Supreme Court detailed in *First Choice*, federal and state regulators have sometimes "demanded private" information using investigatory powers in an effort to identify perceived political rivals. 608 U.S. at 186 (cataloging cases). The motive behind the SEC's investigation is of this same ilk. In December 2025, an Executive Order targeted ISS for investigation based on the Administration's perception that ISS is engaged in "radical politically-motivated agendas"

at odds with the Administration's views on "'diversity, equity, and inclusion' and 'environmental, social and governance'" issues. Exec. Order 14,366, Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors, 90 Fed. Reg. 58,503, 58,504 (Dec. 11, 2025). The Executive Order directs the SEC to take investigative action against both ISS and clients who engage ISS to advise on positions the Administration disagrees with. *Id.* The accompanying Fact Sheet describes ISS' advice on proxy votes regarding "racial equity audits, aggressive GHG emission cuts, and other actions" as "designed to advance radical politically-motivated agendas like DEI and ESG." Ex. 1, *Fact Sheet: President Donald J. Trump Protects American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors* (Dec. 11, 2025) ("*Fact Sheet*"), https://tinyurl.com/mubtkbae (last visited September 18, 2026). Tellingly, the SEC's application practically admits (at 22) that its investigation was prompted by the Executive Order.

Consistent with the Executive Order's directives, the SEC has demanded that ISS produce information enabling it to identify investors who voted for positions that the Administration disagrees with. The agency's regulations would then allow it to share the information with any other federal or state regulator. If, under this Administration, the SEC can use its investigatory powers to find perceived opponents, the same is true for the next Administration—which could demand records showing who supported expanding fossil fuel use or opposed abortion and diversity initiatives. The First Amendment protects investors from unjustified efforts to pry into their protected views, no matter what those views are.

First Amendment aside, the SEC's demand for client-identifying information is still out of bounds. None of the SEC's purported investigative aims even plausibly supports a need for client-linked voting data. Indeed, the SEC short-circuited the meet-and-confer process over ISS

producing anonymized data and ran to this Court the moment a minor logistical hurdle arose. At a minimum, any disclosure that the Court orders should be phased to determine if anonymized data satisfies the SEC's valid investigatory purposes. And, if the Court orders production of client-identifying data, it should preclude the SEC from sharing that data outside the agency and from using it for any purpose other than a valid investigatory one.

ISS understands and appreciates the SEC's important role. That is why ISS has cooperated with every other aspect of the SEC's investigative demands—just as it always has. But when the SEC made an unprecedented request to enable it to identify ISS' clients who have expressed opinions disfavored by the Administration, ISS reasonably asked the SEC to justify its demand. The SEC still has not done so.

The application should be denied.

## BACKGROUND

### A. ISS' Proxy Advisory Services

Publicly traded companies regularly hold meetings to conduct business requiring shareholder approval. *See* Declaration of L. Kelly ("Decl.") ¶ 4. Shareholders usually do not attend these meetings in person, instead submitting a proxy vote to express their views. *Id.* ¶ 8. Shareholders vote on a variety of issues, including electing directors and executive compensation. *Id.* ¶¶ 4-5. In recent years, investors have been asked to vote on environmental, social, and governance issues like whether a company should adopt a climate transition plan, conduct a racial equity audit, report on corporate political contributions, or address abortion-related issues. *Id.* ¶ 6.

Institutional investors—sophisticated market participants that may manage billions or even trillions of dollars for thousands of smaller investors—vote on thousands of proposals each

year. *Id.* ¶¶ 7-9. To make informed decisions, institutional investors often hire proxy advisers to obtain research, analysis, and voting advice. *Id.* ¶ 9. ISS tailors its advice to each client's own expressed preferences and priorities. *Id.* ¶¶ 12, 15-29. ISS' clients, in turn, determine whether and how to incorporate ISS' research into their final proxy voting decisions. *Id.* ¶¶ 13-14. ISS does not guarantee its advice will produce any particular result or investment return. *Id.* ¶ 14.

In 2025 alone, ISS assisted approximately 1,400 clients in connection with voting analyses and recommendations for about 52,000 shareholder meetings. *Id.* ¶ 9. ISS assists a broad range of institutional investors, including mutual funds, university endowments, religious organizations, pension plans, union benefit plans, and state and local governments. *Id.* ¶ 7.

ISS' clients are far from uniform. ISS therefore offers three types of client-driven policy frameworks that guide recommendations: (1) the Benchmark Policy, which is a market-specific voting framework ISS has developed, and updates each year, through a robust consultative process with investors, companies, and other industry experts; (2) Specialty Policies, which are geared to particular investor populations, including investors who are religious, affiliated with labor unions, environmentally conscious, or who prefer to defer to directors' judgments; and (3) Custom Policies tailored to clients' specific preferences. Decl. ¶¶ 15-25. For the Benchmark and Specialty policies, ISS publishes the methodology underpinning its advice. *Id.* ¶¶ 19, 25; *see also* Ex. 2, *Current Voting Policies*, ISS-STOXX, https://tinyurl.com/mt5t3vuj (last visited Sept. 15, 2026). For each proposal requiring a vote, ISS analyzes the proposal and available data through the prism of the applicable policy to develop a voting recommendation. Decl. ¶ 12. ISS then provides each client a report containing research, analysis, and any recommendations. *Id.* Clients generally decide for themselves how to vote; sometimes they follow ISS' advice and

sometimes they do not. *Id.* ¶¶ 13-14.

ISS clients receive proxy research reports through ISS' online voting management platform called ProxyExchange. *Id.* ¶ 30. On ProxyExchange, ISS' clients can review their ISS research reports and recommendations; track their proxy voting activities, including by flagging meetings for special review and creating custom reports; and vote their proxy ballots. *Id.* ¶¶ 30-34. Clients can also learn about significant relationships that ISS or affiliates have with corporate issuers or their affiliates that are the subject of ISS' proxy research reports, or with a shareholder proponent that is the subject of an ISS research report. *Id.* ¶ 32.

**B. The President's Executive Order**

On December 11, 2025, the President issued Executive Order 14,366, entitled "Protecting American Investors From Foreign-Owned and Politically-Motivated Proxy Advisors." The Order asserts that ISS "regularly use[s] [its] substantial power to advance and prioritize radical politically-motivated agendas – like 'diversity, equity, and inclusion' and 'environmental, social, and governance' – even though investor returns should be the only priority." 90 Fed. Reg. 58,503 (Dec. 11, 2025). The Order directed the SEC to investigate ISS and ISS' clients based on these controversial issues. *Id.* at 58,504. The Order also directed the Federal Trade Commission and the Department of Labor to take action regarding proxy advisers. *Id.* at 58,504-05. The Fact Sheet accompanying the Order accuses ISS of adopting "politically-motivated advice" that "prioritize[s] ideological goals." *See Fact Sheet*.

The Order is part of a series of recent attacks on ISS for providing proxy advice that supposedly advances "leftist" or "woke" ideological preferences. For instance, multiple states have passed statutes attempting to regulate the content of ISS' recommendations. ISS has challenged these laws on First Amendment grounds, and every court to address those challenges

to date has concluded that ISS is likely to succeed. *ISS v. Kobach*, No. 2:26-cv-02254-HLT-RES, 2026 WL 1815236, at *1 (D. Kan. June 24, 2026); *ISS v. Rokita*, No. 1:26-cv-00717, 2026 WL 1847882, at *6 (S.D. Ind. June 26, 2026); *ISS v. Paxton*, No. 1:25-cv-01153-ADA, Aug. 29, 2025 Text Order (W.D. Tex. 2025).

**C. The SEC's Examination**

In March 2026, ISS received an examination request from the SEC. Decl. ¶ 36. Item 28 sought data listing all recommendations and recommendation updates made during the Examination Period, including the name of the client who received the recommendation, recommendation category (that is, Benchmark, Specialty, Custom), issuer, date of issuance or update, proposal, ISS recommendation, and the client's vote. *Id.* ¶ 37.

The voting data requested by the SEC is highly sensitive to ISS and its clients. That data includes how ISS' clients have voted their shares or how they voted on behalf of their underlying clients on every corporate ballot item spanning multiple years. *Id.* ¶¶ 37, 40, 47. Thus, this data reveals ISS' clients' opinions on a range of highly sensitive and contentious issues. *Id.* ¶ 47. In more than 25 years of oversight, during which the SEC has examined ISS six times, the SEC has never issued a comparable request for such information. *Id.* ¶ 38. ISS has not previously shared this data with third-parties or regulators, and, to ISS' knowledge, this data is not available from any other source. *Id.* ¶¶ 38, 49-50.

Nevertheless, to facilitate cooperation, in late April, ISS produced three samples of client-facing ProxyExchange data. Dkt. No. 1-6 at 2; Decl. ¶ 42. The samples include comprehensive ProxyExchange data for three former ISS clients, Decl. ¶ 42, as well as the client's name (and sometimes the names of the clients' clients), each issue on the agenda, the policy under which ISS provided its recommendation, ISS' recommendation, when the

recommendation was delivered to the client, and how the client ultimately voted. *Id.* ¶ 40. The data also includes any analysis and customization the client performed in ProxyExchange, such as client prioritization of meetings or issues, client standing voting instructions, and other client analysis performed in ProxyExchange. *Id.* ¶ 41.

After receiving these samples, the SEC again demanded that ISS export all of its ProxyExchange data for a period of nearly two years. *See* Dkt. No. 1-6 at 2. ISS objected, but offered to allow SEC staff to conduct an on-site inspection of ProxyExchange data. Dkt. No. 1-8 at 2. But the SEC insisted on ISS providing a complete download. *See id.*

**D. The SEC's Subpoena**

While ISS continued to negotiate in good faith regarding Item 28, the SEC escalated matters. On July 21, 2026, the full Commission issued a Formal Order of investigation, *see* Dkt. No. 1-2 ¶ 14, stating that the SEC was investigating whether ISS was in compliance with certain recordkeeping requirements, *see* 17 C.F.R. § 275.204-2(c)(1), and anti-fraud provisions, *see* 15 U.S.C. § 80b-6; *see also* 17 C.F.R. § 275.206(4)-8. At the same time, the SEC issued the subpoena at issue in this case. *See* Dkt. No. 1-11. The subpoena seeks three tranches of data. Request 1 seeks a list of ISS' clients during the period covered by the subpoena. Decl. of D. Foster ("Foster Decl.") ¶ 3. Request 2 seeks information about vote-authorization registration agreements between ISS and its clients. *Id.* ISS agreed to produce the data requested in Requests 1 and 2. It has completed production for Request 1 and has made substantial progress toward completing Request 2. *See id.* ¶¶ 3-5. Request 3 demands "an electronic export or exports of ProxyExchange recommendation and voting data for all ISS Voting Services clients, including all data fields referenced in the sample reports of ProxyExchange data produced by ISS on April 27, 2026." Dkt. No. 1-11 at 3. This includes every vote that each one of its voting

clients has cast on every proposal over the requested time period. And the subpoena expanded the time period beyond the Exam—from two years to nearly four years. *Id.*; *see also* Decl. ¶ 37.

ISS began negotiating with SEC Enforcement Staff to identify a mutually agreeable resolution. On August 6, 2026, ISS retained new counsel, Hogan Lovells Cadwalader, to represent it before the SEC. Foster Decl. ¶ 2. Four days later, ISS' counsel met with SEC Enforcement Staff. *See* Dkt. No. 1-13 at 2; Foster Decl. ¶ 4. During that meeting, ISS stated that it was willing to produce most of the data sought in Request 3, but that the request also implicates a significant amount of client data which goes beyond the proxy-advisory and voting-facilitation services that ISS offers to its clients. Foster Decl. ¶ 6. ISS explained that it was concerned about the volume and nature of the data sought by the SEC, emphasizing that sharing that information would chill ISS' and its clients' First Amendment rights. *Id.* ISS instead suggested a compromise in which it would produce the requested ProxyExchange data with client identities anonymized. *Id.* ¶ 7.

On August 18, 2026, ISS' counsel told the SEC that ISS would produce samples of anonymized data using the data of the three former clients provided on April 27. Foster Decl. ¶ 8; *see also* Dkt. No. 1-2 ¶ 17. Less than a week later, ISS' counsel informed SEC Enforcement Staff that ISS had been working diligently, including over the intervening weekend, to prepare the anonymized samples. Foster Decl. ¶ 9. ISS' counsel explained that, in the course of developing those samples, ISS was having difficulty determining exactly which items needed to be redacted to adequately protect client confidentiality, due to the volume of data on ProxyExchange and the interrelated nature of many data fields. *Id.* ISS' counsel indicated that ISS had identified an expert to assist and was willing to work with the SEC to produce other data in the meantime if the SEC could clarify its investigative needs. Foster Decl. ¶ 10.

The SEC refused to engage further. It sent a letter on September 1, 2026, demanding that ISS indicate within 48 hours whether it would produce the data the SEC was requesting, albeit for a shorter period of time. *Id.* ¶ 12; *see also* Dkt. No. 1-15 at 5. On September 3, 2026, ISS' counsel responded, stating that ISS "regrets that the SEC has indicated it wishes to shut down discussions aimed at reaching a compromise on the sole outstanding item under the Subpoena" and reiterating that "ISS has engaged expert consultants to work on the anonymization process as expeditiously as possible." Dkt. No. 1-17 at 1; *see also* Foster Decl. ¶ 13.

ISS' fears that providing the client-identifying data the SEC seeks would damage its client relationships have come to pass. Decl. ¶¶ 52-56. Over the past few weeks, ISS employees have had dozens of conversations with clients. *Id.* ¶ 53. Clients have expressed significant concerns regarding the SEC's investigation and about protecting their data from disclosure. *Id.* ISS also has reason to believe that the SEC has already commenced examinations of ISS clients about their relationships with ISS and those clients' proxy voting decisions. Within the last two weeks, at least one client has told ISS that it is under examination by the SEC and described the information sought by the SEC. Decl. ¶ 56. Other clients have made requests to ISS concerning the same types of information, suggesting they have received similar requests from the SEC. *Id.*

## ARGUMENT

The SEC's subpoena seeks millions of lines of data showing how over 1,000 institutional investors voted on every shareholder vote in ProxyExchange—including votes on hot-button economic, political, and social issues—over a nearly four-year period. Compelling disclosure of that data would severely burden the free speech and associational rights of both ISS and its clients. These burdens require that the Court subject the SEC's subpoena to "exacting scrutiny." *AFP*, 594 U.S. at 607-08; *see EEOC v. Univ. of Penn.*, 850 F.2d 969, 980 (3d Cir. 1988). That

means the SEC must establish a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that the disclosure is "narrowly tailored to the government's asserted interest." *AFP*, 594 U.S. at 607-08.

Under any standard, however, the SEC's demand for sensitive data about ISS' clients should be rejected. Even the SEC concedes it must at least show that its investigation is "conducted pursuant to a legitimate purpose" and that its inquiry "may be relevant to that purpose." *United States v. Rockwell Intern.*, 897 F.2d 1255, 1262 (3d Cir. 1990) (quoting *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). And even the limited evidence in the public record shows that the SEC's inquiry is part and parcel of a retaliatory campaign against ISS' exercise of its First Amendment-protected speech rights, rather than a good-faith investigation into ISS' compliance with federal securities law. That alone is enough to deny the application. Further, the SEC's request is overbroad and seeks irrelevant materials. ISS has complied or is in the process of complying with each and every SEC request *except* the SEC's demand for data which would allow the SEC to match particular clients to particular votes. The SEC has not asserted even a plausible need for that discrete category of information.

## I. The SEC Has Not Met Its Heightened Burden For Compelled Disclosure Of Client-Identifying Voting Information Under The First Amendment.

### A. Producing Client-Identified Voting Data Burdens the First Amendment Rights of ISS and ISS' Clients.

#### *1. ISS and Its Clients Are Engaged in Protected First Amendment Speech and Association.*

ISS and its clients engage in protected speech under the First Amendment throughout the proxy vote recommendation and voting process. And because it is the target of the SEC's subpoena, ISS may assert both its own First Amendment rights and those of its clients. *See Virginia v. Am. Booksellers*, 484 U.S. 383, 392-93 (1988); *Amato v. Wilentz*, 952 F.2d 742, 749

(3d Cir. 1991). Multiple courts have recognized that ISS' voting recommendations are protected under the First Amendment. *Kobach*, 2026 WL 1815236, at *9; *Rokita*, 2026 WL 1847882, at *4. Importantly, ISS is not trying to persuade investors to purchase securities; rather, ISS advises on important issues of corporate governance and policy. *See Kobach*, 2026 WL 1815236, at *10. As a result, "the product [ISS] ultimately provide[s]"—its "recommendations to institutional investors on shareholder votes"—"does not propose any commercial transaction," and is therefore entitled to robust First Amendment protection. *See id.* at *10. The issues on which ISS advises clients are often highly contentious: "what positively affects interest holder value in the eyes of some shareholders may not positively affect value for others." *Rokita*, 2026 WL 1847882, at *8. The range of ISS' policy offerings reinforces the point; indeed, those policies may lead to a different vote recommendation for different clients on the same vote, given variations in clients' priorities, methodology, and other attributes. *See* Decl. ¶¶ 27, 29.

ISS' clients are also engaged in protected speech during this deliberative process, including in selecting the policies they want to develop the voting recommendations they receive; in analyzing the proxy research; and in making a final vote decision. Where clients communicate their voting objectives and strategies to ISS, many of which concern "public issues and political matters," their communications are "at the heart of protected speech" under the First Amendment. *Zapach v. Dismuke*, 134 F. Supp. 2d 682, 687 (E.D. Pa. 2001). ISS is generally not authorized to disclose the specific custom policies of its clients. Decl. ¶ 16.

Relatedly, the process of developing voting recommendations implicates ISS' and its clients' associational rights. The First Amendment protects individuals' ability to "engage in association for the advancement of beliefs and ideas," concerning any number of "political, economic, religious or cultural matters." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449,

460 (1958); *AFP*, 594 U.S. at 606. The Supreme Court has therefore recognized that "compelled disclosure of affiliation with groups" engaged in First Amendment protected conduct "may constitute … a restraint on freedom of association." *AFP*, 594 U.S. at 606 (quoting *Patterson*, 357 U.S. at 462; *see also Salvation Army v. Dep't of Cmty. Affs. of N.J.*, 919 F.2d 183, 201 (3d Cir. 1990) ("[F]orced disclosure may chill individuals from associating with a group engaged in expression protected by the First Amendment.").

ISS' clients' ultimate votes also constitute protected speech. Through their votes, ISS' clients express their views on the issues up for debate—no less than a citizen expresses his views on a particular issue when casting his vote on a ballot initiative. *See Mazo v. New Jersey Secretary of State*, 54 F.4th 124, 142 (3d Cir. 2022) (describing "the lodestar for 'core political speech' as the involvement of 'interactive communication concerning political change'") (quoting *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999)); *see also Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 8 (1986) (plurality op.) ("Corporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster." (citation omitted)).

At a minimum, clients' votes are expressive conduct because clients "inten[d] to convey a particularized message" with respect to a certain shareholder proposal when they vote for or against that proposal. *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 (3d Cir. 2002); *see also id.* at 160 ("[C]onduct is expressive if, 'considering the nature of the activity, combined with the factual context and environment in which it was undertaken, we are led to the conclusion that the activity was sufficiently imbued with elements of communication to fall within the scope of the First … Amendment[].'" (citation omitted)); *cf. John Doe v. Reed*, 561

U.S. 186, 195 (2010) ("[T]he expression of a political view implicates a First Amendment right"). And ISS' clients' votes may ultimately reflect not only their own views, but the views of their downstream clients. Decl. ¶ 40(e).

None of this communication is any less protected because it is confidential. As the Third Circuit has made clear, "[v]iewpoint discrimination is anathema to free expression and is impermissible in both public and nonpublic fora." *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, 653 F.3d 290, 296 (3d Cir. 2011); *see also Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010) ("[T]he First Amendment provides protection for anonymous speech …. To the extent that anonymity is protected by the First Amendment, a court should quash or modify a subpoena designed to breach anonymity."). Indeed, in this context, confidentiality is critical, as many of ISS' clients may be unlikely to express their views as freely if they are concerned that their voting choices on sensitive topics will be disclosed, particularly to a government that disagrees with their votes. Decl. ¶ 55.

***2. Requiring Disclosure of Client-Identified Information Would Burden The First Amendment Rights of ISS And Its Clients.***

Request 3 purports to require ISS to disclose how its clients have voted their shares over four years, as well as client opinions on a range of highly sensitive political and social issues. Decl. ¶ 47. For many reasons, compelling disclosure of that data would "have a chilling effect on [both parties'] speech." *Greenberg v. Hagerty*, 491 F. Supp. 3d 12, 20 (E.D. Pa. 2020).

ISS' clients are unlikely to communicate freely with ISS about their views on shareholder proposals if they fear that their communications may be disclosed to the government. Indeed, in the few days since the SEC filed its application to enforce, many of ISS' clients have expressed serious concerns about the risk of disclosure—conversations that suggest to ISS that those clients may terminate or curtail their relationships with the company if their voting data is disclosed

with their names attached. Decl. ¶¶ 53-56. The danger to ISS and its clients' rights is heightened given that ISS' recommendations frequently concern highly charged political or social topics; ISS and its clients will understandably hesitate to engage fully in "political conversations and the exchange of ideas" with the threat of a subpoena looming. *Buckley v. Valeo*, 525 U.S. 182, 192 (1999). By preventing that "free[] and open[]" exchange, disclosure of client-identified data would threaten the lifeblood of ISS' business and result in significant First Amendment harm. *Bair v. Shippensburg Univ.*, 280 F. Supp. 2d 357, 365 (M.D. Pa. 2003).

Disclosure of client-identified data also threatens the "vital relationship between freedom to associate and privacy in one's associations." *AFP*, 594 U.S. at 606 (quoting *Patterson*, 357 U.S. at 462). ISS clients that have voted in ways that the current Administration might disagree with reasonably fear reprisal from the Administration. Decl. ¶¶ 55-56. Indeed, some have already expressed fears of retaliation to ISS. Decl. ¶ 55. The Executive Order specifically directs federal agencies to single out such clients for adverse administrative action. 90 Fed. Reg. at 58,504. And the SEC has already begun conducting intrusive examinations of ISS' clients, with the SEC's inquiries specifically probing those clients' voting decisions and their relationships with ISS. Decl. ¶ 56.

The First Amendment chilling effect is even more pronounced with respect to other agencies. The Executive Order that launched the investigation against ISS also commanded a whole-of-government effort to target both ISS and its clients for adverse action. *See* Exec. Order 14,366. There is thus a significant risk that the SEC will share the information with other agencies who may be engaged in carrying out the Executive Order. Under 17 C.F.R. § 240.24c-1(b), the Commission asserts the power to "in its discretion" share anything it obtains with *any* state or federal regulator.

All of this is a familiar playbook for chilling First Amendment speech and expression. The Supreme Court's recent *Vullo* decision speaks directly to this issue. There, a New York insurance regulator, Maria Vullo, allegedly "threaten[ed] enforcement actions against" banks because they provided financial services to the National Rifle Association. *Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 187 (2024). There was no dispute that the banks were, in fact, violating New York law. *Id.* at 185. But the Supreme Court held that the NRA stated a retaliation claim against Vullo because her purpose in pursuing those violations was "to punish or suppress the NRA's protected expression." *Id.* at 196. The same logic applies here: Although the government may initiate investigations for potential violations of the securities laws, it may not "wield [its] power selectively to punish or suppress speech." *Id.* at 198.

That the client-identifying voting data will be disclosed only to the government does not lessen the burden on ISS or its clients. *See, e.g., St. German of Alaska E. Orthodox Catholic Church v. U.S.*, 840 F.2d 1087, 1094 (2d Cir. 1988) (recognizing that "[e]nforcement of the IRS summonses" against a church "may operate to restrict the freedom to associate," in that responding to the summons "could cause disclosure of contributors' names"); *cf. Fraternal Order of Police Pennsylvania Lodge v. Twp. of Springfield*, 668 F. Supp. 3d 375, 385 (E.D. Pa. 2023) ("Discovery requests represent 'state action' that may impermissibly affect an organization's associational activities"). Compelled disclosure is "'particularly' likely" to burden First Amendment protected activities "when the government seeks to intrude into the workings of groups that hold 'dissident beliefs' disfavored by those holding the reins of power." *First Choice*, 608 U.S. at 186 (quoting *Patterson*, 357 U.S. at 462).

Nor does it lessen the burden that a subset of ISS' clients report certain proxy votes in Form N-PX. Two categories of ISS' clients file Form N-PX: (1) institutional investors that have

$100 million or more qualifying assets under management and are required to file Form 13F, and (2) "registered management investment companies" such as mutual funds and exchange-traded funds. Decl. ¶ 51; *see also Enhanced Reporting of Proxy Votes by Registered Management Investment Companies; Reporting of Executive Compensation Votes by Institutional Investment Managers*, 87 Fed. Reg. 78,770, 78,811 (Dec. 22, 2022). Clients in the former category are required to report voting data on a small subset of their votes, primarily those having to do with proposed compensation packages for an issuer's senior officers. *See* 87 Fed. Reg. at 78,772. Registered management investment companies are required to report all proxy votes, but the information they provide is more limited than what is on ProxyExchange. *See* Decl. ¶ 51; *cf. Disclosure of Proxy Voting Policies and Proxy Voting Records by Registered Management Investment Companies*, 68 Fed. Reg. 6,564, 6,569 (Feb. 7, 2003) (listing the information that funds are required to disclose). Even for these ISS clients, the disclosure of the ProxyExchange data goes far beyond existing disclosure requirements.

### B. The SEC Fails to Justify Intruding on The First Amendment Rights of ISS and ISS' Clients.

Because the SEC's demand for client-identified vote data burdens free speech and associational rights, the government must satisfy "exacting scrutiny." *See AFP*, 594 U.S. at 607-08; *St. German of Alaska*, 840 F.2d at 1092 (where associational rights are implicated, "[e]nforcement of the IRS summonses … should not be ordered unless it is substantially related to a compelling government interest"). The SEC must demonstrate a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" and that disclosure is "narrowly tailored to the government's asserted interest." *AFP*, 594 U.S. at 607-08.

The SEC never even acknowledges the heightened standard that applies in First Amendment cases and spends just two pages of its application explaining *why* it thinks it should

be able to obtain the trove of client-identifying data it seeks. *See* SEC App. 17-18. Even that argument is directed to a strawman, as the SEC makes no distinction between the majority of data sought by Request 3—which ISS has repeatedly stated it is willing to produce—and the subset of client-identifying data that is actually disputed by the parties. The SEC addresses the latter issue only in a single sentence, buried on page 20 of its brief.

*First*, the SEC cites its purported investigation into whether ISS properly discloses "conflicts of interests to clients." SEC App. 17. But that has nothing to do with the identity of the ISS client that is receiving a recommendation and casting a vote. Instead, the SEC would need to know the identity of the public company that is the subject of the vote or the proponent of the proposal at issue. So the data that the SEC seeks through Request 3 would not aid the SEC in investigating the conflicts issue.

*Second*, the SEC claims it wants to evaluate "the advice provided by ISS to its clients and the bases for that advice." Again, however, ISS has *already offered* to provide the SEC the full contents of every recommendation that it provided during the relevant period. *See* Dkt. No. 1-8 at 2; Dkt. No. 1-9 at 2. That would allow the SEC to fully assess the nature of ISS' recommendations and the basis for them. The SEC declined this offer.

*Third*, the SEC purports to be investigating whether "ISS complied with the voting instructions of its clients." SEC App. 17. To evaluate this issue, ISS recognizes that the SEC would need to know how its clients directed ISS to vote and what vote ultimately was submitted for each client in ProxyExchange. ISS thus offered to provide this data in an anonymized format. The SEC's application does not explain why the SEC would need to know the *identity* of each client. The SEC contends that it would need to "[r]econcile voting recommendations against the client-specific vote authorization registration agreements sought in Request 2," *id.* at

20, but the anonymized data will allow the SEC to determine what recommendation ISS gave to the client, what vote was instructed to be cast, the instruction method, and how the client voted. Decl. ¶ 40(a)-(i). The SEC also claims that it wants to "test[] whether recommendations were differentiated among similarly situated clients." SEC App. 20. But the SEC utterly fails to connect this interest with any of the statutory or regulatory provisions that it purports to be investigating. And, even if it could articulate some connection, it cannot possibly explain why immediate disclosure of *every* client's voting history is adequately tailored to any legitimate investigative purpose. *See AFP*, 594 U.S. at 609 ("Narrow tailoring is crucial where First Amendment activity is chilled—even if indirectly—because First Amendment freedoms need breathing space to survive." (cleaned up)).

*Fourth*, the SEC says it wants to evaluate whether ISS "maintain[s] accurate books and records." *Id.* at 17. Even assuming that ministerial bookkeeping meets the threshold of a "sufficiently important governmental interest," *AFP*, 594 U.S. at 611 (quotation marks omitted), anonymized records would show the SEC what records ISS keeps. After all, in the over 25 years that ISS has been registered, the SEC has never before believed that such an intrusive download was required to assess compliance with the Act's bookkeeping requirements. *See* Decl. ¶ 38.

## II. The SEC's Request Has A Retaliatory Purpose.

The Court also should decline to enforce the subpoena because it has an improper purpose: it is part of a broad retaliatory campaign in which the Administration has singled out ISS and its clients for disfavored treatment based on perceived political differences.

Courts reviewing an application to enforce do not reflexively defer to the government's claims that its purpose for investigating a party are legitimate. *Wearly v. FTC*, 616 F.2d 662, 665 (3d Cir. 1980) (courts are vested with "independent reviewing authority" to "insure the integrity

of [an agency's] proceeding," and do not act as "a mere rubber stamp"); *See v. City of Seattle*, 387 U.S. 541, 545 (1967) (an administrative agency's "decision to … inspect will not be the product of the unreviewed discretion of the enforcement officer in the field"). *Powell* recognized that even where the government makes a prima facie case for enforcement, courts should not enforce an administrative summons where "the summons [was] issued for an improper purpose, such as to harass the [respondent] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." 379 U.S. at 58.

Where the respondent demonstrates that impermissible retaliation "'was a 'substantial factor'" in the agency action, *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977), the burden shifts to the government to establish that its subpoena survives the court's "exacting scrutiny." *AFP*, 594 U.S. at 607-08; *see also Boyle v. Cnty. of Allegheny Penn.*, 139 F.3d 386, 395 (3d Cir. 1998) ("[T]he burden is on the government to show the existence of [a sufficiently important] interest."). For example, an agency must adequately justify its claimed purpose where the responding party establishes that the government "subjected the [party] to [a] retaliatory action[] after the fact for having engaged in protected speech," *Houston Comm'ty Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022), or where the government's action appears to be motivated by a desire to "punish or suppress disfavored speech," *Vullo*, 602 U.S. at 190.

The evidence shows that the SEC's request here is part of a broader campaign to retaliate against ISS and its clients for expressing disfavored political views. In recent years, commentators aligned with the current Administration's political views have wrongly accused ISS and its competitors of "indulging their political preferences" by prioritizing perceived left-leaning or progressive ideologies, such as by endorsing "proxy proposals promoting 'environmental, social, and governance' objectives'" or other corporate governance initiatives

that are, in ISS' critics' views, "inconsistent with the maximization of shareholder value." Ex. 3, Benjamin Zycher, *As firms back away from ESG, Congress must reform proxy voting*, The Hill (Oct. 29, 2025), https://tinyurl.com/ena4p96t (last visited September 15, 2026).

Spurred on by such commentary, states have recently enacted legislation mandating that companies like ISS provide disclosures concerning their recommendations when they suggest a position opposed to company management. *See Kobach*, 2026 WL 1815236, at *1 (citing Kansas statute S.B. 375). Those laws have uniformly been enjoined as unconstitutional by courts that have ruled on the issue. *See id.* (Kansas); *see also Rokita*, 2026 WL 1847882, at *6 (Indiana); *Paxton*, No. 1:25-cv-01153-ADA, Aug. 29, 2025 Text Order (Texas).

Against this backdrop, President Trump issued his Executive Order singling out ISS and a competitor—Glass, Lewis & Co.—in December 2025. The Executive Order accuses proxy advisers of "us[ing] their substantial power to advance and prioritize radically politically-motivated agendas" and demands a new wave of federal administrative action. Exec. Order 14,366, Protecting American Investors from Foreign-Owned and Politically-Motivated Proxy Advisors, 90 Fed. Reg. 58,503, 58,503 (Dec. 11, 2025). The Executive Order instructs federal agencies to "increase oversight" of ISS and "take action," giving the SEC, the Federal Trade Commission, and the Secretary of Labor specific instructions for enforcement or other regulatory activity. *Id.* The Executive Order commands these actions as a step toward the Administration's stated goal of "stopping foreign-owned proxy giants from using American 401(k)s, IRAs, and pensions to force leftist policies on U.S. companies." *See Fact Sheet.*

Tellingly, the SEC never denies that the Executive Order prompted this investigation. On the contrary, it appears to concede that ISS' "speech … brought [it] under suspicion." SEC App. 22. But *Vullo* squarely prohibits "wielding [regulatory] power" in this way "to selectively

punish or suppress speech"—even if there may also be *some* legitimate investigatory goal as well. 602 U.S. at 198. The SEC is therefore wrong to say that "it is not enough for ISS just to show that its voting advice led to the SEC's inquiry." SEC App. 22.

The breadth of the SEC's request is yet another indicator that the government's investigation is part of a broader campaign to harass ISS for purportedly advancing views the Administration disagrees with. *See Endocrine Soc'y v. FTC*, 832 F. Supp. 3d 1, 20 (D.D.C. 2026) (considering a "CID's 'broad scope' to be 'relevant evidence' that the agency's "'purpose was pretextual'") (quotation omitted). As ISS has detailed, *supra* pp. 11-19, the SEC has not explained why its sweeping request for ISS' client-identifying voting data across *all clients* over a four-year period is relevant to its claimed objective of determining whether ISS has committed a "recordkeeping" violation or somehow misled its clients. Nor has the agency explained why ISS' offer to provide its voting research and recommendations—that is, the actual *advice* it provides to clients—was not enough to meet any legitimate investigative need the SEC could claim to have apart from assessing compliance with vote execution instructions or recordkeeping requirements, both of which could be vetted through anonymized data.

But it is very easy to understand the *improper* purpose for that request: the ability to easily identify investors that have voted on sensitive topics counter to the Administration's preferences. These concerns are even more pronounced now that it has become clear that the SEC has expanded its investigation to ISS' clients—just as the Executive Order demanded. *See* Decl. ¶ 56; Exec. Order 14,366, 90 Fed. Reg. at 58,504. All of this is consistent with a campaign of "suppress[ing] views that the government disfavors." *Vullo*, 602 U.S. at 180; *cf. In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) ("The requirement that subpoenas be used only for a legitimate and authorized governmental purpose prohibits the government from

engaging in arbitrary fishing expeditions and from selecting targets of investigation out of malice or an intent to harass."). Under *Powell*, "[t]he abuse against which the federal courts stand guard is the adoption by the enforcement agency of a political, vindictive, or other objectionable motivation of an influential official who refers an investigation to an agency." *SEC v. Wheeling-Pittsburgh Steel Co.*, No. 80-1375, 1980 WL 8157, at *10 (3d Cir. Aug. 27, 1980), *modified on reh'g*, 648 F.2d 118 (3d Cir. 1981) (en banc).

The Court can stop here. But if the Court were to find the current record inadequate, then ISS still would be at minimum entitled to reasonable discovery into the SEC's basis for its investigation. The Third Circuit has ordered further proceedings, including discovery, where a respondent makes non-frivolous allegations suggesting a lack of legitimate purpose. *Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 128. Where a respondent presents "meaningful evidence" of an abuse of judicial process such as improper purpose, the Third Circuit (and others) allow "closely supervised discovery" and "cannot […] foreclose further inquiry" into the alleged abuse. *Id.* Courts have granted such "limited discovery" where a responding party demonstrates that the government's investigation was not in "good faith," and that the government's "efforts at retaliation" could have motivated their inquiry. *United States v. Fensterwald*, 553 F.2d 231, 232 (D.C. Cir. 1977) (holding taxpayer was entitled to limited discovery into IRS's motivation for auditing him where public evidence suggested that government could have taken "an extraordinary interest in this taxpayer" because he represented one of the Watergate defendants); *United States v. McCarthy*, 514 F.2d 368, 375 (3d Cir. 1975) (discovery is appropriate where "significant issues of fact remain unresolved").

ISS has more than met this standard here. The evidence of the government's retaliatory campaign against ISS shows that the SEC's motivation in targeting ISS is not legitimate.

Limited discovery will assist ISS in determining why the company and its clients were singled out, and whether the SEC's enforcement efforts reflect the agency's "honest[] pursui[t] [of its] goals" under the Advisers Act. *Pickel v. United States*, 746 F.2d 176, 183-84 (3d Cir. 1984).

## III. The Government Cannot Articulate Any Legitimate Investigative Need For The Disputed Client-Identifying Voting Data.

Beyond the First Amendment, the SEC cannot satisfy even the *Powell* relevancy standard as to the disputed client-identifying data. Although the *Powell* test is not as exacting as the standard under the First Amendment, the Court still must analyze whether the SEC has met its burden of establishing potential relevance. *See Powell*, 379 U.S. at 57-58. Courts have interpreted the relevancy requirement as demanding more than an "idle hope that something may be discovered," instead requiring "an indication of a realistic expectation" that something relevant to the investigation will be produced. *United States v. Harrington*, 388 F.2d 520, 524 (2d Cir. 1968). And courts have not hesitated to refuse to enforce agency subpoenas when they "are irrelevant to the [agency's] assessment" of the issues that it purports to be investigating. *NLRB v. Vista Del Sol Health Servs., Inc.*, 40 F. Supp. 3d 1238, 1259-60 (C.D. Cal. 2014).

As ISS has explained, *supra* pp. 17-19, none of the SEC's asserted investigative purposes have any plausible connection to data that connects clients to specific votes. All can be addressed by the anonymized data that ISS has proposed to share. There is therefore no reason for the Court to compel disclosure. The only case that the SEC cites in support of its relevance argument only confirms how far afield the situation here is. In *SEC v. Barr Fin. Group, Inc.*, No. 98-1806, 1999 WL 1209520, *1 (M.D. Fla. May 5, 1999), the respondent "willfully refus[ed] to allow the SEC to examine [its] books and records" and would not "produce to the SEC copies of certain legally-required documents." Here, ISS has complied or will comply with every single one of the SEC's many requests in full except the disputed client-identifying data that is a subset

of Request 3. The narrow issue before the Court is whether the SEC has justified the *disputed* data, not the subpoena as a whole. The SEC cites nothing that would justify that request.

## IV. At Minimum, The Court Should Impose Adequate Safeguards On Any Production.

This Court can "condition enforcement upon observance of safeguards to the respondent's valid interests." *Wearly*, 616 F.2d at 665; *see also United States v. Hunton & Williams*, 952 F. Supp. 843, 856-57 (D.D.C. 1997) (noting "the discretion of the court to … provide measures of confidentiality"). If the application is granted (in whole or in part), three important safeguards are warranted here.

*First*, the Court should order that ISS be permitted to make the proposed anonymized production first and that the SEC may renew its request if the anonymized data proves inadequate. And, if the Court permits ISS to produce anonymized data, it should include a protective order prohibiting the SEC from reverse-engineering the client identifications that it has been prohibited from seeking directly.

*Second*, the Court should prohibit the SEC from sharing the data with other agencies given the sensitivity and the potential First Amendment dangers. *Cf. EEOC v. C&P Tel. Co.*, 813 F. Supp. 874, 876-77 (D.D.C. 1993) (ordering EEOC to "enter into a confidentiality agreement with respondents that prevents the dissemination of" sensitive material to adverse parties, finding that "the EEOC's internal procedures are insufficient" to prevent disclosure).

*Third*, if the Court would grant the SEC's motion, ISS respectfully requests that the Court set a compliance date that is at least 30 days from the Court's Order (or 45 days for an anonymized production) to ensure ISS is capable of making the production, *see* Decl. ¶¶ 45-46, and to permit ISS to request a stay pending appeal, *see, e.g.*, *EEOC v. Trustees of U. Penn.*, No. 25-cv-6502 (E.D. Pa. Apr. 27, 2026), Dkt. No. 67 (granting stay in similar proceeding).

Dated: September 18, 2026

Respectfully submitted,

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja (PA #322093)
HOGAN LOVELLS CADWALADER US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Tel.: (267) 675-4600
Fax: (267) 675-4601
jasmeet.ahuja@hlc.com

Jessica Ellsworth (*Pro Hac Vice Pending*)
David M. Foster (*Pro Hac Vice Pending*)
Reedy C. Swanson (*Pro Hac Vice Pending*)
HOGAN LOVELLS CADWALADER US LLP
555 Thirteenth Street, N.W.
Washington, DC 20004
Tel.: (202) 637-5600
Fax: (202) 637-5601
david.foster@hlc.com
jessica.ellsworth@hlc.com
reedy.swanson@hlc.com

Peter J. Martinez (*Pro Hac Vice Pending*)
HOGAN LOVELLS CADWALADER US LLP
100 International Drive
Suite 2000
Baltimore, MD 21202
Tel.: (410) 659-2700
Fax: (410) 659-2701
peter.martinez@hlc.com

*Counsel for Respondent*
*Institutional Shareholder Services, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on September 18, 2026, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all registered users.

Respectfully submitted,

*/s/ Jasmeet K. Ahuja*
Jasmeet K. Ahuja