**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Applicant,**<br>**-against-**<br><br>**INSTITUTIONAL SHAREHOLDER SERVICES, INC.,**<br><br>**Respondent.** | **MC No. 2:26-mc-00078-AMP** |

# SECURITIES AND EXCHANGE COMMISSION'S REPLY BRIEF IN SUPPORT OF ITS APPLICATION

John V. Donnelly III, Esq.
Gregory Bockin, Esq.
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Email: DonnellyJ@sec.gov

Attorneys for Applicant

Dated: September 25, 2026

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. The Subpoena Satisfies The Requirements For Enforcement ........ 2

A. The SEC Need Not Accept Altered ISS Records ........ 2

B. ISS Has Not Shown An Improper Purpose ........ 4

II. ISS's First Amendment Objections To The Subpoena Are Unavailing ........ 6

A. Exacting Scrutiny Does Not Apply ........ 7

B. The Subpoena Satisfies Exacting Scrutiny ........ 8

III. The Court Should Reject ISS's Proposed "Safeguards" ........ 10

CONCLUSION ........ 10

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Amato v. Wilentz*,
952 F.2d 742 (3d Cir. 1991) ....7

*Americans for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021) ....7, 8, 9, 10

*Del. Strong Families v. Att'y Gen. of Del.*,
793 F.3d 304 (3d Cir. 2015) ....7

*EEOC v. Franklin & Marshall Coll.*,
775 F.2d 110 (3d Cir. 1985) ....3

*EEOC v. Univ. of Pa.*,
850 F.2d 969 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990) ....7

*FEC v. Machinists Non–Partisan Political League*,
655 F.2d 380 (D.C. Cir. 1981) ....9

*First Choice Women's Res. Ctrs., Inc. v. Davenport*,
608 U.S. 174 (2026) ....7

*Lowe v. SEC*,
472 U.S. 181 (1985) ....8

*NAACP v. Ala. ex rel. Patterson*,
357 U.S. 449 (1958) ....8

*NRA v. Vullo*,
602 U.S. 175 (2024) ....5

*QueerDoc, PLLC v. DOJ*,
-- F.4th -- , 2026 WL 2359440 (9th Cir. Aug. 14, 2026) ....4, 5, 6

*SEC v. Leibowitz*,
No. 25-cv-02155, 2025 WL 1677758 (S.D.N.Y. June 13, 2025) ....10

*SEC v. Wheeling-Pittsburgh Steel Corp.*,
648 F.2d 118 (3d Cir. 1981) ....6

*St. German of Alaska E. Orthodox Catholic Church v. U.S.*,
840 F.2d 1087 (2d Cir. 1988) ....6, 7, 9, 10

*U.S. v. Markwood*,
48 F.3d 969 (6th Cir. 1995) ....................................................................................4

*U.S. v. Powell*,
379 U.S. 48 (1964) ....................................................................................5

*Wayte v. U.S.*,
470 U.S. 598 (1985) ....................................................................................5

**Statutes**

15 U.S.C. § 78x....................................................................................10

15 U.S.C. § 80b-4(a) ....................................................................................3

**Other Authorities**

Chair Mary Jo White, *Welcoming Remarks at Proxy Advisory Services Roundtable* (Dec. 5, 2013), https://www.sec.gov/newsroom/speeches-statements/open-meeting-statment-2013-12-06-mjw. ....................................................................................4

Commissioner Elad L. Roisman, *Statement at the Open Meeting: Modernizing SEC Rules Governing Proxy Voting Advice* (Nov. 5, 2019), https://www.sec.gov/newsroom/speeches-statements/statement-roisman-2019-11-05-14a-2b....................................................................................4

Exec. Order No. 14366, 90 Fed. Reg. 58503 (Dec. 11, 2025)....................................................2, 4, 5, 6

## INTRODUCTION

This case involves lawful and reasonable requests for business records by a regulator exercising its statutory oversight authority over a regulated entity. Notwithstanding ISS's attempts to manufacture a constitutional dispute, nothing in ISS's opposition justifies its position that an SEC-registered investment adviser should be permitted to refuse an SEC request for records of its core business activity, as ISS has done for months.

The SEC's Division of Examinations is examining ISS to ensure it is complying with the federal securities laws. Such examinations are a regular occurrence, but ISS's response is extraordinary. It has refused to provide records that would show whether it complies with its obligations when advising clients and executing their proxy votes. Thus, ISS's refusal required the SEC to issue an investigative subpoena and now to bring this subpoena enforcement action.

ISS does not dispute the SEC's authority to examine and subpoena investment advisers; it does not dispute the SEC's theories of possible liability; and it does not dispute its possession of the records in question or its ability to produce them. ISS argues that it should be allowed to withhold the records entirely or alter them so that the SEC cannot identify the specific client to which a particular ISS proxy voting recommendation was made and proxy services provided. The Court should reject ISS's position, which would invite investment advisers (and other registered entities) to refuse to provide unaltered records to the SEC at will, shielding themselves from examination, investigation, and enforcement, and exposing investors to potential harm.

To evaluate whether ISS is complying with the federal securities laws, the SEC needs to understand the preferences and instructions communicated to ISS by its clients, whether ISS provided advice consistent with those preferences, and whether ISS acted in accordance with those instructions. To do so, the SEC must compare that information by client, just as ISS keeps

it. Moreover, for investigative purposes, the SEC may need to contact clients regarding the data, which it cannot do if the data is anonymized.

ISS also asserts that the subpoena was issued for an improper purpose, pointing to Executive Order 14366's concerns about proxy advisors and instruction to agencies to consider measures to address those concerns and potential legal violations. But lawful agency action in response to appropriate presidential direction is not evidence of a retaliatory campaign.

Finally, ISS argues that it cannot be required to produce unaltered records because they implicate the First Amendment. ISS is a for-profit entity that sells corporate proxy advice; it does not identify a single case where a relationship based on the exchange of "commercial information" (ISS Opp. 1, ECF 9) gave rise to the exacting scrutiny that ISS demands. In any event, the subpoena—narrowly tailored to the SEC's interests and duties in examining registrants and investigating potential violations—satisfies that standard.

## ARGUMENT

### I. The Subpoena Satisfies The Requirements For Enforcement

ISS does not dispute that the subpoena is within the SEC's statutory authority, nor does it claim that the subpoena is unduly broad or burdensome. *See* SEC Brief ("Br.") 14-18, ECF 1-1. Instead, ISS argues that the SEC does not need records that identify the specific client to which a particular proxy recommendation was made and that the subpoena has an improper purpose. Both arguments fail.

#### A. The SEC Need Not Accept Altered ISS Records

Rather than producing its existing records responsive to Request 3 of the subpoena, ISS proposes that the SEC make do with records altered by ISS's "expert consultants" to ensure that the SEC cannot determine the specific client to which proxy services were provided. Opp. 10, 25. But a subpoena recipient "cannot be allowed to pick and choose the evidence which may be

necessary for an agency investigation." *EEOC v. Franklin & Marshall Coll.*, 775 F.2d 110, 116 (3d Cir. 1985). The SEC's examination and investigation—the confines of which are not for ISS to set—require unaltered records.

As an initial matter, altered records are inherently insufficient for the SEC's examination. Among ISS's duties as a registrant is keeping appropriate books and records. *See* Br. 4, 16-17. While ISS derides that bedrock requirement as "ministerial," Opp. 19, recordkeeping is a critical component of Congress's regulatory regime. *E.g.,* 15 U.S.C. § 80b-4(a) (providing that registered investment adviser's records are subject "at any time" to "examinations by representatives of the [SEC]"). That alone dooms ISS's radical proposal.

Beyond that fatal flaw, altered records would obscure necessary information, a problem that ISS overlooks. *See* Opp. 18-19. For example, to evaluate whether ISS is complying with its fiduciary duties of care and loyalty, the SEC needs to understand the preferences and instructions communicated to ISS by its clients, and whether ISS provided advice consistent with those preferences and acted in accordance with those instructions. Altering the data as ISS proposes would undermine the SEC's ability to make those sorts of evaluations. It is impossible to fully evaluate, for example, whether ISS discharged its fiduciary duties to an oil-and-gas pension fund client without the ability to identify that client and assess its preferences and instructions. The voting recommendations and attendant proxy services data may raise concerns that the preferences and instructions of the oil-and-gas pension fund were not followed for a variety of reasons. The identity of the client will allow us to communicate with that client, request additional documents and information specific to that client, and evaluate possible concerns and breaches of fiduciary duties. However, those are precisely the details that ISS seeks to obscure.

Additionally, investment advisers sometimes have interests that conflict with their clients' interests. In its Form ADV, ISS acknowledges that such conflicts exist and purports to have policies in place to prevent their advisory services from being tainted by conflicts. Ex. 1 to McGlynn Dec. at 13-16, ECF 1-3. However, the SEC must be able to examine, evaluate, and test ISS's policies and conflict disclosures, verify with clients whether a conflict was properly disclosed, and assess whether the advice reflected clients' individual best interests or ISS's own profitability or policy preferences.

**B. ISS Has Not Shown An Improper Purpose**

Notwithstanding longstanding SEC concern about proxy advisor conflicts of interest,[1] ISS claims that the subpoena is unenforceable because it is "part of a broader campaign to retaliate against ISS and its clients for expressing disfavored political views." Opp. 20. That is a serious accusation; to prevail on it, ISS bears a "heavy burden [of] produc[ing] specific facts and evidence to support [its] allegations . . . ." *QueerDoc, PLLC v. DOJ*, -- F.4th --, 2026 WL 2359440, at *12 (9th Cir. Aug. 14, 2026) (internal quotations omitted); *see U.S. v. Markwood*, 48 F.3d 969, 983-84 (6th Cir. 1995) (concluding that supposed "'evidence' of impropriety" was "merely an assertion of impropriety" that "[did] not amount to a substantial demonstration [of improper purpose]"). To meet that burden, ISS points to state legislation requiring proxy advisors to make certain disclosures when recommending a vote against company management, an op-ed by a think tank fellow, and the Executive Order. Opp. 20-22.

[1] *See, e.g.*, Commissioner Elad L. Roisman, *Statement at the Open Meeting: Modernizing SEC Rules Governing Proxy Voting Advice* (Nov. 5, 2019), https://www.sec.gov/newsroom/speeches-statements/statement-roisman-2019-11-05-14a-2b; Chair Mary Jo White, *Welcoming Remarks at Proxy Advisory Services Roundtable* (Dec. 5, 2013), https://www.sec.gov/newsroom/speeches-statements/open-meeting-statment-2013-12-06-mjw. Attached as Exs. 1 and 2 to the Declaration of John V. Donnelly III, Sept. 25, 2026, filed herewith.

The first two are makeweights; ISS does not explain how, much less demonstrate that, the state legislation or the op-ed "reflect[] on the good faith of the [SEC's] investigation." *U.S. v. Powell*, 379 U.S. 48, 58 (1964). And the Executive Order also fails to substantiate ISS's claim. It simply expresses the President's policy views with respect to proxy advisors, including his concern that they may be subordinating their clients' interests to their own. Br. 21-22. Differences between ISS's policy views (whatever they might be) and its clients' views (whatever they might be) give rise to a risk of such subordination, which ISS does not dispute would violate the law. *See* Opp. 21-22. Of course, a court "has no warrant to override the President's judgment on a disputed matter of public policy." *QueerDoc*, 2026 WL 2359440, at *13.[2]

The directive to the Chairman of the SEC to take certain actions with respect to proxy advisors does not render the subpoena improper either. Agency action is "entitled to a presumption of regularity," and thus it may not be "presume[d] that an agency carried out lawful directives in an unlawful manner." *Id.* at *13. As just explained, the Executive Order instructs the SEC to investigate, not because of ISS's views, but because of the possibility that an investment adviser's views might conflict with its clients' economic interests. Even then, ISS does not deny that the government may properly undertake an investigation in response to expressive conduct that creates suspicion of wrongdoing. Br. 22-23; *see Wayte v. U.S.*, 470 U.S. 598, 614 (1985) (explaining that a contrary view "would allow any criminal to obtain immunity from prosecution simply by reporting himself and claiming that he did so in order to 'protest' the law").[3]

---

[2] ISS claims that the Executive Order "specifically directs federal agencies to single out [ISS] clients for adverse administrative action." Opp. 15. But in relevant part it merely instructs the SEC Chairman to "direct SEC staff to examine whether the practice of [r]egistered [i]nvestment [a]dvisers engaging proxy advisors to advise on . . . non-pecuniary factors in investing . . . is inconsistent with their fiduciary duties." Ex. 12 to McGlynn Dec., ECF 1-14.

[3] *NRA v. Vullo* is not to the contrary; the SEC has not threatened enforcement actions to punish those who do business with ISS. *See* 602 U.S. 175, 187 (2024).

In short, "there is nothing improper about a President . . . directing the Executive Branch to enforce federal law in a manner consistent with [his policy] preferences." *QueerDoc*, 2026 WL 2359440, at *12. Otherwise, "the administration of the federal government would crumble" because "a President's stated policy views" would be "evidence of improper purpose." *Id*. at *15. Indeed, in ISS's view, the mere existence of the Executive Order renders illegitimate any SEC investigation of proxy advisors. That is not and cannot be the law.

ISS has therefore failed to carry its "heavy burden [of] produc[ing] specific facts and evidence to support [its] allegations of . . . improper purpose." *Id*. at *12 (internal quotations omitted). And because ISS has not put forward "meaningful evidence" of improper purpose, its request for "discovery into the SEC's basis for its investigation" should also be denied. Opp. 23; *see SEC v. Wheeling-Pittsburgh Steel Corp*., 648 F.2d 118, 128 (3d Cir. 1981).

## II. ISS's First Amendment Objections To The Subpoena Are Unavailing

ISS also contends that, even if the SEC needs the unaltered records to investigate possible violations of the securities laws, and that investigation has a proper purpose, the SEC *still* cannot have them: the subpoena supposedly burdens ISS's and its clients' First Amendment rights and fails exacting scrutiny. Opp. 11-19. But the subpoena does not implicate the sort of associational rights to which exacting scrutiny has been applied, and in any event the subpoena is narrowly tailored to the SEC's interests in examining registrants and investigating potential violations and imposes no cognizable First Amendment burden. ISS's records are not "immunized from governmental investigation," *St. German of Alaska E. Orthodox Catholic Church v. U.S.*, 840 F.2d 1087, 1093 (2d Cir. 1988), simply because ISS's proxy advice involves speech.

### A. Exacting Scrutiny Does Not Apply

"Exacting scrutiny is triggered by state action which may have the effect of curtailing the freedom to associate, and by the possible deterrent effect of disclosure." *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 616 (2021) ("*AFPF*") (internal quotations and emphasis omitted); *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 309 (3d Cir. 2015) (exacting scrutiny "accounts for the general interest in associational privacy"). Courts have applied exacting scrutiny where compelled disclosure implicates such associational rights. *See, e.g.*, *AFPF*, 594 U.S. at 602 (names and addresses of charity donors); *St. German*, 840 F.2d at 1092 (names of church donors); *see also First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. 174, 174 (2026) (information about donors to "religious nonprofit organization that has provided counseling and resources to pregnant women").[4]

However, the relationship between ISS and its clients does not implicate those associational rights.[5] Br. 23 n.5. ISS's clients do not join or support it; rather, they purchase its proxy voting advice. Opp. 4-5. Moreover, many of ISS's clients are themselves registered investment advisers who purchase that advice for purposes of voting securities that they manage and control on behalf of clients (in funds, separately managed accounts, or other structures) and fulfilling their fiduciary duties, not as part of some overarching expressive association. And the proxy votes cast by ISS's clients on corporate matters—which ISS concedes may not actually reflect those clients' "own views" (Opp. 14) and certain of which are publicly disclosed as a

[4] In *EEOC v. Univ. of Pa.*, 850 F.2d 969 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990), the Third Circuit considered the level of scrutiny applicable to a subpoena that sought the disclosure of confidential academic peer review materials. But, in a ruling subsequently affirmed by the Supreme Court, the Third Circuit concluded that the materials were not protected by a First Amendment right to academic freedom. *Id.* at 980.

[5] While ISS purports to assert the First Amendment rights of its clients, the subpoena seeks information regarding, among other things, whether ISS has violated its fiduciary duties to its clients. Br. 17-18. The subpoena thus presents a potential conflict of interest between ISS and its clients that "strongly counsel[s] against third party standing." *Amato v. Wilentz*, 952 F.2d 742, 750 (3d Cir. 1991).

matter of law (Br. 6, 18-19)—do not implicate associational rights. ISS's economic relationships with its clients do not involve the "freedom to engage in association for the advancement of beliefs and ideas." *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958). Indeed, ISS cites no case in which disclosure requirements involving a relationship based in the exchange of "commercial information" (Opp. 1) triggered exacting scrutiny.

That is unsurprising. If the SEC had to satisfy exacting scrutiny every time it inquired into communications between investment advisers (or other types of registrants like broker-dealers) and their clients, Congress's carefully crafted system of agency oversight might grind to a halt. No court has ever suggested such a radical result; indeed, the law is to the contrary. *See Lowe v. SEC*, 472 U.S. 181, 207-08 (1985) (suggesting Congress permissibly regulated the speech of those in the "investment-advisory profession—those who provide personalized advice attuned to a client's concerns").

Finally, that ISS's proxy voting recommendations may not be subjected to viewpoint discrimination (Opp. 12) does not demonstrate that disclosure of those recommendations implicates exacting scrutiny. That information does not implicate the same associational and political rights as political donations or votes on ballot initiatives.

### B. The Subpoena Satisfies Exacting Scrutiny

Were exacting scrutiny applicable, however, the subpoena would still pass muster. Exacting scrutiny is not strict scrutiny; it "requires that there be a substantial relation between the disclosure requirement and a sufficiently important governmental interest, and that the disclosure requirement be narrowly tailored to the interest it promotes." *AFPF*, 594 U.S. at 611 (cleaned up). The subpoena meets that test.

To begin, the SEC has strong interests in examining registrants and investigating potential violations pursuant to its statutory mandates to do so; "if the [agency] has statutory jurisdiction to conduct th[e] investigation, then a compelling interest for the subpoenaed information can be shown." *FEC v. Machinists Non–Partisan Political League,* 655 F.2d 380, 389 (D.C. Cir. 1981); *see also* Br. 16-18. It is those interests—not "mere administrative convenience"—that underlie the subpoena. *AFPF*, 594 U.S. at 615. And those interests outweigh any possible First Amendment burden here. *St. German*, 840 F.2d at 1093; *AFPF*, 594 U.S. at 607 ("[T]he strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights.") (internal quotation omitted).

Any such burden is "incidental" because the subpoena does not "forbid[]" or "directly impinge upon" First Amendment activity; ISS and its clients remain free to say what they wish. *St. German*, 840 F.2d at 1093. That burden is also "reduced" by the fact that the subpoena does not require ISS to publicly disclose the information at issue. *AFPF*, 594 U.S. at 616. And as ISS concedes, some of the information is already public, as is the "methodology underpinning [some of ISS's] advice," including its policies "geared to particular investor populations." Opp. 5, 16-17; Br. 6, 18-19. Indeed, ISS has already identified its clients in response to Request 1 of the subpoena, belying any supposed associational harm from disclosure. And because it is a registered investment adviser, ISS's records are subject to SEC examination as a matter of law, diminishing any reasonable expectation of privacy ISS or its clients may have had. Br. 4, 18-21.

ISS argues that disclosure would have a chilling effect because its clients "are unlikely to communicate freely with ISS . . . if they fear that their communications may be disclosed to the government." Opp. 14. ISS overstates these concerns. Many of its clients are required to publicly disclose certain proxy votes, including via SEC Form N-PX. Br. 6, 18-19. ISS also previously

told its clients that their information could be shared with the SEC. Br. 20. Once again, ISS's argument proves too much—the SEC could never investigate investment advisers if such potential burdens could defeat the government's investigatory ends.

Finally, the subpoena is narrowly tailored for purposes of the exacting scrutiny analysis. "[E]xacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends," *AFPF*, 594 U.S. at 608, but the subpoena here would meet even that standard. ISS concedes that the requested information "is not available from any other source." Opp. 7. As a result, this is the appropriate means to obtain it. *See St. German*, 840 F.2d at 1094. As explained above, "less intrusive alternatives," including altered records, would be "inadequate" for purposes of the SEC's investigation. *AFPF*, 594 U.S. at 611, 613.

## III. The Court Should Reject ISS's Proposed "Safeguards"

As a fallback, ISS proposes that it be permitted to produce altered records until they "prove[] inadequate." Opp. 25. For the reasons already given, such an exercise would only result in delay and waste judicial and party resources.

ISS also proposes that the SEC be prohibited from sharing its data with other agencies. Opp. 25. But Congress authorized the SEC to do so, *see* 15 U.S.C. § 78x, and courts have declined to deviate from that statutory scheme, *e.g.*, *SEC v. Leibowitz*, No. 25-cv-02155, 2025 WL 1677758, at *1 (S.D.N.Y. June 13, 2025). The records are not uniquely "sensitiv[e]" (Opp. 25; *see* Br. 19-20) and ISS's fear of "potential First Amendment dangers" (Opp. 25) ignores the presumption of regularity (*see supra* 5).

## CONCLUSION

The Court should compel ISS to produce the requested records without alteration.[6]

[6] The SEC does not object to ISS's proposed compliance date of 30 days after an order enforcing the subpoena. Opp. 25.

Respectfully submitted,

By: s/ John V. Donnelly III

John V. Donnelly III, Esq.
Gregory Bockin, Esq.
Attorneys for Applicant
U.S. Securities and Exchange Commission
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Email: DonnellyJ@sec.gov

Dated: September 25, 2026