**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | **CIVIL ACTION** |
| **Applicant,** | : | |
| **v.** | : | **NO. 26-mc-78** |
| **INSTITUTIONAL SHAREHOLDER SERVICES, INC.,** | : | |
| **Respondent.** | : | |

# MEMORANDUM OPINION

**POZOS, J.** **November 23, 2026**

The Securities and Exchange Commission ("SEC") brings this action to compel Institutional Shareholder Services, Inc. ("ISS") to fully comply with a subpoena seeking, among other things, proxy voting data that identifies ISS's clients on a vote-by-vote basis. The SEC argues it is entitled to this information under its authority to inspect the books and records of ISS, a registered investment adviser, and under its authority to investigate potential violations of the securities laws. ISS argues that it has offered to produce the information that the SEC needs to conduct its investigation in other formats, including by providing a list of its clients, ISS's advice to its clients, and anonymized voting data that reflects the voting activity, but does not attribute specific votes to particular clients. ISS contends that requiring production of voting data that includes the identities of clients associated with those votes would be improper because the SEC's investigation constitutes unlawful retaliation against ISS for exercising its First Amendment rights, and that requiring ISS to comply with the subpoena would impermissibly chill the free association rights of ISS and its clients.

For the reasons which follow, the Court will order ISS to produce proxy voting data and the identities of the clients on a vote-by-vote basis. The Court finds that ISS has not established that the investigation in this matter constitutes unlawful retaliation, or made a showing that would justify discovery on the topic. The Court also finds that the relationship between ISS and its clients is not an association of the type protected by the First Amendment, and that investigative acts that could chill those relationships are, accordingly, not prohibited by the First Amendment.

The Court is, however, concerned that requiring ISS to produce all data in its possession, custody or control relating to the voting activities of ISS's clients would impermissibly intrude upon the free association rights of ISS's clients. The rights of ISS's clients – many of which are entities with acute First Amendment interests in protecting their rights, and the rights of their members, to freely associate – require careful attention from this Court, and data requests by the SEC that implicate those rights are subject to exacting scrutiny. The SEC has not made a showing that it needs all of the information relating to ISS's clients called for by the subpoena. The SEC stated during the hearing on its application that it does not seek information about the internal deliberative processes of ISS's clients, the membership of ISS's clients, donors, or the finances of ISS's clients. But further discussion revealed that requiring ISS to produce full and unredacted exports of data from its systems would result in production of data beyond voting data attributed at the client level, including production of information about parents, sub-clients, and individuals who authorized the relevant votes. When asked whether the SEC would agree to a production that does not include such information, the SEC declined. Accordingly, the Court will limit this ruling to requiring production of voting data attributed at the client level, and deny the application to the extent that it seeks information that could reveal the structure, composition, or inner workings of ISS's clients.

# I. BACKGROUND

## A. ISS and Its Business

ISS is a proxy advisor that provides, among other services, recommendations to advisory clients on votes for public issuer matters subject to shareholder votes, such as board or shareholder proposals. ECF No. 1-2, ¶ 6. Proxy advisors like ISS are hired by investors to help manage the voting rights that come with their share ownership in public companies. ECF No. 9-1, ¶ 9. ISS provides its services as a proxy advisor to institutional investors such as asset managers, mutual funds, hedge funds, the endowments of religious organizations, universities and other non-profits, pension funds, Taft-Hartley organizations, and state and local governmental entities. ECF No. 9-1, ¶ 7. In 2025, ISS assisted approximately 1,400 clients in connection with voting analyses and recommendations for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide. ECF No. 9-1, ¶ 9.

ISS provides advisory services through two primary business lines: ISS Governance Solutions and ISS Sustainability Solutions. *See* ECF No. 1-3, at 6-9. ISS Governance Solutions includes providing voting research, recommendations, and vote execution services to its clients. ECF No. 1-3, at 6. ISS Governance Solutions also offers a "Vote Disclosure Service" that assists clients, including registered investment companies and certain other institutional investment managers, with their obligations to disclose certain proxy vote history information publicly on SEC Form N-PX. ECF No. 1-3, at 8. ISS Sustainability Solutions includes a variety of advisory services that assist clients with identifying "corporate involvement in a range of controversial products, business practices and high-risk sectors" and managing their environmental, social, and governance preferences, among other matters. ECF No. 1-3, at 8-9. Only ISS's Governance Solutions' data is at issue in this matter.

ISS Governance Solutions offers three types of voting policies, which are frameworks that guide ISS's proxy vote recommendations: (1) the ISS Benchmark Policy; (2) ISS Specialty Policies, which are also known as Thematic Policies; and (3) client-specific Custom Policies. ECF No. 9-1, ¶ 15.

The Benchmark Policy is ISS's market-specific proxy voting framework that ISS updates each year through a robust consultative process, with investors, companies, and other industry experts. ECF No. 9-1, ¶ 19. The U.S. Benchmark Policy is publicly available on ISS's website, along with several sets of frequently asked questions. ECF No. 9-1, ¶ 19.

ISS also offers seven Specialty Voting Policies that evaluate ballot issues from a variety of specific perspectives: (1) Global Board-Aligned; (2) Catholic Faith-Based; (3) Socially Responsible Investment; (4) Climate; (5) Sustainability; (6) Public Fund Guidelines; and (7) Taft-Hartley. ECF No. 9-1, ¶ 24. These policies are also publicly available on ISS's website. ECF No. 9-1, at ¶ 25.

Custom Policies are designed by ISS, with the input from its clients to reflect the client's own specific approach to proxy voting, and/or mandates clients receive from their respective clients for whom they manage assets. ECF No. 9-1, ¶ 16. Because Custom Policies are tailored to specific clients' needs, and reflect their unique corporate governance and voting philosophies, the vote recommendations issued under these policies often differ from vote recommendations issued under the ISS Benchmark Policy and Specialty Policies. ECF No. 9-1, ¶ 17. In 2025, approximately 85% of the shares for which ISS processed voting instructions were tied to clients' Custom Policies. ECF No. 9-1, ¶ 18.

ISS shares proxy research reports and vote recommendations with its clients on its proprietary web-based platform ProxyExchange. ProxyExchange "provides clients with end-to-

end management of their proxy voting process." ECF No. 1-3, at 8. Through ProxyExchnage, ISS executes client voting instructions, manages clients' voting policies, and facilitates the recordkeeping and reporting needs of ISS's clients. ECF No. 1-3, at 8. ISS also discloses conflicts of interest to clients through ProxyExchange. ECF No. 1-3, at 14-15. According to ISS's public disclosures, such conflicts of interest may arise from an ISS affiliate's provision of consulting services to public issuers whose matters are subject to shareholder votes analyzed by the ISS Governance Solutions, or be based on ISS's advisory relationships with corporate issuers, their affiliates, or entities that make shareholder proposals. ECF No. 1-3, at 14-15.

According to ISS, as a fiduciary, it provides neutral, objective advice to its clients for a fee. ECF No. 21, 3:23-4:16. It does not hold particular political, social, or religious positions, or pick and choose which clients it serves based on common positions on such issues. ECF No. 21, 4:17-4:25. The goals and objectives of each client are unique and the recommendation provided by ISS on how to vote on a given proxy, which clients are free to follow or ignore, is tailored to the specific client's stated preferences and objectives. ECF No. 9-1, ¶ 28. As such ISS will often give clients different recommendations when voting on the same questions. ECF No. 9-1, ¶ 29. ISS reports that it is also common for ISS clients to pursue divergent investment and proxy voting strategies, as reflected in investors' subscriptions to multiple proxy voting policies. ECF No. 9-1, ¶ 26.

**B. SEC Regulation of ISS as an Investment Adviser**

ISS is a registered investment adviser, and has been registered with the SEC under the Investment Advisers Act since the 1990s. ECF No. 9-1, ¶ 10. As a registered investment adviser, ISS is subject to the books and records, examination, and other compliance-related provisions of the Advisers Act, and owes its clients fiduciary duties of care and loyalty. *See* 15 U.S.C. § 80b-1, et seq.

The Advisers Act and its implementing regulations require registered investment advisers to make and keep records relating to their advisory business. 15 U.S.C. § 80b-4(a); 17 C.F.R. § 275.204-2. Under the Advisers Act, "records" are defined as "accounts, correspondence, memorandums, tapes, discs, papers, books, and other documents or transcribed information of any type, whether expressed in ordinary or machine language." 15 U.S.C §§ 80b-4(a), 78c(a)(37). Those records are "subject at any time, or from time to time, to such reasonable periodic, special, or other examinations by representatives of the Commission as the Commission deems necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80b-4(a).

In addition to its examination authority, the Advisers Act also authorizes the SEC to investigate violations of the Advisers Act, and the rules promulgated thereunder, including potential breaches of an investment adviser's fiduciary duties. 15 U.S.C. § 80b-9(a). The SEC may issue subpoenas, and "require the production of any books, papers, correspondence, memoranda, contracts, agreements, or other records which are relevant or material" to the Commission's investigation. 15 U.S.C. § 80b-9(b).

As its regulator, the SEC's Division of Examinations has conducted examinations into ISS several times before. ECF No. 1-1, at 11. In each of its four previous examinations, between 2006 and 2022, the SEC identified deficiencies in ISS's compliance with the Advisers Act. ECF No. 1-1, at 11.

### C. The Executive Order

On December 11, 2025, President Donald J. Trump issued Executive Order 14366, *Protecting American Investors From Foreign-Owned and Politically-Motivated Proxy Advisors*, 90 Fed. Reg. 58503 (the "Executive Order"). According to the Executive Order, ISS and another non-party proxy advisor "regularly use their substantial power to advance and prioritize radical

politically-motivated agendas – like 'diversity, equity, and inclusion' and 'environmental, social, and governance' – even though investor returns should be the only priority." *Id.* The Executive Order also found that "[t]heir practices also raise significant concerns about conflicts of interest and the quality of their recommendations, among other concerns," and that "[t]he United States must therefore increase oversight of and take action to restore public confidence in the proxy advisor industry, including by promoting accountability, transparency, and competition." *Id.*

To achieve these objectives, the Executive Order directed the SEC, Federal Trade Commission (in consultation with the Attorney General), and Department of Labor, to consider and/or take a number of investigative and oversight actions. In relevant part, the Executive Order instructed the SEC Chairman to "direct SEC staff to examine whether the practice of Registered Investment Advisers engaging proxy advisors to advise on (and following the recommendations of such proxy advisors with respect to) non-pecuniary factors in investing, including as appropriate, 'diversity, equity, and inclusion' and 'environmental, social, and governance' factors, is inconsistent with their fiduciary duties." 90 Fed. Reg. at 58504.

**D. The Investigation**

On March 19, 2026, the SEC's Division of Examinations initiated an examination of ISS to evaluate its compliance with the federal securities laws. ECF No. 9-1, ¶ 36. Between March and July 2026, the SEC issued fifty-three requests to ISS as part of the examination. ECF No. 9-1, ¶ 37. One of those requests directed ISS to produce data relating to proxy recommendations and votes, including the names of clients who received proxy recommendations, the policy the client elected to receive, the corporate issuer that was the subject of the proxy ballot item, the date that the recommendation was issued and the date of any updates, the proposal at issue, ISS's recommendation, and the client's voting decision. ECF No. 9-1, ¶ 37.

On April 27, 2026, ISS produced sample reports of data for three former clients (the "Sample Reports") [1] that it generated by querying its ProxyExchange system. ECF No. 9-1, ¶ 39. During the week of May 4, 2026, the SEC examination team confirmed that the Sample Reports contained the requested information for those clients and asked ISS to provide similar reports for all of its clients. ECF No. 1-2, ¶ 10. ISS, however, refused to provide the requested proxy recommendation and vote data in the same electronic format as the Sample Reports, and the SEC Division of Enforcement informed ISS on July 6, 2026, that it had opened an inquiry into ISS's failure to produce the information requested by the SEC's examination team. ECF No. 1-2, ¶ 12. In a letter dated July 10, 2026, ISS offered to satisfy the outstanding request by allowing members of the SEC examination team to conduct an in-person inspection of the requested data. ECF No. 1-8, at 2. In a responding letter dated July 16, 2026, the SEC rejected ISS's proposal for an in-person inspection as "unworkable and entirely inconsistent with the nature and scale of ISS' advisory business." ECF No. 1-10, at 2.

On July 20, 2026, the SEC issued a Formal Order of investigation into whether ISS is in compliance with its recordkeeping obligations and applicable anti-fraud provisions. Pursuant to the authority granted by the Formal Order, on July 21, 2026, the SEC served an investigative subpoena on ISS (the "Subpoena"). The Subpoena required ISS to produce three categories of data from September 1, 2022, through the present: (1) documents sufficient to show ISS's current and former clients; (2) information about vote registration agreements between ISS and its clients;

[1] The fields of the sample data included the following: (a) the policy or policies under which ISS provides recommendation(s) to the client; (b) the recommendation(s) that ISS provided; (c) how the client instructed the vote to be cast on the ballot item; (d) whether the client's vote was against or for management; (e) the name of any beneficial owners or sub-clients on whose behalf the ISS client was voting; (f) the custodian for the vote; (g) the asset owner; (h) the portfolio manager for the investment at issue; and (i) the name of the individual who approved the vote. ECF No. 9-1, ¶ 40.

and (3) "[a]n electronic export or exports of ProxyExchange recommendation and voting data for all ISS Voting Services Clients during the Relevant Period, including all data fields referenced in the sample reports of ProxyExchange data produced by ISS on April 27, 2026." ECF No. 1-11, at 7.

On August 10, 2026, ISS agreed to produce data responsive to Requests 1 and 2 of the Subpoena. But it declined to produce data to satisfy Request 3 in the form provided in the Sample Reports. ISS instead offered to provide data responsive to Request 3 in an anonymized form. ECF No. 1-2, ¶ 17. On August 24, 2026, ISS reported to the SEC that it would not be able to provide a sample of the anonymized data without a third-party expert, and was unable to provide the SEC with a timeline for the production of a sample. ECF No. 1-2, ¶ 18. Additionally, ISS sent a letter to the SEC outlining their objections to producing the data in Request 3, claiming that revealing their clients' identifiable information alongside their voting history would result in various harms to ISS and its clients. The objections were primarily based on: (1) the confidentiality interests of ISS and its clients; and (2) the First Amendment speech and free association rights of ISS and its clients. *See* ECF No. 1-13. In particular, ISS argued that the Subpoena was issued in retaliation for its protected speech, which with the current Presidential Administration disfavors. ECF No. 1-13, at 3-4. Due to fears of hostility from the Administration, ISS contended that revealing the data sought in Request 3 would subject ISS and its clients to potential further retaliation, and that a protected association between ISS and its clients would be chilled. ECF No. 1-13, at 4. ISS invoked the Executive Order to support its contention that the SEC was seeking the information in Request 3 for a retaliatory purpose in response to its and its clients' protected speech. In that same letter, however, ISS denied that it was engaged in politically motivated voting-advisory services,

maintained that the Executive Order's narrative was incorrect, and stated that ISS is an objective advisor that acts in response to its clients' instructions. ECF No. 1-13, at 3-4.

On September 1, 2026, the SEC responded to ISS's objections, explained why they did not find them persuasive, and directed ISS to notify the SEC by September 3, 2026, if it intended to produce the requested data for a now shortened period between September 1, 2024, and June 1, 2025. *See* ECF No. 1-15. In response, ISS reaffirmed its objections but stated it was willing to continue discussions to work toward a resolution. *See* ECF No. 1-16. And the SEC initiated the instant action.

### E. Procedural History

The SEC filed its Application on September 4, 2026, ISS filed its Opposition on September 18, and the SEC filed its Reply on September 25. *See* ECF Nos. 1, 9, 16. In its Opposition, ISS argued that ISS and its clients are involved in a protected association, that compliance with the Subpoena would chill their relationship, and that the Subpoena was impermissibly issued in retaliation for protected speech. ISS further argued that even, in the absence of heightened scrutiny under the First Amendment, the SEC did not have a legitimate investigative need for the disputed data. *See* ECF No. 9.

The Court held a hearing on October 29, 2026, at which time the SEC stated it was not seeking information about the internal deliberative processes of ISS's clients, the membership of ISS's clients, or ISS's clients' donors. ECF No. 21, 39:25-40:23. In response, however, ISS explained that the data the SEC seeks includes data fields containing information about its clients' parents, sub-clients, and individuals who authorized the votes at issue. ECF No. 21, 43:17-44:22. When asked at the hearing whether the SEC would be willing to forego this information about ISS's clients, the SEC declined, stating that the SEC seeks complete records in the form those

records are maintained by ISS, and that the SEC is entitled to those records as part of its oversight of ISS's books and records. ECF No. 21, 44:23-45:10.

## II. <u>LEGAL STANDARDS</u>

As a general matter, administrative agencies, including the SEC, have wide discretion to initiate and pursue investigations of potential violations of the law within their purview. *See*, *e.g.*, *SEC v. Wheeling Pittsburgh Steel Corp.*, 648 F.2d 118, 124 (3d Cir.1981) (en banc) (citing *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316-17 (1978)). Unwarranted "[j]udicial supervision of agency decisions to investigate might hopelessly entangle the courts in areas that would prove to be unmanageable and would certainly throw great amounts of sand into the gears of the administrative process." *Wheeling-Pittsburgh*, 648 F.2d at 127 n.12 (quoting *Dresser Industries, Inc. v. United States*, 596 F.2d 1231, 1235 n.1 (5th Cir. 1979)).

Under this approach, "Courts will enforce a subpoena if (1) the subpoena is within the statutory authority of the agency; (2) the information sought is reasonably relevant to the inquiry; and (3) the demand is not unreasonably broad or burdensome." *United States v. Westinghouse Elec. Corp*., 788 F.2d 164, 166 (3d Cir. 1986) (citing *United States v. Powell*, 379 U.S. 48, 57-58 (1964)). Courts will, however, refuse to enforce a subpoena if it was issued in bad faith, or for an improper purpose, because doing so would constitute an abuse of the court's process. *See Westinghouse Elec. Corp*., 788 F.2d at 167; *Wheeling Pittsburgh Steel Corp.*, 648 F.2d at 124-25. The initial burden to prove the Subpoena's enforceability falls on the SEC. *Territorial Ct. of the V.I. v. Richards*, 847 F.2d 108, 112 (3d Cir. 1988) ("The issuing agency has the preliminary burden of showing that a subpoena satisfies the *Westinghouse* requirements."). ISS, as the challenging party, "bears a heavy burden to establish that enforcement of the subpoena will result in an abuse of judicial process." *United States v. Oncology Services Corp.*, 60 F.3d 1015, 1020 (3d Cir. 1995).

Different rules apply when government investigations implicate protected First Amendment interests. In cases where the government seeks to compel the disclosure of information which would have a chilling effect on protected associations, "heightened First Amendment scrutiny," referred to as "exacting scrutiny," applies. *Americans for Prosperity v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*"); *First Choice Women's Res. Ctrs., Inc. v. Davenport,* 608 U.S. 174, 187 (2026). To satisfy exacting scrutiny, there must be "a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *AFP*, 594 U.S. at 607 (quoting *Doe v. Reed*, 561 U.S. 186, 196 (2010)). "While exacting scrutiny does not require that disclosure regimes be the least restrictive means of achieving their ends, it does require that they be narrowly tailored to the government's asserted interest." *AFP*, 594 U.S. at 608.

## III. <u>ANALYSIS</u>

### A. Enforceability of the Subpoena Generally

Beginning with the question of whether the SEC's Subpoena is enforceable as a general matter, ISS does not challenge the SEC's authority to issue the Subpoena, or argue that the demand is unreasonably broad or unduly burdensome. Indeed, ISS's proposal to produce anonymized data would require more time and effort than production of attributed proxy voting data. ECF No. 9-1, ¶ 46. Rather, ISS contends that the Subpoena fails the *Powell/Westinghouse* standard on the basis of relevancy. This argument is unavailing, and the Court finds that the Subpoena seeks information that is reasonably relevant to the SEC's inquiry.

The Third Circuit has defined reasonably relevant to mean "merely that the information must be relevant to some (any) inquiry that the agency is authorized to undertake, not that it must be reasonably relevant to the particular authorized inquiry." *Oncology Services Corp.*, 60 F.3d at 1020 (citing *Dole v. Trinity Industries, Inc.*, 904 F.2d 867, 872 (3d Cir. 1990)) (internal quotations

omitted). The Court "must enforce the subpoena unless the information is 'plainly incompetent or irrelevant to any lawful purpose of the [SEC]....'" *Id. (*quoting *Dole*, 904 F.2d at 872).

In support of the Subpoena, the SEC emphasizes that the client identifying data sought by the Subpoena will aid in its investigation by showing, among other things: (1) the advice provided by ISS to its clients, and the bases for that advice; (2) whether ISS complied with the voting instructions of its clients; (3) whether ISS properly disclosed potential conflicts to its clients; and (4) whether ISS maintained accurate books and records. ECF No. 1-1, at 17. While ISS may believe that the evidence the SEC seeks will not reveal a violation of the law, the Court finds that the SEC has made a showing sufficient to establish relevance under the relatively expansive definition of relevance adopted by the Third Circuit. *See Oncology Services Corp.*, 60 F.3d at 1020; *Dole*, 904 F.2d at 871-872.

ISS further takes issue with the SEC's position that it needs attributed, rather than anonymized, voting data to adequately test the accuracy of the information provided by ISS. ISS argues that it has provided a list of clients, and is willing to provide the SEC with its recommendations to clients – which should be sufficient for the SEC's investigative objectives. The Court, however, agrees that "the SEC must be able to examine, evaluate, and test ISS's policies and conflict disclosures, verify with clients whether a conflict was properly disclosed, and assess whether the advice reflected clients' individual best interests or ISS's own profitability or policy preferences." ECF No. 16, at 8. Indeed, a subpoena recipient "cannot be allowed to pick and choose the evidence which may be necessary for an agency investigation" – thereby improperly circumscribing the scope of an otherwise valid investigation. *See EEOC v. Franklin & Marshall Coll.*, 775 F.2d 110, 116 (3d Cir. 1985). Further, pressure testing is not the only relevant purpose for the client identifying data. ISS also has a duty to keep accurate books and records, which are

subject to examination "at any time… by representatives of the Commission as the Commission deems necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 80b-4. Accordingly, the Court finds that the Subpoena satisfies the general *Powell/Westinghouse* standards for enforceability.

**B. Retaliation or Other Improper Purpose**

The Court also finds that ISS has failed to demonstrate that the Subpoena is motivated by retaliation, or otherwise infirm as a result of issuance for an improper purpose, and that discovery regarding the SEC's motives for issuing the Subpoena is unwarranted.

To show an improper purpose, ISS bears a "heavy burden [of] produc[ing] specific facts and evidence to support [its] allegations . . ." *QueerDoc, PLLC v. DOJ,* 187 F.4th 1112, 1125 (9th Cir. 2026) (internal quotations omitted); *see also United States v. Markwood*, 48 F.3d 969, 983-84 (6th Cir. 1995) (concluding that supposed "'evidence' of impropriety" was "merely an assertion of impropriety" that "[did] not amount to a substantial demonstration [of improper purpose]"). Agency action is "entitled to a presumption of regularity," and it may not be "presume[d] that an agency carried out lawful directives in an unlawful manner." *QueerDoc,* 187 F.4th at 1139-40 (citing *Ross and Morrison v. Reed*, 14 U.S. 482, 486 (1816) ("It is a general principle to presume that public officers act correctly until the contrary be shown.")).

ISS argues that the Subpoena is the product of retaliation for exercising its First Amendment rights, and that the Court should not enforce the Subpoena in the face of such a constitutional violation. Retaliatory use of investigative authority may constitute an improper purpose warranting denial of enforcement. *See United States v. Clarke*, 816 F.3d 1310, 1316 (11th Cir. 2016). Because the asserted improper purpose is specifically retaliation for protected First Amendment activity, the First Amendment retaliation framework will inform the Court's inquiry

in evaluating whether the SEC acted in bad faith under *Powell* and, notwithstanding *Powell*, if the Court must refuse to enforce the Subpoena to protect ISS and its client from retaliation for First Amendment protected expression.

"[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018); *see also Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). Courts examining First Amendment retaliation claims evaluate whether the party asserting retaliation: (1) engaged in conduct protected by the First Amendment; (2) the government took some retaliatory action sufficient to deter a person of ordinary firmness in the moving party's position from exercising their constitutional rights; and (3) a causal link between the exercise of a constitutional right and the adverse action taken against the movant. *Mirabella v. Villard*, 853 F.3d 641, 649 (3d Cir. 2017); *see also Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, 784 F. Supp. 3d 127, 150 (D.D.C. 2025). The causation element requires a showing that the government's action was motivated by "retaliatory animus," and that the adverse action against the injured party "would not have been taken absent the retaliatory motive." *Nieves*, 587 U.S. at 398-99.

Although ISS disagrees with the characterization that it advances "woke" or "leftist" ideologies, ISS contends that the government is taking adverse actions against ISS and its clients by seeking the client identifying data for allegedly holding these disfavored viewpoints. To rule in favor of the SEC on this issue, the Court need not determine whether ISS and its clients were engaged in protected speech by casting shareholder votes because, even if they were, the Court finds that the circumstantial evidence offered by ISS does not establish retaliatory animus.

ISS's position is premised on the Executive Order, which asserted ISS "regularly use[s] [its] substantial power to advance and prioritize radical politically-motivated agendas – like

'diversity, equity, and inclusion' and 'environmental, social, and governance' – even though investor returns should be the only priority." 90 Fed. Reg. at 58503. ISS characterizes the Executive Order as an inappropriate call to action, in which the President impermissibly called upon the SEC and other agencies to investigate proxy advisors based on their stance on controversial issues. ECF No. 9, at 27-28. ISS also cites state attempts to take regulatory actions against it, and other proxy advisors, as evidence of broader animus. ECF No. 9, at 27.

ISS's contention that state actions taken against it are somehow evidence of a retaliatory conspiracy is, however, unpersuasive. It is not uncommon for large institutions to come under scrutiny of both federal and state regulators. The fact that state regulators may take enforcement postures consistent with federal authorities is, while perhaps unwelcome from ISS's perspective, unremarkable.

Announcing an enforcement initiative in an executive order is also not evidence of retaliatory animus. Executive orders announcing and directing multi-agency financial industry enforcement initiatives on controversial topics are not unique to this case, or this administration. *See*, *e.g.*, Executive Order 14067, *Ensuring Responsible Development of Digital Assets*, 87 Fed. Reg. 14143 (Mar. 9, 2022). And the SEC has a documented history of being concerned about the potential for conflict of interests to arise between proxy advisors and their clients and the Executive Order is evidence that the current administrative has directed the agency to explore those concerns.[2] It is not the role of a district court to second guess the policy objectives of the Administration, or the platform on which they are announced. *See QueerDoc*, 187 F.4th at 1139 ("A district court has no warrant to override the President's judgment on a disputed matter of

[2] *See, e.g.*, Commissioner Elad L. Roisman, *Statement at the Open Meeting: Modernizing SEC Rules Governing Proxy Voting Advice* (Nov. 5, 2019), https://www.sec.gov/newsroom/speeches-statements/statement-roisman-2019-11-05-14a-2b; Chair Mary Jo White, *Welcoming Remarks at Proxy Advisory Services Roundtable* (Dec. 5, 2013), https://www.sec.gov/newsroom/speeches-statements/open-meeting-statment-2013-12-06-mjw.

public policy"). If this Court were to hold otherwise, and find evidence of retaliation because the government publicized its regulatory objectives, these policy goals would be removed from public fora, and obscured from the public. *See id.* at 1142. ("if a President's stated policy views are evidence of improper purpose… the administration of the federal government would crumble").[3]

The Court also finds that ISS's analogy to the Supreme Court's decision in *Nat'l Rifle Ass'n of Am. v. Vullo,* 602 U.S. 175 (2024), is inapt. In *Vullo*, a state regulator threatened enforcement actions against regulated entities in order to suppress the National Rifle Association's ("NRA") protected First Amendment advocacy for gun rights. *Id.* at 187. There was no dispute that the regulated entities had violated New York law, but the Supreme Court held the NRA stated a retaliation claim because the purpose of the enforcement of those violations was "to punish or suppress the NRA's protected expression." *Id.* at 196. The logic of *Vullo* does not apply here, however, as the SEC has not threatened to punish ISS or its clients for doing business with each other.

The Court is aware of recent decisions in which courts have sided against the current Administration on First Amendment retaliation claims, relying on executive orders as evidence of retaliatory animus. *See, e.g., Wilmer*, 785. F. Supp. 3d at 150. In particular, the *Wilmer* court found that the executive order in question was issued, "on its face, [in] retaliation for the firm's protected speech." *Id.*, at 151. The order at issue in *Wilmer*, however, did not merely criticize conduct or state the Administration's legitimate enforcement directive regarding a public policy

[3] While the Fact Sheet accompanying the Execute Order cited by ISS does contain pointed language and criticism of ISS and other proxy advisors, such language alone is insufficient to overcome the presumption of regularity, and does not satisfy the high burden ISS must meet. *See QueerDoc*, 187 F.4th at 1140 (rejecting allegations of retaliation where the aggrieved party "presented no evidence of impropriety besides the Administration's public statements and directives"); *see also Mullin v. Doe*, 609 U.S. 324, 348-49 (2026) ("Political discourse by prominent public figures is increasingly couched in terms that would have scandalized the public just a short time ago. But whatever one may think of the cited statements, they are insufficient to show that the [government acted out of animus].").

issue, it explicitly imposed sanctions against both the subject law firm and its clients – including denial of security clearances, access to government buildings, engagement with federal employees, future federal employment for the firm's lawyers, and eligibility for government contracts. *Id.*, at 151-52. The Executive Order at issue here, while critical of proxy advisors, and skeptical of their ability to comply with their fiduciary duties, is distinct from the *Wilmer* executive order because the Executive Order in this case does not impose any form of punishment. Rather, it states the Administration's policy position, and directs evaluation and investigation, and is therefore analogous to the ordinary enforcement initiatives traditionally adopted by the Executive, as discussed above. The SEC may investigate whether registrants are in compliance with the securities laws, and the Executive may announce its enforcement initiatives involving such laws. It would not be appropriate for the Court to short-circuit enforcement initiatives because of the medium through which the initiatives are announced – whether by Executive Order or otherwise.

Finally, the Court also denies ISS's request for discovery into the SEC's motives for issuing the Subpoena. The Court does not find that the Administration making their policy preferences public, rather than private, and documenting those views in an Executive Order, constitutes "meaningful evidence" of an abuse of judicial process, and discovery is therefore not warranted. *See Wheeling-Pittsburgh Steel Corp.*, 648 F.2d at 128.

For these reasons, ISS has failed to make an adequate showing that the SEC acted with retaliatory animus, or any other improper purpose, and the Court will not authorize discovery on this topic.

### C. Freedom of Association Between ISS and Its Clients

ISS objects to the enforcement of the Subpoena on the theory that ISS and its clients are engaged in a protected association recognized by the First Amendment, and that compliance with

the Subpoena would impermissibly chill that association. The Supreme Court has long read the First Amendment to implicitly protect a right to associate with others to exercise the freedoms which the Amendment expressly protects. *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The Third Circuit applies a three-step test to evaluate freedom of association claims. *Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000). First, ISS must show the affected parties, ISS and its clients, engage in expressive association. *Id.* Second, ISS must demonstrate that the enforcement of the Subpoena would "significantly affect[] the group's ability to advocate its viewpoints." *Id.* Finally, if steps one and two are met, then the SEC must satisfy exacting scrutiny. *Id.* The Court finds that the association between ISS and its clients does not satisfy the first step of this test because their commercial relationship does not rise to the level of a constitutionally protected expressive association.

The Supreme Court has observed that "expressive association is not reserved for advocacy groups. But to come within its ambit, a group must engage in some form of expression, whether it be public or private." *Boy Scouts of America v. Dale*, 530 U.S. 640, 648 (2000). Associations are protected under the First Amendment when individuals "engage in association for the advancement of beliefs and ideas." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958). While an organization need not be primarily political, there is a *de minimus* threshold for expressive association claims. *See Pi Lambda Phi Fraternity, Inc.*, 229 F.3d at 443; *see also City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989) ("It is possible to find some kernel of expression in almost every activity a person undertakes—for example, walking down the street or meeting one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within the protection of the First Amendment."). And, in the context of securities, the Supreme Court has explained: "[n]umerous examples could be cited of communications that are regulated without

offending the First Amendment such as the exchange of information about securities … [and] corporate proxy statements." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) (citing *SEC v. Texas Gulf Sulpher Co.*, 401 F.2d 833 (2d Cir. 1968); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)).

The Third Circuit has also held that compelled disclosure of client information from a commercial enterprise, even when production may chill the commercial relationship of the parties, "does not offend the First Amendment because commercial transactions do not entail the same rights of association as political meetings." *United States v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) (citing *IDK, Inc. v. County of Clark*, 836 F.2d 1185, 1193–95 (9th Cir.1988)). In *Bell*, a tax advisor under investigation for fraud was ordered to disclose his customer list. *Id.* Bell challenged the subpoena and contended that turning over his client list would impermissibly chill his protected association with his clients. *Id.* In support of his and his clients' freedom of association claim, Bell relied on cases finding First Amendment protection for advocacy groups such as *NAACP*, 357 U.S. at 460 (non-profit organization with the goal of promoting equal rights), and *Gibson v. Fla. Legis. Investigation Comm.*, 372 U.S. 539, 544 (1963) (same). The Third Circuit, however, observed that Bell's tax advisory practice was clearly distinguishable from such organizations. *Bell*, 414 F.3d at 485.

The Court further differentiated Bell's practice from the recognized protected association in *In re First Nat'l Bank, Englewood, Co.*, 701 F.2d 115 (10th Cir.1983). In that case, the Tenth Circuit ruled that a subpoena served on a bank for information regarding two non-profit groups espousing dissident views on the federal income tax system had to meet exacting scrutiny because the production of those records could impermissibly chill the protected associational interest of the underlying organizations. *Id.* at 117. The Third Circuit rejected Bell's argument that his interest

was similar to the protected association in *In re First Nat'l Bank*, noting that Bell's "operation was primarily a commercial enterprise, not a political group." *Bell*, 414 F.3d at 485. The court held, absent some form of advocacy motivating the association—rather than merely associating for "the sale of tax evasion strategies"—that "the government's interest in enforcement of the tax laws outweighs rights of association that may be implicated by disclosure." *Id.* (citing *Kerr v. United States*, 801 F.2d 1162, 1164 (9th Cir. 1986); *St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F.2d 1087, 1093–94 (2d Cir. 1988)).

The relationship between a regulated professional and its client is not always outside the scope of a protected expressive association. For example, the Supreme Court has held that legal organizations can come "within the generous zone of First Amendment protection reserved for associational freedoms" when an organization "engages in litigation as a vehicle for effective political expression and association, as well as a means of communicating useful information to the public." *In re Primus*, 436 U.S. 412, 431 (1978).

Here, however, the Court finds that the relationship between a proxy advisor and its clients is analogous to that of a tax advisor and its clients, rather than the attorney-client relationship. The First Amendment does protect individuals' ability to "engage in association for the advancement of beliefs and ideas," concerning any number of "political, economic, religious or cultural matters." *NAACP*, 357 U.S. at 460; *AFP*, 594 U.S. at 606. As in *Bell*, ISS attempts to compare its transactional commercial relationship to cases in which advocacy groups were recognized to have a protected association under the First Amendment such as *AFP*, 594 U.S. at 608 and *First Choice*, 608 U.S. at 185. But, while the Court has concerns about the associational rights of ISS's clients for the reasons discussed below, ISS itself is not an advocacy organization protecting its membership, donors, or internal affairs, or engaging in litigation or petitioning the government on

behalf of its clients. It is a registered investment adviser, under investigation for compliance with the securities laws – and its commercial associations between itself and its clients does not warrant the same protection as those that apply to expressive associations. *Bell*, 414 F.3d at 485; compare also *NAACP*, 357 U.S. at 460, with *Orahlik*, 436 U.S. at 456 ("the exchange of information about securities … [and] corporate proxy statements" are "regulated without offending the First Amendment."). Accordingly, ISS's objection is unavailing to the extent that its freedom of association arguments are based on rights of association between ISS and its clients.

**D. Freedom of Association of ISS's Clients**

The Court does, however, find that the Subpoena, and the position taken by the SEC regarding the extent of data that must be produced in response to the Subpoena, are overbroad to the extent they seek information regarding the internal activities and composition of ISS's clients – and therefore not sufficiently narrowly tailored to satisfy exacting scrutiny. As noted above, ISS's clients include the endowments of religious organizations, non-profits, and other well-recognized expressive associations. While the Court is unpersuaded by ISS's assertions of retaliation, and First Amendment protections based on freedom of association between ISS and its clients, and will order ISS to comply with the Subpoena by producing proxy voting data that attributes votes to ISS's clients notwithstanding those challenges, the Court will limit the Subpoena insofar as it impermissibly looks into the underlying associations of ISS's clients.

The First Amendment protects associational interest for a variety of organizations. *See, e.g.*, *First Choice*, 608 U.S. at 178-79 (nonprofit organizations and their donors); *AFP*, 594 U.S. at 600-01 (charity organizations and their donors); *NAACP*, 357 U.S. at 453 (civil-rights organization and its members); *In re Primus*, 436 U.S. at 414 (legal advocacy organization); *Dale*, 530 U.S. at 644 (youth organization); *United Mine Workers of Am., Dist. 12 v. Illinois State Bar*

*Ass'n*, 389 U.S. 217, 225 (1967) (labor union and its legal representation). For the government to investigate these associations and compel certain disclosures, courts apply exacting scrutiny. *See AFP*, 594 U.S. at 607–11 (compelled disclosure of identities of donors); *NAACP*, 357 U.S. at 462–66 (membership lists); *Shelton v. Tucker*, 364 U.S. 479, 485–90 (1960) (identities of organizations to which teachers belonged or contributed); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia*, 812 F.2d 105, 118–20 (3d Cir. 1987) (invalidating compulsory disclosure of positions held by police applicants and their family members in for-profit and nonprofit organizations). The Supreme Court has emphasized "that demands for private donor information 'inevitabl[y]' carry with them a 'deterrent effect on the exercise of First Amendment rights.'" *First Choice*, 608 U.S. at 186 (quoting *Buckley v. Valeo*, 424 U.S. 1, 65 (1976)) (collecting cases).

Because ISS's clients include a variety of organizations, some of which are engaged in protected First Amendment expressive associations, the Court will not require ISS to turn over information regarding the internal structures of ISS's clients, individuals who authorized votes on behalf of ISS's clients, or other data reflecting the internal composition or activities of ISS's clients. The information the SEC seeks does bear "a substantial relation between the disclosure requirement and a sufficiently important governmental interest" to satisfy the first prong of exacting scrutiny. *See, e.g., FEC v. Machinists Non-Partisan Political League*, 655 F.2d 380, 389 (D.C. Cir. 1981) ("if the [agency] has statutory jurisdiction to conduct th[e] investigation, then a compelling interest for the subpoenaed information can be shown."). Where the SEC's requests fail, however, is the requirement of narrow tailoring.

At the October 29, 2026, hearing, the Court inquired whether the SEC seeks information that could enable the government to look into the internal organization and affairs of ISS's clients. ECF No. 21, 39:25-40:23. Specifically, the Court asked the SEC if it seeks "any materials about

the internal deliberative processes of ISS's clients," "information about the membership of ISS's clients," "who is a member of their clients," "information about the donors," and "information about the finances of the clients;" and the SEC responded that it was not seeking any such information. *Id*. ISS represented to the Court, however, that within the 850 million rows of data in dispute, the contents of some of those columns reveal information about clients' sub-clients, parents, individuals who authorized votes, and other potentially sensitive information. ECF No. 21, 43:17-44:22. Following ISS's representation, the Court inquired whether the SEC would accept data which connected the client to its ultimate proxy vote, but did not contain information about parents, sub-clients, and individuals who authorized the relevant votes. ECF No. 21, 44:23-45:4. The SEC stated that such a compromise would not be acceptable, citing its oversight authority and right to access complete books and records, asserted it was seeking the subject records in the form maintained by ISS. ECF No. 21, 45:5-46:24.

The Court recognizes SEC's responsibilities, and inspection authority. This is not, however, ordinary oversight. The SEC has ordered a formal investigation into ISS's records as part of a broad enforcement initiative formally directed by the President. The Court has found that this investigation has not been undertaken for an improper purpose, as discussed in greater detail above. But the investigation is also more purposeful than an ordinary administrative inspection, and the SEC's investigative needs do not justify an intrusion into the inner workings of ISS's clients as part of a global demand for information from ISS. Where the government seeks to compel disclosure which may chill protected associations, the government must satisfy exacting scrutiny. *AFP*, 594 U.S. at 608. Exacting scrutiny requires narrow tailoring, and the government does not meet its burden when it employs broad request for information which looks into individual's protected associations. *Id.* at 610. ("When it comes to 'a person's beliefs and

associations,' '[b]road and sweeping state inquiries into these protected areas ... discourage citizens from exercising rights protected by the Constitution.'") (quoting *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6 (1971) (plurality opinion)). Indeed, as in the *AFP* case, where broad disclosure requirements imposed a "widespread burden on donors' associational rights," the intrusion cannot be justified "on the ground that the regime is narrowly tailored to investigating charitable wrongdoing, or that the [Government's] interest in administrative convenience is sufficiently important." *Id.* at 618.

The Court also finds the distinction between the Third Circuit's decision in the *Bell* case, and the Tenth Circuit's decision in *In re First Nat'l Bank*, to be instructive. While the Third Circuit in *Bell* found no First Amendment protection based on commercial relationship between tax preparer and clients, *see* 414 F.3d at 485, the Tenth Circuit found that a subpoena seeking information regarding the bank's non-profit clients would impermissibly chill the associational interests of the underlying organizations, *In re First Nat'l Bank*, 701 F.2d at 117. The distinction between the commercial relationship among a financial services provider and its clients, and the protected internal associational activities of clients which may be chilled through a subpoena to the financial services provider, is apt in this case as well.

Here, the Court will not authorize broad investigative activity that fails exacting scrutiny. On the record as it stands, it appears that the wholesale enforcement of the SEC's Subpoena would provide a window into the inner workings of at least some of ISS's clients – including those with clear First Amendment free association rights. Compelling ISS to produce proxy voting data with client attribution, but excluding internal information about ISS's clients, strikes an appropriate balance between: (1) allowing the SEC to conduct their investigation, and pursue investigative leads relating to specific clients without further input from ISS if the SEC chooses to do so; and

(2) ensuring that internal associational information is not produced without the knowledge of ISS's clients whose internal information would be disclosed – and a corresponding opportunity to protect (or disclose) any sensitive internal information. While the SEC argues that the Court should not consider the First Amendment rights of ISS's clients because they may be victims of a breach of fiduciary duty, *see* ECF No. 16, at 7 n.5, the fact that ISS may be an imperfect guardian of their clients' rights in the SEC's view is not an excuse for ignoring those rights. And the Court will not do so.

The Court, therefore, finds that the Subpoena, and the SEC's demands under the Subpoena, are not sufficiently narrowly tailored to require complete production of all of the data which the SEC seeks to compel, and that while the SEC is entitled to voting data that attributes proxy votes to ISS's clients, the Court will not order production of data regarding the internal structures of ISS's clients, individuals who authorized votes on behalf of ISS's clients, or other data reflecting the internal composition or activities of ISS's clients.

## IV. CONCLUSION

For the reasons set forth above, the SEC's Application is granted in part, and denied in part. Respondent ISS shall produce proxy voting data responsive to the SEC's Subpoena which attribute those votes to ISS's clients on a vote-by-vote basis. ISS shall not, however, produce data that could reveal the structure, composition, or inner workings of ISS's clients, including information that would identify relationships between clients' subsidiaries, parents, affiliates, or other associated persons or entities, or individuals who authorized votes on behalf of ISS's clients. ISS and the SEC shall meet and confer within fourteen (14) days to identify any remaining areas of dispute regarding the data to be included in (or excluded from) the production under this Court's ruling. If the parties are not able to reach an agreement regarding the data and/or data fields that

are subject to production under the Court's ruling (while reserving their respective rights to seek review of the Court's ruling), they shall submit a Joint Report to the Court identifying the data at issue, and the parties' positions regarding whether the data must be produced, within twenty-one (21) days. Otherwise, ISS shall produce the outstanding data within forty-five (45) days. An appropriate Order will issue.

/s/ Antonio M. Pozos
**ANTONIO M. POZOS, J.**